**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AMERICAN APPAREL, INC., *et al.*,[1] | : | Case No. 15-12055 |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

**DECLARATION OF MARK WEINSTEN**
**IN SUPPORT OF FIRST DAY PLEADINGS**

I, Mark Weinsten, declare and state as follows:

1.      I am the Chief Restructuring Officer ("CRO") for American Apparel, Inc.

("AAI") and each of its domestic wholly-owned subsidiaries (collectively, the "Debtors") that

have filed voluntary petitions (the "Chapter 11 Petitions") under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code") commencing these chapter 11 cases (the "Cases").

The Debtors and their non-debtor foreign affiliates (the "Non-Debtor Affiliates") are referred to

herein collectively as "American Apparel" or the "Company."

2.      To minimize the adverse effects of filing the Chapter 11 Petitions while at the

same time maximizing value for the benefit of stakeholders, the Debtors have filed a number of

pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings").[2]

I submit this Declaration in support of the Chapter 11 Petitions and the First Day Pleadings.  I

---

[1]    The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  American Apparel, Inc. (0601); American Apparel (USA), LLC (8940); American Apparel Retail, Inc. (7829); American Apparel Dyeing & Finishing, Inc. (0324); KCL Knitting, LLC (9518); and Fresh Air Freight, Inc. (3870).  The address of each of the Debtors, other than American Apparel Dyeing & Finishing, Inc. and KCL Knitting, LLC, is 747 Warehouse Street, Los Angeles, California, 90021.  The address of American Dyeing & Finishing, Inc. is 12537 Cerise Avenue, Hawthorne, California, 90250.  The address of KCL Knitting, LLC is 1020 E. 59th Street, Los Angeles, California, 90001.

[2]    Unless otherwise defined herein, capitalized terms in this Declaration shall have the meanings ascribed to them in the relevant First Day Pleading.

am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve value and maximize recoveries; and (c) best serves the Debtors' estates and creditors' interests.  Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these chapter 11 cases.

3.       Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  The Debtors have authorized me to submit this Declaration.

4.       I began serving as CRO of the Debtors upon the filing of the Chapter 11 Petitions, and immediately prior to that, served as the Chief Strategy Officer ("CSO") to AAI beginning on September 9, 2015.  Additionally, I functioned similarly to a chief restructuring officer with respect to certain of the Debtors from April 2011 to April 2012.  In these capacities, I have become familiar with the Debtors' businesses, operations and financial affairs.  As part of my duties as CRO in these Cases, I will be overseeing and advising the Debtors on their day-to-day operations, bankruptcy compliance, budgets, cash flows, financial analysis and overall restructuring and reorganization efforts.

2

5.      In addition to being the CRO of the Debtors, I am a senior managing director of FTI Consulting, Inc., an international financial advisory firm ("FTI"), and my business address is FTI's Boston office located at 200 State Street, Boston, MA 02109.  Over the past 20 years, I have served as Interim Executive Chairman, CEO, CRO and/or CSO for numerous companies, including Manischewitz, LodgeNet, Inspiration Bio Pharmaceuticals and Andrew Marc.  I have also been involved in many retail bankruptcy cases, including Ultimate Electronics, DB Mart, KB Toys, Tower Records, Filene's Basement, Whitehall Jewelers and Sportsman Warehouse.

6.      This Declaration is divided into five parts.  Part I sets forth an executive summary.  Part II provides an overview of the Debtors' businesses, their corporate structure and their prepetition indebtedness.  Part III discusses the Debtors' recent financial performance, their proposed turnaround plan and the circumstances surrounding the commencement of these chapter 11 cases.  Part IV provides specific information regarding the Restructuring Support Agreement, dated as of October 4, 2015, among the Debtors and certain of the Prepetition Secured Lenders and holders of the Senior Notes (each term as defined below) (the "Restructuring Support Agreement," a copy of which is attached as Exhibit A), and describes the pathway by which the Debtors intend to exit chapter 11 with a substantially de-levered balance sheet, which will enable them to execute on a comprehensive turnaround plan.  Finally, Part V sets forth relevant facts in support of the First Day Pleadings.

## I.      EXECUTIVE SUMMARY

7.      American Apparel is the largest apparel manufacturer in North America.  A vertically-integrated retailer and wholesaler, it employs about 4,600 sewing and manufacturing workers in five facilities in and around downtown Los Angeles, California (and 8,500 employees worldwide).  The American Apparel brand is about social commentary—a call to action in

support of important issues like Made in the USA, immigrants' rights, sweatshop-free manufacturing and LGBTQ rights.

8.    Despite its prominence, American Apparel has struggled in recent years. Between 2009 and 2014, under the direction of former management, the Company lost more than $300 million dollars.

9.    In December 2014, following the termination of the Company's former chief executive officer, Dov Charney, the board of directors (the "Board") installed an entirely new management team of proven industry veterans.[3]  Management has developed a turnaround plan, but the Company—saddled with nearly $300 million of secured debt at an annual cost of nearly $40 million—is constrained from effectuating that plan by a need for liquidity.  Over the past nine months, as discussed more fully herein, the Company, without success, aggressively explored many alternatives to raise additional equity or loosen existing liquidity.  This forced the Company to consider more significant restructuring options, including filing chapter 11 cases.

10.    The Company ultimately decided to approach the Prepetition Secured Lenders and holders of over 95% of the Senior Notes (collectively, the "Committee of Lead Lenders" and, together with the other Prepetition Secured Lenders and holders of Senior Notes party to the Restructuring Support Agreement, the "Supporting Parties") with the hope of negotiating a consensual restructuring.  These negotiations were hard-fought and contentious at times, but after many weeks, successfully culminated with the parties' execution of the Restructuring Support Agreement, based on the plan of reorganization the Debtors now propose in these cases (the "Plan").  The Plan, which has been filed contemporaneous with this declaration, would:

---

[3] By this time, the Board was comprised primarily of newly appointed directors.

- convert over $200 million of Senior Notes into equity interests of the reorganized American Apparel;

- provide the reorganized American Apparel with up to $40 million in committed exit capital from the Supporting Parties in the form of a minimum $10 million of equity capital pursuant to an equity commitment agreement and up to an additional $30 million under a exit credit facility; and

- provide distributions to general unsecured creditors in the form of units in a litigation trust and, if the Plan is accepted by such class of creditors, a $1 million cash payment.

11.     If confirmed, the Plan will result in a revitalized American Apparel with a significantly deleveraged balance sheet. It will infuse the Company with much needed operating capital, and free it from a significant litigation overhang resulting from its former chief executive officer's misconduct and lawsuits he has brought against the Company. The Plan will provide management with the liquidity necessary to implement and execute a turnaround plan. And in doing these things, the Plan will save thousands of American manufacturing jobs and will preserve a true American apparel manufacturer.

## II.    OVERVIEW OF THE DEBTORS' BUSINESSES

### A.    Historical Overview

12.     American Apparel is an iconic, household brand, known around the world for its commitment to making its goods in the United States in a "Sweatshop Free" environment and its dedication to social causes, such as equal rights for immigrants and the LGBTQ community, high quality clothing and cutting edge designs. Founded in 1989 in Los Angeles, California, American Apparel initially focused its operations on the manufacture and wholesale distribution of blank and screen-printed t-shirts. The Company later expanded its operations to include retail and online stores, and broadened its manufacturing and marketing operations to include an array of clothing and apparel basics. American Apparel now operates a vertically integrated manufacturing, distribution and retail business focused on branded fashion apparel, employing

about 8,500 employees across six manufacturing facilities and approximately 230 retail stores worldwide. American Apparel is the largest apparel manufacturer in North America, and in 2014, American Apparel generated more than $600 million in net sales.

13. The Debtors' parent, AAI, became a publicly traded company in December 2007, and, as of the Petition Date, traded on the New York Stock Exchange's MKT market under the stock symbol "APP."

## B. The Debtors' Business Operations

### 1. Business Segments

14. American Apparel operates in three symbiotic segments: manufacturing, retail and wholesale. Each segment is discussed below.

15. Manufacturing. The Company's manufacturing business is operated exclusively in the United States. To that end, the Debtors operate five manufacturing facilities and one distribution facility in and around the downtown Los Angeles area, employing more than 4,600 individuals. The table below reflects basic information regarding the Debtors' manufacturing and distribution facilities:

| Facility Address | Appx. Square Footage | Appx. Employees | Designated Use |
|---|---|---|---|
| 747 Warehouse Street Los Angeles, CA 90021 | 800,000 | 2,700 | Corporate headquarters, sewing, cutting, knitting and distribution |
| 1020 East 59th Street Los Angeles, CA 90001 | 111,000 | 48 | Knitting |
| 12537 Cerise Avenue Hawthorne, CA 90250 | 95,000 | 84 | Dyeing |
| 2654 Sequoia Drive South Gate, CA 90280 | 73,000 | 755 | Cutting and sewing |
| 12641 Industry Street Garden Grove, CA 92841 | 102,000 | 528 | Knitting, dyeing, cutting and sewing |
| 16322-16400 Trojan Way La Mirada, CA 90638 | 220,000 | 547 | Distribution |

16.     The Company's manufacturing segment produces substantially all of the apparel sold in the retail and wholesale businesses discussed below, deriving 59% of its revenue from product sold in its retail stores, 29% of its revenue from product sold wholesale, and 12% of its revenue from product sold online.  The manufacturing process is vertically integrated, such that the Company makes almost everything—short of thread, yarn, buttons, zippers, and other raw materials and ancillary inputs—that goes into a finished product.  This vertically integrated model provides the Company with the capability to respond quickly to changes in market demand.  It also allows the Company to exercise maximum control and certainty regarding the quality and methods used for garment inputs.

17.     The manufacturing business utilizes a state-of-the-art distribution center in La Mirada, California.  The distribution center, which the Company designed and built out in 2012, has the capacity to handle shipments of up to 65 million units of apparel per year.  The La Mirada facility is the primary source for distributing the Debtors' goods to their retail stores and online and wholesale customers.  In 2014, the Debtors' manufacturing segment produced and shipped more than 50 million units of apparel.

18.     Retail.  The Company owns and operates approximately 230 retail and outlet stores in 30 states and 18 countries.  In addition, the Company operates an online store, located at www.americanapparel.net, that ships directly to over 29 countries.  The retail business employs approximately 4,000 people: 2,200 people in the United States and approximately 1,800 people abroad.

19.     In 2014, the Company's retail business generated net sales totaling approximately $420 million, including approximately $190 million in net sales generated in the United States. The Company's retail business competes in the highly competitive "fast fashion industry."  Some

of the primary competitors for the Company's retail business are The Gap, Urban Outfitters, H&M, Uniqlo, Forever 21 and Brandy Melville.

20.    <u>Wholesale</u>. The Company's wholesale business, which employs 47 individuals, markets and sells undecorated apparel products to distributors and third party screen printers. The customer base for the wholesale business has historically been centered in the United States. In 2014, the Company's wholesale business generated net sales totaling approximately $186 million, almost all of which was generated in the United States. Some of the primary competitors for the wholesale business are Gildan Activewear, HanesBrands, Russell Athletic and Fruit of the Loom.

### 2.    In-House Marketing and Advertising Teams

21.    In tandem with its vertically-integrated manufacturing model, the Company also maintains a staff of about 45 professionals dedicated to marketing and advertising. These individuals are based in the Company's Los Angeles headquarters and are responsible for devising and implementing strategies for selling and advertising products sold through both the retail and wholesale businesses. The Company's advertising campaigns have historically centered on edgy, high-impact and visual advertising campaigns, which use print, outdoor, in-store and electronic communication vehicles. The Company's in-house capabilities significantly reduce its need for outside advertising firms and ensure that the Company's branding remains consistent throughout the organization.

### 3.    Foreign Operations

22.    American Apparel's global corporate headquarters is located in Los Angeles, California. In fiscal year 2014 (which ended December 31, 2014), 66% of the Company's revenue was generated by the Debtors inside the United States, and the remaining 34% of revenue was generated largely by Non-Debtor Affiliates abroad. The Company anticipates and

intends that its business outside of the United States, conducted largely through the Non-Debtor

Affiliates, will remain unaffected by these Chapter 11 Cases. The Non-Debtor Affiliates are

almost entirely cash flow self-sufficient. The Debtors do, however, seek certain limited relief

from the Bankruptcy Court in order to support the ongoing operation of its entire global

enterprise, which in turn will preserve value on a global basis for the benefit of the Debtors and

their stakeholders.[4]

### 4.    Intellectual Property Portfolio

23.    The Company has invested heavily in developing and maintaining a large

portfolio of trademark registrations in the U.S. and internationally. Among other things, the

Company own registrations in the U.S. and certain foreign countries of the following trademarks:

"American Apparel," "Classic Girl," "Standard American," "Classic Baby" and "Sustainable

Edition." In total, the Company's trademark portfolio includes more than 120 registrations

worldwide.

### 5.    Employees

24.    As discussed, the Company employs approximately 8,500 employees worldwide,

7,000 of whom work in the United States. The table below summarizes how this population is

distributed across the Company's operations.

---

[4]    The Debtors are requesting to fund two discrete payments to Non-Debtor Affiliates during the Cases. First, with respect to Non-Debtor Affiliate American Apparel Brasil Comercio de Roupas Ltda., the DIP budget contemplates that the Debtors will fund approximately $250,000 during the Cases toward the Company's ongoing winddown of its Brazilian operations. Second, with respect to Non-Debtor Affiliate American Apparel (Carnaby) Ltd. ("Carnaby"), the DIP budget contemplates that the Debtors may be required to loan Carnaby $1.2 million during the Cases to enable Carnaby to satisfy certain lease guarantee obligations. Carnaby's failure to satisfy such claims would jeopardize the Company's operations in the United Kingdom and possibly deprive the Debtors of the certain annual revenue and distributions they receive from Carnaby each year. The Debtors are attempting to consensually resolve this claim.

| Operation/Segment | Approximate Percentage | Employer |
|---|---|---|
| Manufacturing | 51% | American Apparel (USA), LLC |
| U.S. Retail | 25% | American Apparel Retail, Inc. |
| International Retail | 20% | Non-Debtor Affiliates |
| Wholesale | <1% | American Apparel (USA), LLC |
| Administrative, Executive, Management, and Other Headquarter-related Functions | 3% | American Apparel (USA), LLC |

**C.  The Debtors' Corporate Organizational Structure**

25.  AAI, the direct or indirect parent of each of the Debtors and the Non-Debtor Affiliates, is a Delaware corporation.  Each of the other Debtors is organized under the laws of California.  The Debtors' foreign operations are owned and operated through several affiliates that are organized under the laws of various foreign countries.  A corporate organization chart depicting the ownership structure of the Debtors and their Non-Debtor Affiliates is attached as Exhibit B.

26.  The Debtors' day-to-day operations are operated primarily through five entities.  Debtors American Apparel (USA), LLC, American Apparel Dyeing & Finishing, Inc., Fresh Air Freight, Inc., and KCL Knitting, LLC, collectively operate the Company's manufacturing and wholesale businesses.  Additionally, Debtor American Apparel Retail, Inc., operates the Company's domestic retail business and owns some of the Company's international subsidiaries.

**D.  The Debtors' Prepetition Indebtedness**

27.  As of the Petition Date, the Debtors had outstanding long term debt in the aggregate principal amount of approximately $295 million, which can be summarized as follows and is described in more detail below:

(a) $60 million of debt under an asset-based revolving credit facility;

(b) $209.9 million of secured notes due April 15, 2020; and

(c) a $9.9 million unsecured note due April 15, 2021.

Additionally, AAI has guaranteed Carnaby's obligations under a $15 million unsecured note due October 15, 2020.

### 1.    Secured Debt

28.    The Debtors are obligated under a $90 million asset-based, secured credit facility and have issued or guaranteed over $200 million in secured notes. These obligations, and the priorities of liens between and among the Debtors' prepetition secured lenders, are discussed below.

29.    ABL Facility. On April 4, 2013, American Apparel (USA), LLC entered into a secured $35 million asset-based, revolving credit facility (as amended, the "Capital One Credit Facility") pursuant to that certain Credit Agreement (as amended from time to time, the "Capital One Credit Agreement"), among American Apparel (USA), LLC, American Apparel Retail, Inc., American Apparel Dyeing & Finishing, Inc., and KCL Knitting, LLC, as borrowers (the "ABL Borrowers"), AAI and Fresh Air Freight, Inc. as guarantors (the "ABL Guarantors" and, together with the ABL Borrowers, the "ABL Obligors"), Capital One Business Credit Corp. ("Capital One") as administrative agent (the "Capital One Agent") and the lenders party thereto (the "Capital One Lenders"). Subject to the terms of the Intercreditor Agreement (as discussed and defined below), the Capital One Credit Facility was secured by a lien on substantially all of the Debtors' assets. On July 5, 2014, the Capital One Credit Agreement was amended to increase the Capital One Lenders' initial commitment to $50 million.

30.    In early August 2015, the Debtors' limited liquidity caused them to violate certain performance covenants under the Capital One Credit Facility. The Debtors approached certain major existing bondholders about the possibility of replacing Capital One and providing additional liquidity to stabilize the business or to provide debtor in possession financing. As a result of such discussions, on August 17, 2015, the Capital One Lenders assigned their rights and

11

obligations as lenders to a syndicate of lenders that included certain of the Company's existing creditors, including funds associated with Standard General L.P., and then-existing bondholders Monarch Alternative Capital L.P., Coliseum Capital LLC and Goldman Sachs Asset Management, L.P. (collectively, the "Prepetition Secured Lenders"), and Capital One was replaced by Wilmington Trust, National Association ("Wilmington Trust") as administrative agent (such transactions, the "ABL Assignment").

31.    To prevent further value erosion that would be caused by an ill-prepared chapter 11 filing, in lieu of debtor in possession financing, immediately following this assignment, the Capital One Credit Facility was amended and restated pursuant to an amended and restated credit agreement among the Company, the Prepetition Secured Lenders and Wilmington Trust (the "Prepetition ABL Facility"), pursuant to which among other things, (a) the total commitment thereunder was increased from $50 million to $90 million, and (b) the borrowing base was increased by $15 million (provided that such increase would not apply to the extent the borrowing base exceeds $60 million) to provide a liquidity bridge so that the Company could prepare for an orderly and value maximizing transition into chapter 11.  Additionally, certain covenant violations existing as of June 30, 2015, under the Capital One Credit Facility were waived under the Prepetition ABL Facility.  Certain of the Debtors' other financing agreements, including the Secured Notes and the Lion Credit Facility (each as defined below), were also amended with the assistance and at the direction of the Prepetition Secured Parties to permit the incurrence of additional indebtedness evidenced by the Prepetition ABL Facility.

32.    The Prepetition ABL Facility, like the Capital One Credit Facility before it, continues to be secured by a lien on substantially all of the Debtors' assets, subject to the terms of the Intercreditor Agreement.  The borrowings that were outstanding under the Capital One

Credit Facility at the time of the ABL Assignment remain outstanding under the Prepetition ABL

Facility.  As of the Petition Date, $60 million remains outstanding under the Prepetition ABL

Facility.

33.    <u>Senior Notes due 2020</u>.  Pursuant to an Indenture dated April 4, 2013, among U.S.

Bank National Association ("<u>U.S. Bank</u>"), as trustee and collateral agent, AAI as issuer, and the

remaining Debtors as guarantors (the "<u>Guarantors</u>," and together with AAI, the "<u>Notes</u>

<u>Obligors</u>"), AAI issued Senior Notes totaling $206 million, due April 15, 2020 (the "<u>Senior</u>

<u>Notes</u>").  The Senior Notes issued with an initial interest rate of 13% per annum, subject to

adjustment.  That adjustment has triggered, such that interest now accrues at the rate of 15% per

annum, with the interest in excess of 13% per annum treated as paid-in-kind for interest

payments due before April 15, 2018.  Subject to the terms of the Intercreditor Agreement, the

Senior Notes are secured by a lien on substantially all of the Debtors' assets.

34.    As of the Petition Date, an aggregate principal balance of approximately $209.9

million remains outstanding under the Senior Notes.

35.    <u>Collateral and the Intercreditor Agreement</u>.  U.S. Bank, as Collateral Agent for

the Secured Notes, and Wilmington Trust, as administrative agent under the Prepetition ABL

Facility (as successor administrative agent under the Prepetition ABL Facility to Capital One

Business Credit Corp.), are parties to that certain Intercreditor Agreement dated as of April 4,

2013 (as amended, the "<u>Intercreditor Agreement</u>"), which sets forth the relative lien priorities

between the Prepetition Secured Lenders and the noteholders.  The Intercreditor Agreement

provides that the Prepetition ABL Facility is secured by (i) a lien on the Credit Facility Priority

Collateral[5] that is contractually senior to the lien on the Credit Facility Priority Collateral that secures the Senior Notes and (ii) a lien on the Notes Priority Collateral[6] that is contractually subordinated to the lien on the Note Priority Collateral that secures the Senior Notes, in each case subject to certain permitted liens. The Intercreditor Agreement also provides that the Senior Notes are secured by (i) a lien on the Notes Priority Collateral that will be contractually senior to a lien on the Notes Priority Collateral that secures the obligations under the Prepetition ABL Facility and (ii) a lien on the Credit Facility Priority Collateral that is contractually subordinated to the lien on the Credit Facility Priority Collateral that secures the obligations under the Prepetition ABL Facility, again in each case subject to certain permitted liens.

## 2.    Unsecured Debt

36.    The Company is obligated under two unsecured credit facilities, discussed below, in the aggregate principal amount (as of the Petition Date) of approximately $25 million.

37.    <u>Lion Credit Facility</u>.  On May 22, 2013, AAI, as borrower, and American Apparel (USA), LLC, American Apparel Retail, Inc., American Apparel Dyeing & Finishing, Inc., KCL Knitting, LLC, and Fresh Air Freight, Inc., as guarantors, entered into an agreement with

---

[5]    As defined in the Intercreditor Agreement, "Credit Facility Priority Collateral" consists of all of the Company's and each Guarantor's existing and future assets, consisting of: (i) accounts, (ii) inventory, (iii) cash, (iv) deposit accounts and all cash, checks and other instruments on deposit therein or credited thereto, (v) securities accounts and all investment property, (vi) tax refunds, (vii) intercompany notes and obligations, (viii) proceeds of business interruption insurance, (ix) royalties and contract and license rights, (x) instruments, documents, chattel paper (whether tangible or electronic), drafts and acceptances, payment intangibles and all supporting obligations and general intangibles to the extent they arise out of or relate to the foregoing in clauses (i) through (ix), and (xi) books, records and the proceeds of the foregoing (including insurance proceeds of the foregoing). The following specifically does not constitute Credit Facility Priority Collateral: (w) trademarks, licenses, trade names, patents, trade secrets, domain names, and copyrights of the Company or any Guarantor, and general intangibles necessary for the operation of the equipment, machinery and motor vehicles, including warranties and operational manuals and similar items, (x) any Capital Stock of any direct or indirect Subsidiary of the Company, (y) any general intangibles relating to any of the foregoing, and (z) the identifiable proceeds of each of the foregoing.

[6]    As defined in the Intercreditor Agreement, "Notes Priority Collateral" means all existing and future property and assets owned by the Company and the Guarantors, whether real, personal or mixed (other than any Excluded Assets or Credit Facility Priority Collateral).

14

Lion/Hollywood L.L.C. ("Lion"), to borrow $4.5 million on an unsecured basis with interest accruing at 18% per annum, subject to increase to 20% per annum in the event of certain trigger events (as amended, the "Lion Credit Facility"). On November 29, 2013, Lion and the Debtors amended the Lion Credit Facility to, among other things, increase borrowings thereunder by $5 million. The Lion Credit Facility matures on April 15, 2021.

38.     The Debtors defaulted under the Lion Credit Facility when the Company suspended Mr. Charney from his position as chief executive officer in June 2014. This default was waived and cured when, on July 16, 2014, Lion assigned its rights and obligations under the Lion Credit Facility to Standard General Master Fund L.P. ("SGMF").

39.     Later, in conjunction with ABL Assignment, the Lion Credit Facility was amended to permit the Debtors to enter into the Prepetition ABL Facility. In exchange for this amendment, the Debtors agreed to provide the payment of consent fees and equity registration rights in favor of SGMF, and the Debtors released potential claims against SGMF and other parties.

40.     The Company failed to make an interest payment due on the Lion Credit Facility on September 30, 2015. On October, 1, 2015, SGMF provided notice to the Debtors that a default had occurred and was continuing on account of the missed payment, and that an event of default would occur to the extent the interest payment was not received by October 5, 2015.

41.     As of the Petition Date, an aggregate principal balance of approximately 9.9 million remains outstanding under the Lion Credit Facility.

42.     Standard General Credit Facility. On March 25, 2015, one of the Debtors' foreign subsidiaries, Carnaby, entered into a credit agreement to borrow $15 million from Standard

General L.P., with interest accruing at 14% per annum (the "Standard General Credit Facility"). The Standard General Credit Facility, which is guaranteed by AAI, matures on October 15, 2020.

43.     As of the Petition Date, an aggregate principal balance of approximately $15 million remains outstanding under the Standard General Credit Facility, which amount is guaranteed by AAI.

### 3.     Other Material Unsecured Debt

44.     The Debtors owe material amounts, on an unsecured basis, to vendors critical to their manufacturing process, including vendors of yarn, trim and zippers.  These vendors typically provide material to the Debtors on an order-by-order basis, without long term contractual agreements.

### 4.     Equity Interests

45.     AAI is publicly owned, with one class of common stock.  The stock is traded on NYSE MKT.  As of September 30, 2015, the number of shares outstanding, par value $.0001, totaled approximately 182 million shares.[7]

## III.     RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING TO THE CHAPTER 11 CASES

46.     American Apparel is in the early stages of an operational turnaround.  After years of operating losses, mounting debt and poor leadership, the Company has in the past year replaced its management team, made new hires in key leadership positions and devised a comprehensive turnaround plan.  Unfortunately, continuing and significant operating losses— coupled with a heavy overhang of debt and an accumulation of excess inventory—has left the Company with inadequate liquidity to implement its turnaround plan.  As discussed herein, over

---

[7]     The Company has authorized one million shares of preferred stock, but as of the Petition Date no preferred stock was outstanding.

the past nine months, the Company has aggressively explored many alternatives to raise additional or loosen existing liquidity, without success.  Ultimately, the Company approached its secured noteholders to negotiate a restructuring, which negotiations culminated with a restructuring support agreement and the plan of reorganization the Debtors now propose in these cases.

## A.    The Company's Business in Recent Years

47.    American Apparel enjoyed significant growth and profitability (albeit decreasing profitability) from its inception through 2009.  During that period, it opened more than 280 stores in 19 countries, opened five manufacturing facilities in Southern California and increased its sales revenue to $559 million.  American Apparel financed its growth—and, for that matter, its general operations—largely with a combination of borrowings from related and unrelated parties, bank and other debt, lease financing and proceeds from the exercise of purchase rights and issuance of common stock.  As a result, the Company was for years saddled with a "high level of indebtedness" "uncommon for companies involved in the retail apparel business,"[8] forcing the Company to dedicate a substantial portion of its cash flow to pay interest and principal on its debt.  In turn, the Company has been plagued with reduced liquidity, increased vulnerability to downturns in the business, industry or the general economy, and limited flexibility in planning for or reacting to changes or disruptions in the business and the retail industry.

48.    The Company's particular vulnerability to business disruptions came to the forefront in 2009.  In 2009, the Company began a growth initiative under which it opened (on a

---

[8]    *See* American Apparel, Annual Report (Form 10-K), at 11 (Mar. 31, 2010); *id.* at 17 (Mar. 31, 2011); *id.* at 13 (Mar. 14, 2012); *id.* at 12 (Mar. 5, 2013) (describing "substantial indebtedness" that is "not common for companies involved in the retail apparel business"); *id.* at 13 (Apr. 1, 2014) (same); *id.* at 11-12 (Mar. 25, 2015) (same).

net basis) 23 additional stores and began to manufacture a significant number of new and additional styles, including denim, sweaters, jackets and other products. This expansion was financed with a combination of debt, lease financing and proceeds from the exercise of purchase rights and issuance of common stock. In the midst of this massive campaign, Immigration and Customs Enforcement conducted a raid of American Apparel's facilities, resulting in the loss of more than 1,500 experienced manufacturing employees on very short notice. This unforeseen personnel loss caused significant manufacturing and other delays, caused the Company to burn through its cash availability and negatively impacted the Company's ability to successfully roll out its new stores and products. For the year ended December 31, 2009, the Company reported just $1.1 million in net income, as compared to $14.1 million in net income a year earlier.

49.    The Company's problems worsened in 2010. For the year ended December 31, 2010, the Company reported a 4.6% decrease in net sales and a 4.8% decrease in gross margin. The Company attributed the decreases in both sales and gross margin primarily to (a) an increase in production costs caused by increases in yarn and fabric prices and manufacturing labor inefficiencies associated with training of newly added sewing operators, and (b) a continued shift in production mix towards more complex retail styles. These operational and market challenges, coupled with the Company's very significant debt obligations (by this time, the Company was carrying approximately $81 million in term debt and approximately $57 million in debt under revolving credit facilities, with a yearly interest expense of approximately $23 million),[9] caused the Company to experience a severe liquidity crisis.

---

[9]    Yearly interest expenses, as reported herein, only include amounts actually paid and, as such, do not include accrued paid in kind ("PIK") interest. In 2009, for example, the Company accrued $6.1 million in PIK interest on its then outstanding $65.6 million term loan with Lion Capital, LLP ("Lion Capital"). *See* American Apparel, Annual Report (Form 10-K), at 81 (Mar. 31, 2010).

50.    The Company's troubles came to a head in the spring of 2011, when it included a "going concern" qualification with respect to its 2010 financials in its Form 10-K and warned of a potential bankruptcy.  The "going concern" qualification was a breach of covenant under the Company's then-existing credit facilities with Bank of America, N.A. ("Bank of America") and Bank of Montreal, requiring the Company to obtain waivers from those lenders, or refinance those facilities, to avoid default, as well as to avoid a potential cross default under a third facility funded by Lion Capital.

51.    Thus, in early 2011, the Company began exploring alternative sources of capital for its ongoing cash needs.  The Company faced significant challenges in this regard.  Not only was the Company in a precarious financial condition, but the Company's auditor, Deloitte & Touche LLP, had also recently resigned and, in doing so, stated that its report on the Company's previously issued 2009 financial statements should not be relied upon.  At the same time, the Company was also under subpoenas from the United States Attorney's Office for the Central District of California and the United States Securities and Exchange Commission ("SEC") for documents relating to investigations by the Federal Bureau of Investigation and the SEC into the change in its registered independent accounting firm and its financial reporting and internal controls.  These circumstances seriously damaged the Company's credibility in the credit markets.

52.    Through significant efforts, the Company was able to amend its existing credit facilities with Bank of America, Bank of Montreal and Lion Capital.  These amendments came with some important conditions, including (among others) that:

- the Company was required to retain FTI and create an Office of Special Programs (the "OSP") comprised of me (as chairman), Thomas Casey and John Luttrell;

- the OSP was required to develop and had power to implement business operating plans for 2011 and 2012, which plans were to be approved by the Company's Audit Committee and acceptable to one or both of Bank of America or Lion Capital;

- the OSP controlled and approved all disbursements;

- the OSP was to develop thirteen week cash flow budgets reasonably acceptable to BofA on an ongoing basis; and

- the Company was to raise equity in the amount of $10.5 million.

53.    Thus, the Company engaged FTI and formed the OSP to develop and implement a plan to improve both its operating performance and its cash, liquidity and financial position.  The plan that the OSP developed included, among other things, reducing seasonal volatility in production levels at manufacturing facilities in order to reduce direct labor costs and increase production efficiency; streamlining the Company's logistics operations; rationalizing merchandise pricing in the Company's wholesale and retail channels; renegotiating the terms of a number of the Company's retail real estate leases, including possible store closures; lengthening the cycle of payables to certain vendors and landlords; improving merchandise allocation procedures; and rationalizing staffing levels at the retail stores.  In addition, the Company worked with its advisors to develop other initiatives intended to increase sales, reduce costs and improve liquidity.

54.    As a result of these changes—and a much needed $10.5 million equity infusion—the Company stabilized.  Net sales for 2011 increased $14.3 million, or 2.7%, to $547.3 million due primarily to sales improvements in the Company's wholesale and international segments.  The improvement at the wholesale segment, which included the domestic online sales business, was due to a focused effort on maintaining stock of key items.  The Company also introduced a new wholesale catalog and new wholesale products, which attracted a more diversified customer base, and made functional improvements to its website and fulfillment processes.  International

sales increased as a result of improvements at the retail and online sales channels, as well as favorable foreign exchange rates.

55.     The Company's gross margin for 2011 increased to 53.9% compared to 52.5% for the year ended December 31, 2010.  The increase in gross margin was primarily due to an increase in sales prices across sales channels and improvement in manufacturing labor efficiencies beginning in the second half of 2010.  Operating expenses decreased $11.8 million, or 3.6%, to $318.2 million, as compared to 2010.  The decrease in operating expenses was attributable primarily to lower rent expenses due to the closure of 29 retail stores during 2011 and a 50% reduction to impairment charges on long-lived assets.

56.     The Company continued, however, to carry more than $145 million in legacy, long term debt at an annual interest expense of $33 million (again, not including accrued PIK interest).  And despite its incremental improvements, the Company still suffered an overall loss in 2011.  Loss from operations was $23.3 million for the year ended December 31, 2011, an improvement of $26.8 million, or 53.5% as compared to 2010.  Net loss for 2011 was $39.3 million, an improvement of $47.0 million, or 54.5%, from the net loss of $86.3 million reported for 2010.

57.     The Company, under the OSP's 2012 business plan, continued to see incremental gains in 2012.  These gains were due to—among other things—improvements in distribution operations and allocation efforts, a reduction in corporate overhead expenses and better inventory planning.  Net sales increased by 12.8% over those reported in 2011, due to higher sales across all of the Company's segments.  The Company generated income from operations of $962,000, as compared to a loss from operations of approximately $23 million for 2011.  And

while the Company still experienced a net loss of about $37 million in 2012, the loss was a $2 million improvement over the prior year.

58.    The Company, however, remained highly leveraged with its historical debt load, and thus vulnerable to operational disruptions. And its lagging performance required it to add more expensive debt to increase its existing debt load. To that end on March 13, 2012, the Company replaced its soon-to-expire $75 million revolving credit facility with Bank of America—which carried interest of LIBOR plus 4.5%—with an $80.0 million senior secured credit facility with Crystal Financial LLC ("Crystal").[10] The Crystal credit facility had onerous terms. Interest under the agreement was set at the 90-day LIBOR plus 9.0% and included an unused facility fee of up to one percent on the unused portion of the revolving credit facility. Additionally, the Crystal credit facility, like the Bank of America facility before it, had subjective acceleration clauses and permitted Crystal, at its discretion, to adjust the advance restriction and criteria for eligible inventory and accounts receivable. The Company saw an increase in interest expense of about $8 million in 2012 on account of the Crystal credit facility.

59.    Notably, Crystal did not require that the OSP remain in place (and, as a result, it was disbanded). Crystal did, however, require that I remain involved in the Company in an advisory capacity. My advisory role ended in April 2013, when the Company refinanced the Crystal credit facility.

60.    On April 4, 2013, the Company closed a private offering of the Senior Notes and also entered into the Capital One Credit Facility. The Company used the net proceeds from the offering of the Senior Notes, together with borrowings under the Capital One Credit Facility, to

---

[10]  The Company continued to carry at this point its $109 million credit facility with Lion Capital, which was accruing PIK interest at a rate of 18%.

repay and terminate its credit agreement with Crystal and its then-existing loan agreement with Lion Capital (under which the Company had borrowings of approximately $66 million and $144 million, respectively). Thereafter, on May 22, 2013 the Company entered into the Lion Credit Facility in a principal amount of $4.5 million. On November 29, 2013, the Lion Credit Facility was amended to increase the borrowings by $5 million and to make certain other technical amendments. By the end of 2013, the Company was carrying approximately $260 million in long-term debt at an annual expense of approximately $39 million.

61.    Also in 2013, the Company transitioned to a new distribution center in La Mirada, California. The transition, completed by the end of 2013, was fraught with difficulties that caused processing inefficiencies which required the Company to employ additional staff in order to meet customer demand. These issues had a significant negative impact on the Company's earnings and cash flow in 2013. The Company ultimately incurred incremental distribution costs and recorded additional cost of sales of approximately $3 million and selling expenses of approximately $11.8 million. The Company also reported that the disruption caused by the cut-over to the new distribution center had a negative impact on sales. The Company, as highly leveraged as it was, could bear neither the increased costs nor the declines in sales. Its 2013 financial results were very poor. The overall net loss for 2013 exceeded $106 million.

62.    Things did not improve in 2014. Unexpected operating expenses continued to mount. For example, after conducting a lengthy audit of the Company's German subsidiary, German authorities concluded in September 2014 that the Company had not been paying all requisite import taxes. German authorities assessed, and the Company was forced to pay, $4.5 million in customs penalties. Around the same time, the Company was forced to pay about $7 million to resolve certain sexual harassment, sexual assault and battery, racial discrimination and

23

other claims against Dov Charney as well as severance claims and a claim relating to a 2011 employee fatality. These two events significantly impacted the Company's liquidity.

63.    Additionally, in early 2014, the Board launched an investigation after becoming aware of growing evidence that Mr. Charney had engaged in a pattern of misappropriation of Company funds for personal use, extreme verbal and physical abuse of employees, sexual harassment, sexual assault and misconduct and other illicit and unlawful behavior. This conduct exposed the Company to millions of dollars of legal liabilities, an SEC investigation (not targeting the Company), an untold amount of financial harm, disruption to operations and significant negative publicity. Following the investigation, Mr. Charney was terminated for cause in December 2014. *See* Exhibit C (listing litigations brought against the Company on account of Mr. Charney's conduct).

64.    Overall sales declined more than $8 million in the first half of 2014 (compared with the same period in 2013). The Company ended 2014 with nearly $250 million in long term debt and reported a $68.8 million loss, bringing its total losses in the prior five year period to $300 million.

**B.    The Company Installs New Management**

65.    Following Mr. Charney's removal, the Board recruited a new management team to professionalize the Debtors' operations, identify and address operational challenges, and return the Company to profitability. Specifically, the Debtors' management has undergone a top-to-bottom revitalization, including a new Chief Executive Officer, Chief Financial Officer, General Counsel, Chief Information Officer, Chief Digital Officer, Senior Vice President of Marketing, President of Wholesale, General Manager of Global Retail and Senior Vice President

of Human Resources.[11]  Collectively, the new management team has significant retail

experience, with companies like the Gores Group, Warnaco Swimwear Group, BCBG Max

Azria, Laundry by Shelli Segal, Bauer Nike Hockey, Inc., Jones Soda Company, DirecTV,

Verizon, Fox Network Group, Beachbody, Perry Ellis International, Express, Indigo Books

Music, Inc. and Club Monaco, Inc.

## C.    The Company's New Management Team Develops a Turnaround Plan

66.    At the start of 2015, the Company's newly appointed management (later assisted

by myself and FTI) assessed the Company's finances and operations and crafted a turnaround

plan based around, among other things, (a) designing product lifecycles that fully exploit

domestic capabilities, (b) meeting industry averages for e-commerce, (c) monetizing brand value,

(d) building the brand to embrace future marketing initiatives and (e) evaluating and

rationalizing the company's store footprint.  Each of these initiatives is summarized below.

67.    *Designing Product Lifecycles to Exploit Domestic Capabilities*.  The Company

historically lacked a formal process for determining what items would be manufactured, when

they should be in the stores, and what the Company should do with items that do not sell.  This

had a series of negative impacts.  *First*, the Company had an ever-growing amount of slow

moving inventory that was never fully liquidated and gave stores a stale appeal to customers.  To

that end, as of June 2014, the Company estimates that it had three million units of slow moving

inventory.  *Second*, of the Company's more than 5,000 styles, only a small fraction accounted

for the large majority of sales; as such, the Company was incurring the significant cost and

inefficiency of manufacturing, distributing and maintaining significant style diversity without

---

[11] Upon its installation, the new management team adopted a *Code of Business Conduct and Ethic* to avoid
future claims against the Company based upon inappropriate employee conduct.

any real benefit. ***Third***, the lack of any seasonal deadlines or calendars resulted in the

manufacture of product when the Company least needed it—the production, for example, of a

bathing suit in September. ***Finally***, the Company did not change its product from season to

season or year to year, such that the Company's stores had the same offerings year round.

    68.    To address these challenges, the Company's new management team has devised

and begun to implement a series of new overhauls, including the following:

- The design and merchandizing of a new cohesive product line for wholesale and retail.

- Implementation of a new data management system to begin collecting and tracking important sales-related data and trends. The Company can now begin to track which styles are the most successful in different regions and demographics, and seasonality for each product and style.

- Cessation of production of underperforming styles, with a new focus on the production and sale of bestselling items.

- Creation and maintenance of a design calendar, to ensure that materials are ordered and production commenced at the right times in order to stock stores with clearly defined seasonal lines, giving the Company's operations a fresh look tailored to shifting, seasonal demand.

- Improvements to quality control in the manufacturing process, thereby reducing overtime hours and ensuring a more efficient production method.

    69.    <u>Meeting Industry Averages for e-Commerce</u>. The Company's competition

generates, on average, 20% of their sales from e-commerce. The Company's e-commerce

platform, however, accounts for 11% of sales. Similarly, of the visits to a retail e-commerce site,

the industry norm is to expect that 2.5% of the visits will result in a purchase. In contrast, the

Company has a "conversion rate" of 1.6%. This relative disadvantage has resulted from, among

other things, a poor website experience, problems with inventory allocation, stale product

offerings, lack of a meaningful mobile app and poor use of online marketing options. To address

these challenges, management (including the Company's first Chief Digital Officer) has begun

to, among other things, develop and build a new state-of-the art mobile app, improve user experience with the Company's website and implement better options for accepting payments internationally.

70.  <u>Monetizing Brand Value</u>.  Since the fourth quarter of 2013, same store sales comparables have declined virtually every month at an average rate of 7%.  To address these challenges, management has, among other things, (a) placed greater emphasis on new designs that emphasize quality and fit, (b) commenced the process of creating new and viable products for wholesale, retail, and e-commerce, (c) launched a new marketing campaign to increase store traffic and rejuvenate store branding, (d) begun to improve the Company's training, onboarding procedures and communications between management and retail staff, (e) identified new markets that might be exploited through new store openings, as well as current stores that are unprofitable and should be closed, (f) hired a new design and merchandising team and a new buying team and (g) created a planning and forecasting division.  On the wholesale side, management has, among other things, developed plans for (a) new research and development for innovative fabrics, (b) an increased focus on international wholesale sales, with strategic expansion into new geographic regions and (c) launching a new website and mobile experience for the wholesale business.

71.  <u>Building the Brand to Embrace Future Marketing Initiatives</u>.  While retaining its classic image and culture, the new management team (including the Company's new Senior Vice President of Marketing) has developed a marketing plan to cast the Company in a positive, socially conscious light.  The plan involves, among other things, (a) new product launches aligned with digital promotions, (b) a strong collaboration with visual merchandising to create a compelling retail experience, (c) launching new in-store events and partnerships with personalities, celebrities and music bands to increase store traffic, and (d) a new focus on digital

27

advertising with less emphasis on traditional print and outdoor marketing. In addition, the Company has bolstered its dedication to important social and political issues such as immigration rights and equality for the LGBTQ community.

72.    *Evaluating and Rationalizing the Company's Store Footprint.* Over time, some stores have become unprofitable due to economic conditions in a particular area, rental trends for a particular location or the Company's inability to adequately invest in the location due to a lack of capital resources. Additionally, chronic cash shortages have limited the Company's ability to identify and expand into areas of proven performance or potential. In August 2015, the Company retained DJM Realty Services, LLC ("DJM") to serve as real estate consultants and professionals. On the Company's behalf, DJM has begun to analyze the Company's leases and to negotiate with landlords regarding potential lease concessions and the terms of new, long-term relationships. At the same time, DJM and management have begun to identify new potential areas for future expansion. In these Cases, the Debtors intend to reject leases for some of their unprofitable stores and to assume leases for their currently profitable stores. They will also assume leases for those stores they believe will become profitable with adequate investment and increased management attention. Ultimately, the Debtors have as their goal emerging with a strong lease portfolio that is built to capitalize on strong geographic demand for their products. The Debtors' assessment of the leases it intends to assume and to reject is ongoing.

**D.    Attempts to Secure New Financing Sources to Deploy the Turnaround Plan**

73.    In order to implement its turnaround plan, the Company took aggressive measures to raise capital and to address projected tight liquidity. Those measures included the following:

- ***Exploring potential transactions:*** In late December 2014, the Company retained Moelis & Company ("Moelis") as investment bankers to explore and solicit interest in a wide variety of potential transactions, including a sale transaction or a transaction involving new debt, equity interests, hybrid capital, or options, warrants or other rights to acquire equity interests in the Company. Moelis

contacted and engaged with more than 92 parties with an interest in the retail sector or experience with the Company's operations. Of those, 18 parties signed a non-disclosure agreement with the Company and gained access to due diligence regarding the Company's operations and financial conditions. Ultimately, none of those parties chose to engage with Moelis regarding a transaction with the Company.

- ***Obtaining additional credit:*** On March 25, 2015, a Non-Debtor Affiliate entered into the $15 million Standard General Credit Facility, providing a loan for $15 million in principal, the proceeds of which were used for general corporate purposes of the Company. AAI guaranteed the Standard General Credit Facility.

- ***Raising equity:*** On May 11, 2015, the Company entered into a Sales Agreement to sell up to 15 million shares of common stock for an aggregate sales price up to $10 million, through an "at-the-market" transaction. This transaction generated approximately $2.2 million in sale proceeds, over a one-month period and involved the sale of more than 3.5 million shares.

- ***Attempting to increase authorized shares:*** In June 2015, the Board and management submitted a proposal for ratification at the Annual Shareholders' Meeting that would have increased authorized shares of common stock from 230 million to 460 million in order to provide the Company with greater flexibility to generate capital through things like future equity financings and potential strategic transactions.

- ***Seeking consent to release share reserves***: In July 2015, after shareholders rejected the Board and management's proposal to increase the number of authorized shares, management approached Lion Capital to ask that it waive the requirement that the Company reserve shares in connection with its warrants. Releasing the Lion Capital share reserves would have freed up 24.5 million shares, which the Company could have sold to raise additional liquidity. Lion Capital declined to permit the release of the reserves.

74.    Ultimately, despite its efforts, the Company could not generate additional liquidity sufficient to fully support management's turnaround plan. At the same time, the Company's sales continued their downward projection. For the three month period ending June 30, 2015, the Company's net sales totaled approximately $134 million (representing a 17% decrease compared with the same period in 2014), resulting in a net loss totaling approximately $19 million and adjusted EBITDA of approximately $4.1 million (compared with $15.9 million of adjusted EBITDA for the same period in 2014). As of June 30, 2015, the Company had an

estimated $7 million in cash and its capacity for additional borrowings under the Capital One

Credit Facility totaled $6 million.

**E.    The Company Begins Exploring a Financial Restructuring**

75.    With dwindling options for raising capital, in July 2015 the Company deployed a

plan to drastically reduce costs in an effort of giving themselves a runway to execute their

turnaround plan. The Company aimed to reduce short-term costs by $30 million through, among

other things, (a) organization-wide layoffs across all three business operations, (b) negotiations

with landlords of significant stores and warehouse facilities to reduce rent obligations, and

(c) sourcing fabric and other production inputs from less expensive suppliers. Despite these

efforts, management projected that absent a turnaround in sales, the Company may not have

sufficient cash for the near term.

76.    Thus, the Company began exploring alternatives, including restructuring

contingencies. The Company retained Jones Day as restructuring counsel and FTI Consulting,

Inc. as financial advisors and asked Moelis to scour the market for interest in any type of in-court

or out-of-court transaction. The Company also approached Standard General and holders of the

Secured Notes to assess options for restructuring its onerous debt obligations. In early August

2015, certain of the senior noteholders executed non-disclosure agreements and began reviewing

confidential information regarding the Debtors' financial condition.

77.    Early in the noteholders' diligence process, on August 11, 2015, AAI filed a

notice with the Securities and Exchange Commission that its quarterly report for the Second

Quarter of 2015 would be delayed. Therein, the Company disclosed, among other things,

potential non-compliance with certain of the covenants for the Capital One Credit Facility, and

referenced ongoing discussions with the Company's lenders regarding potential waivers of any

potential defaults thereunder. Those discussions were ultimately successful, and on August 17,

2015, the Prepetition Secured Lenders assumed all of Capital One's rights and obligations under the Capital One Credit Facility with the intent of providing critical bridge financing. As discussed in Part II.B, immediately following the purchase, the Company entered into a series of agreements whereby, among other things, (1) existing defaults or potential defaults under the ABL were waived, (2) the total principal amount allowed under the Wilmington Trust Credit Facility was increased from $50 million to $90 million, and (3) Wilmington Trust assumed the role as administrative agent under the Prepetition ABL Facility. The Prepetition ABL Facility contained a $15 million permitted over-advance to provide a borrowing base of $60 million, the value of which was supported by Credit Facility Priority Collateral. As a result of the ABL Amendment, and the willingness of the Prepetition Secured Lenders to step in, the Company obtained access to much-needed liquidity and capital, providing the Company breathing room to further assess its options and attempt to negotiate a reorganization framework with its primary creditor constituencies.

**F.    The Debtors Negotiate with the Supporting Parties**

78.    Concurrently with the negotiations over the ABL Amendment, and after having received tepid interest from potential investors in exploring a distressed or restructuring transaction, the Debtors and their advisors entered into extensive arms'-length negotiations with the Committee of Lead Lenders and Standard General, L.P. ("Standard General") regarding (a) the terms of potential debtor in possession financing sufficient to provide the Debtors with the liquidity necessary to sustain operations without material disruption to their businesses, while in a bankruptcy proceeding, and (b) the terms of a potential chapter 11 plan of reorganization.

79.    The Debtors' discussions with these parties regarding debtor-in-possession financing proceeded along a parallel track with separate marketing efforts, conducted by Moelis, to obtain such financing from other sources, as described in *Declaration of Robert Flachs in*

31

*Support of Motion for Entry of Interim And Final Orders (I) Authorizing the Debtors to (A)*

*Obtain Postpetition Senior Secured Superpriority Financing Pursuant To 11 U.S.C. §§ 361, 362,*

*363(c), 363(e), 364(c), 364(d)(1), 364(e) And 507 and (B) Utilize Cash Collateral, (II)*

*Authorizing the Repayment in Full of Amounts Owed Under the Prepetition ABL Credit Facility,*

*(III) Granting Priming Liens, Priority Liens And Superpriority Claims to the DIP Lenders, (IV)*

*Granting Adequate Protection to Certain Prepetition Secured Parties, (V) Scheduling a Final*

*Hearing Pursuant to Bankruptcy Rules 4001(b) And (c) And (VI) Granting Related Relief* (the

"Flachs Declaration" in support of the "DIP Motion").  The negotiations on both fronts were

active and, at times, contentious.

## IV.    THE DIP FACILITY, RESTRUCTURING SUPPORT AGREEMENT AND PROPOSED PLAN

80.    Ultimately, on October 4, 2015, the Debtors entered into an agreement (the

"Restructuring Support Agreement") with the Committee of Lead Lenders in their respective

capacities as Prepetition Secured Lenders and holders of Senior Notes, to effectuate a holistic

restructuring of the Company's capital structure to be implemented in these Cases through the

Plan.  The parties' agreement was memorialized in the Restructuring Support Agreement.  In

connection with the Restructuring Support Agreement, the Supporting Parties (collectively, in

such capacity, the "DIP Lenders") committed to provide the Debtors with a $90 million in debtor

in possession financing (the "DIP Credit Facility"), the terms of which are set forth in the DIP

Credit Agreement dated October 4, 2015.  The Supporting Parties have also agreed to convert the

DIP Credit Facility into an Exit Term Loan and provide an additional $40 million of liquidity to

fund exit costs and capitalize the business.

81.     The principal terms of the DIP Credit Facility, which are described in more detail in the Flachs Declaration and the DIP Motion, are as follows:[12]

- American Apparel (USA), LLC, American Apparel Retail, Inc., American Apparel Dyeing & Finishing, Inc., and KCL Knitting, LLC are borrowers. Each of the borrowers, along with American Apparel, Inc. and Fresh Air Freight, Inc., is a guarantor.

- Wilmington Trust, N.A. shall serve as administrative agent.

- The DIP Lenders are Standard General Master Fund L.P., P Standard General Ltd., Monarch Master Funding Ltd., Coliseum Capital Partners, L.P., Coliseum Capital Partners II, L.P., Blackwell Partners, LLC, Series A, Goldman Sachs Trust - Goldman Sachs High Yield Floating Rate Fund, Goldman Sachs Lux Investment Funds - Goldman Sachs High Yield Floating Rate Portfolio (LUX), Goldman Sachs Lux Investment Funds - Global Multi-Sector Credit Portfolio (LUX), Global Opportunities LLC, Global Opportunities Offshore Ltd., Oceana Master Fund Ltd., and PWCM Master Fund Ltd.

- The DIP Lenders will provide $90 million in senior secured postpetition financing in the form of $30 million in new money and a $60 million roll-up of the Prepetition ABL Facility.  Interest shall accrue at Libor plus 7.00% per annum.

- The Debtors' use of cash collateral and the loan proceeds shall be used for working capital and other general corporate purposes, to pay administrative costs of the chapter 11 cases, to repay all amounts owing under the Prepetition ABL Facility, to pay transaction costs, fees, and expenses with respect to the DIP Credit Facility, to make "Permitted Adequate Protection Payments" as defined in the DIP Agreement, to fund fees owed to the clerk of the Court and the United States Trustee under 28 U.S.C. § 1930(a), to pay fees incurred by a trustee under section 726(b) of the Bankruptcy Code up to $100,000, and certain professional fees and expenses allowed by the Court.  The foregoing, however, is governed by a budget as agreed upon by the parties to the DIP Credit Facility.

- The DIP Lenders will be granted certain liens and claims, including priming liens and superpriority claims on property of the estate.

- The parties will make representations and warranties substantially the same as those made with respect to the Prepetition ABL Facility.

- Events of default under the DIP Agreement are standard for a facility of this type.

---

[12] The following is only a summary of the relevant terms and the terms of the DIP Credit Facility and any related documents shall definitely govern the relationship between the parties thereto.

- The DIP Credit Facility shall terminate on the earlier of (a) April 5, 2016, (b) the date on which the Court orders the chapter 11 cases converted to cases under chapter 7 of the Bankruptcy Code, (c) the acceleration of the loans and termination of commitments under section 8.02 of the DIP Credit Agreement, (d) the sale of all or substantially all of the Debtors' assets, and (e) the consummation of a confirmed plan of reorganization for the Debtors.

82.    The Restructuring Support Agreement provides the Debtors with a strong and immediately actionable path to address their capital structure, fully deploy their turnaround plan in the near-term and successfully emerge from bankruptcy as a strong competitor in the manufacturing, retail and wholesale markets. The Plan at the heart of the Restructuring Support Agreement contemplates:

- the conversion of over $200 million of Senior Notes into equity interests of the reorganized American Apparel;

- the infusion into the reorganized American Apparel of up to $40 million in committed exit capital from the Supporting Parties in the form of a minimum of $10 million of equity capital pursuant to an equity commitment agreement and up to an additional $30 million under a exit credit facility; and

- distributions to general unsecured creditors in the form of units in a litigation trust and, if the Plan is accepted by such class of creditors, a $1 million cash payment.

If confirmed, I believe that the Plan will provide American Apparel with a significantly deleveraged balance sheet and will infuse the Company much needed operating capital necessary to implement and execute on its turnaround plan.  The Plan will leave American Apparel on much stronger footing to compete in the marketplace, saving thousands of American manufacturing jobs in the process.

83.    In addition to outlining the main terms of the Plan, the Restructuring Support Agreement, together with the DIP Credit Agreement, also provides a number of relevant milestones that must be satisfied, including:

- not later than 10 days after the Petition Date, the Debtors shall have filed the Plan, Disclosure Statement and a motion seeking approval of the Disclosure Statement;

- not later than 45 days after the entry of the interim order approving the DIP Credit Facility, the Bankruptcy Court must have entered a final order approving the DIP Credit Facility;

- not later than 60 days from the Petition Date, the Bankruptcy Court must have held the Confirmation Hearing;

- not later than 120 days from the Petition Date, the Bankruptcy Court must have entered the Confirmation Order; and

- not later than 180 days from the Petition Date, the Effective Date must have occurred.

In the event that any of these milestones are not satisfied, then each of the Supporting Parties may terminate its support of the Plan and terminate the Restructuring Support Agreement.

84.     The Restructuring Support Agreement obligates the Debtors to, among other things, take all necessary action to propose and seek confirmation of the Plan in accordance with the foregoing milestones.  At the same time, the proposed DIP Credit Facility will provide the Debtors with adequate liquidity to accomplish confirmation of the Plan on a reasonable timeline.

85.     Through the Restructuring Support Agreement and the Supporting Parties' commitments thereunder, the Debtors intend to emerge from bankruptcy quickly, with drastically reduced debt, with at least $40 million in new equity and debt capital and with viable and competitive business operations.  Moreover, the Debtors believe that the Plan, by enabling the Debtors to emerge quickly as a going concern, is in the best interest of their estates and will otherwise permit the Debtors to avoid liquidation.

## V.     FIRST DAY MOTIONS

86.     To enable the Debtors to minimize the adverse effects of these cases, the Debtors are requesting various types of relief in their First Day Pleadings.  Generally, the First Day Pleadings are designed to meet the Debtors goals of (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible, (b) maintaining the confidence and

support of their customers, employees, vendors, suppliers, and service providers during the

Debtors' reorganization process, and (c) establishing procedures for the smooth and efficient

administration of these chapter 11 cases.

87.     I have reviewed each of the First Day Pleadings.  I believe that the relief sought in

each of the First Day Pleadings is narrowly tailored to meet the goals described above and,

ultimately, will enhance the Debtors' ability to achieve a successful reorganization.

Furthermore, I believe that with respect to those First Day Pleadings requesting the authority to

pay discrete prepetition claims or to continue selected prepetition programs, the relief requested

is essential to the Debtors reorganization and granting the relief within the first twenty-one days

of the chapter 11 cases is necessary to avoid immediate and irreparable harm to the Debtors and

their employees, customers, vendors, and creditors.

88.     The Debtors have an immediate need to continue the orderly operation of their

business by securing goods and paying employees in the normal course of business.  The

Debtors' continued operations will enable them to preserve the going concern value of their

estates and main vendor and customer confidence.

A.     **Administrative and Procedural Motions**

89.     The Debtors will present several purely administrative or procedural First Day

Pleadings: (a) a motion to jointly administer the Debtors' bankruptcy cases, (b) a motion to

establish procedures to resolve claims arising under section 503(b)(9) of the Bankruptcy Code,

and (c) an application to employ the Garden City Group, LLC ("GCG") as claims and noticing

agent under 28 U.S.C. § 156.[13]

---

[13] The GCG application is supported by a separate declaration of Angela Ferrante submitted therewith.

B.    **Consolidated Creditor List and Notice Procedures**

90.    As in many large chapter 11 cases that are jointly administered, the Debtors do not maintain lists of the names and addresses of their respective creditors on a debtor-specific basis. The Debtors have prepared a consolidated creditor matrix that includes over 30,000 parties that may receive certain notices during these cases. Requiring the Debtors to segregate and convert their records to provide six separate Debtor-specific creditor matrices would be unnecessarily burdensome and would result in duplicate filings.

91.    Similarly, the Debtors have proposed certain notice procedures that are designed to (a) provide service of most documents only to those parties in interest on a "Master Service List," with any party in interest eligible to be put on the Master Service List upon request, and (b) with several exceptions, provide electronic service of documents whenever possible to reduce costs and to speed up the service process. The Debtors believe that these procedures are fair, will provide adequate service to all relevant parties of all pleadings and documents, and will save significant amounts in administrative costs that would otherwise detract from potential recoveries in these cases.

C.    **Employee Wages and Benefits**

92.    The Debtors and their affiliates employ over 8,500 people, with approximately 7,000 employed directly by the Debtors. The continued and uninterrupted support of the Debtors; employees is essential to the success of the Debtors' business. Maintaining the goodwill of the Debtors' employees and ensuring the uninterrupted availability of their services will protect the going concern value of the estates and maximize the value ultimately available to creditors by assisting the Debtors in maintaining the necessary "business as usual" atmosphere and preserving the Debtors' relationships with customers and vendors. Interruptions in payment of prepetition employee-related obligations, including wages, health and other benefits, and

37

reimbursement of business expenses, will impose hardship on the employees and is certain to jeopardize their continued performance during this critical time.

93.     To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale during this critical time, it is important that the Debtors be permitted to pay and/or perform, as applicable, employee-related obligations, including: (a) employee wages, salaries, vacation (where applicable) and holiday pay, and other accrued compensation, (b) prepetition business expenses, including airfare, hotels, meals during travel, other transportation expenses, postage and packaging, office supplies, fuel, small equipment, and merchandise samples, (c) prepetition contributions to, and benefits under, employees' benefit plans, (d) ordinary course bonus payments to the Debtors' manufacturing workforce, (e) payments to a small group of supplemental workers that provide information technology services, accounting, and clerical and other services, (f) carrying forward accrued vacation time, and (g) all costs and expenses incident to the foregoing.

94.     The Debtors are seeking authority to pay (a) prepetition compensation, deductions, benefits, and costs in an amount not to exceed $5.5 million in the aggregate, (b) prepetition business expenses in an amount not to exceed $140,000, (c) manufacturing bonuses in an amount not to exceed $1.1 million, and (d) obligations to supplemental workers in an amount not to exceed $500,000.

**D.      Customer Programs**

95.     The Debtors, in the ordinary course of their business, engage in certain marketing and sales practices that are designed to maximize profitability by attracting new customers and enhancing loyalty and sales among their existing customer base.  These customer-targeted practices (collectively, the "Customer Programs") include industry standard return and exchange

policies, a customer loyalty program that allows customers to earn "points" that entitle the customer to discounts and promotions, gift cards, and various sales promotions. As of the Petition Date, the Debtors estimate that outstanding gift card balances totaled approximately $5.1 million.

96.     The Debtors operate in a very competitive sector, and much of the success and viability of the Debtors' businesses are dependent upon brand loyalty, the Debtors' reputation and confidence of their customers. Continued customer support is essential to the success of the Debtors' businesses and the preservation of the value of their estates. The failure to honor the Customer Obligations in the ordinary course and without interruption would almost certainly cause the Debtors to suffer an irreparable loss of customer support and confidence, and those customers might in the future make their purchases elsewhere as a result. The loss of customers would, without a doubt, detrimentally affect the Debtors' business and the recoveries to creditors.

**E.     Critical Vendors**

97.     The Debtors operate one of the largest garment manufacturing operations in the United States. They rely on numerous suppliers, service providers, and vendors for the delivery of goods and/or services in support of the Debtors' operations. Their operations require domestic capacity of certain products and services that would be difficult, if not impossible, to replace without significant disruption to the company's ability to manufacture. The Debtors have reviewed their outstanding accounts payable and consulted with appropriate members of their management team to identify those vendors that are essential to the Debtors' ongoing operations, including, yarn and fabric suppliers, contract knitters, accessory and beauty product suppliers, repair/parts suppliers, specialty services providers,  finished goods providers, component and raw materials suppliers collectively, (the "Critical Vendors").

98.    To avoid catastrophic disruptions in the Debtors' ability to produce high-quality products in a timely fashion, it is of the utmost importance that the Debtors' supply chain remains intact. The Debtors are very concerned, however, that certain Critical Vendors may refuse to deliver goods and services without payment of at least some portion of their prepetition claims, or that the failure to pay may otherwise negatively impact the Debtors' existing relationships with the Critical Vendors. For these reasons, the Debtors seek to minimize the adverse business effects—as well as the cash flow impact—of their chapter 11 filing to the fullest extent possible by obtaining authority to pay, in the ordinary course of business and in the Debtors' discretion, subject to the Critical Vendors' agreement to trade terms, at least some portion of the prepetition claims of certain Critical Vendors.

99.    The Debtors seek to pay Critical Vendors on an interim basis up to an aggregate amount of $4 million and up to an aggregate amount of $5 million on a final basis.

**F.    Prepetition Taxes**

100.    The Debtors, in the ordinary course of their business, incur various tax liabilities, including, among other things, sales and use taxes, franchise taxes, business license fees, and personal property taxes, as well as other taxes, fees and governmental obligations (the "Prepetition Taxes"). The Debtors have reviewed their books and records and believe that accrued but unpaid prepetition taxes incurred in the ordinary course of business total approximately $1 million as of the Petition Date.

101.    The Debtors seek entry of an order authorizing them to pay the Prepetition Taxes. The Debtors have ample business justification to pay the Prepetition Taxes because it is my understanding that (a) many, if not all, of the Prepetition Taxes would be priority claims under the Bankruptcy Code that likely would be paid in full under a chapter 11 plan, (b) certain of the Prepetition Taxes may not constitute property of the Debtors' estates, (c) the Debtors are

40

required to pay the Prepetition Taxes to maintain their good standing in the jurisdictions in which

they do business, (d) failure to pay certain Prepetition Taxes could give rise to liens on certain of

the Debtors' property, and (e) the Debtors' directors and officers could face personal liability if

certain Prepetition Taxes are not paid.  Therefore, to prevent immediate and irreparable harm that

would result from such disruptions and distractions, the Debtors seek authority to pay these

claims on a first day basis up to a maximum amount of $1 million in the aggregate.

**G.     Insurance and Workers' Compensation**

102.    In the ordinary course of their business, the Debtors maintain numerous insurance

policies that provide coverage for, among other categories, the following types of liability:

property, terrorism, marine cargo, general liability, automobile, umbrella, pollution, foreign

liability, directors and officers, employment practices, trade credit, and surety bonds.  The

Debtors estimate that the aggregate yearly premiums for all of its insurance policies is

approximately $5.4 million.

103.    The Debtors' insurance policies are essential to preserve the value of the Debtors'

businesses, and are, in some cases, required by various laws, regulations or contracts that govern

the Debtors' businesses.  It is critical that the insurance policies be maintained and renewed on

an ongoing and uninterrupted basis.

104.    The Debtors are also required to maintain workers' compensation policies in each

of the states in which they do business and provide employees with workers' compensation

coverage for claims arising in any jurisdiction related to their employment.  The Debtors

maintain high-deductible workers' compensation insurance policies with New Hampshire

Insurance Company ("NHIC").  The current policies with NHIC, which cover all of the Debtors'

domestic employees, run from July 14, 2015 to October 14, 2015.

105.    While the NHIC policies carry a high deductible, the NHIC policies also require

NHIC to satisfy any claims made against the policies if the Debtors do not or cannot do so.  As

such, the NHIC policies require the Debtors to post cash collateral to secure those potential

obligations; failure to post required collateral gives NHIC the right to terminate the policies.  The

Debtors have recently experienced an increase in their workers' compensation claims activity,

prompting NHIC to demand additional collateral.  For instance, to secure a three-month renewal

of the NHIC policies, in July 2015 NHIC required the Debtors to make three monthly collateral

payments of $518,208, which the Debtors did.  Thereafter, in August 2015, NHIC requested that

the Debtors pay an additional $5.1 million in collateral by September 28, 2015.  The Debtors

made a partial payment of $1.25 million on September 28, 2015; the remaining $3.8 million

request remains outstanding and subject to further actuarial analysis.  Finally, in their discussions

with NHIC regarding a renewal of the current policies, NHIC has stated that the terms of such

renewal — which will again be for three months — will require the Debtors to pay a premium of

$325,000 and to post collateral of $2.5 million.  A further three-month extension beyond January

2016 will likely require the Debtors to post additional cash collateral.  As of the Petition Date,

the Debtors had provided approximately $22.4 million in cash collateral to NHIC or its affiliates.

106.    As of the Petition Date, approximately 310 open workers' compensation claims

were pending against the Debtors under the Workers' Compensation Program.  In addition, there

may be other claims by employees relating to prepetition injuries that have not yet been

processed.  The Debtors estimate that the aggregate amount of workers' compensation claims

accrued, but not yet paid by the Debtors or their plan administrators or insurer, is approximately

$22.4 million (the "Prepetition Workers' Compensation Claims").  Due to the high deductibles

on the workers' compensation claims, the Debtors estimate that they are responsible for the entire $22.4 million in accrued but unpaid claims.

107.    Because the Debtors are required under the laws of most states do maintain workers' compensation coverage (including California, where the Debtors face the majority of their workers' compensation claims), with drastic remedies if the Debtors fail to comply with those laws, the Debtors are seeking authorization to continue the workers' compensation programs in all applicable states, including the payment of all premiums and additional cash collateral, as well as outstanding and future administrative fees and costs.

108.    Altogether, the Debtors are seeking to pay prepetition insurance obligations in an amount not to exceed $26.5 million in the aggregate, which amount includes the $22.4 million in Prepetition Workers' Compensation Claims, up to $3.8 million in unresolved collateral demands, and $30,000 in past due administrative fees.

**H.    Confirming Administrative Expense Priority Status for Postpetition Delivery of Goods and Provision of Services.**

109.    The Debtors obtain the goods and services integral to their ongoing business operations from many vendors and service providers ("Suppliers"). When they filed these cases, the Debtors had outstanding prepetition purchase orders (collectively, the "Outstanding Orders") with many of these Suppliers. They will continue to order and receive goods and services from Suppliers on a postpetition basis during these cases ("Future Orders").

110.    The Debtors believe that Suppliers may, as a result of the commencement of these cases, refuse to perform on Outstanding Orders. Specifically, the Debtors believe that Suppliers may be concerned that they will be treated as prepetition general unsecured creditors for the cost of any goods and services they provide to the Debtors after the Petition Date pursuant to the Outstanding Orders. As a result, Suppliers may require the Debtors to issue substitute

43

postpetition purchase orders or provide other assurances of payment before providing the requested goods and services. Issuing substitute purchase orders or providing other forms of assurance of payment would be administratively burdensome, time consuming, and counterproductive, and inevitably would lead to delays in the Debtors' receipt of goods and services. This could disrupt the Debtors' operations.

111.    Additionally, some Suppliers may not understand the impact of the Debtors' bankruptcy filing on Future Orders. Such Suppliers may be hesitant to make shipments to the Debtors due to their uncertainty over the status of these chapter 11 cases. This uncertainty could impact the Debtors' ability to obtain the goods and services that they need on the best available terms and pricing.

112.    Under these circumstances, the Debtors believe that relief is necessary to permit the Debtors to obtain the timely delivery of goods and uninterrupted provision of services from their Suppliers. Accordingly, the Debtors will seek entry of an order confirming that the Debtors' undisputed obligations to the Suppliers under Outstanding Orders or Future Orders for (i) shipments of goods delivered to and accepted by the Debtors on and after the Petition Date and (ii) the provision of services to the Debtors at the Debtors' request on and after the Petition Date, will be entitled to administrative expense priority status.

**I.    Utilities**

113.    The Debtors utilize various utility services provided by numerous utility companies (collectively, the "Utility Companies"). Because the Utility Companies provide essential services to the Debtors and their retail operations, any significant interruption in utility services would be highly problematic. In fact, the temporary or permanent discontinuation of utilities services at any of the Debtors' locations could irreparably disrupt business operations, and, as a result, fundamentally undermine the Debtors' restructuring efforts.

44

114.    The Debtors will propose procedures to protect the rights of Utility Companies by providing such Utility Companies with a deposit in an amount equal to approximately two weeks of the Debtors' aggregate utility expenses.  The Debtors submit that the deposit (which will be in the amount of approximately $500,000), in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business and their existing security deposits constitutes sufficient adequate assurance of future payment to the Utility Companies.

## J.    Procedures for Trading in Equity Securities

115.    The Debtors have experienced losses from the operation of their business.  As a result, the Debtors estimate that their federal income tax net operating losses ("NOLs") were approximately $207 million of the December 31, 2014, and they expect to have incurred in excess of $50 million additional NOLs since then through the Petition Date, which amount could be even higher when the Debtors emerge from chapter 11.  These NOLs are valuable tax attributes, and to preserve the NOLs the Debtors will seek to (a) establish notice and objection procedures regarding certain transfers of beneficial interests in equity securities in American Apparel, Inc. and (b) establish a record date for notice and potential sell-down procedures for trading in claims against the Debtors.  The relief sought will enable the Debtors to closely monitor certain transfers of equity securities and thereby preserve the Debtors' ability to seek the necessary relief at the appropriate time if it appears that such transfers may jeopardize the Debtors' use of their NOLs.  In addition, establishing a record date with respect to trading in claims against the Debtors will ensure that claimholders receive sufficient notice that any claims purchased after such date may ultimately be subject to certain sell-down procedures in the event an order approving such procedures is sought by the Debtors and entered by the Court in order to preserve the Debtors' ability to use their NOLs.

**K.**     **Shipping and Processor Charges**

116.     In connection with the day-to-day operation of their business, the Debtors rely on a vast network of third party shippers, haulers, common carriers, truckers, other transporters, freight forwarders, related shipping services, and logistics management companies (collectively, the "Shippers") to coordinate transportation of products between and among (a) the Debtors' manufacturing facilities and distribution center, (b) the Debtors' and their Non-Debtor affiliates' retail store locations, and (c) the Debtors and their customers.

117.     Additionally, the Debtors rely on certain third party processors (the "Processors") to perform services during the manufacturing and distribution process. These Processors have certain capabilities (special dyes, specific types of knitting) that the Debtors do not have in-house. Other Processors are key because of their high capacity. To perform their services, the Processors will temporarily take possession of and store large quantities of the Debtors' products and materials in their own warehouses at various points during the manufacturing and distribution process.

118.     It is essential to the Debtors' business that they maintain a reliable and efficient supply of products for sale to customers through their retail and wholesale operations. If the Debtors fail to pay the claims of Shippers and Processors (collectively, the "Distribution Vendors"), the Debtors believe that many of the Distribution Vendors may assert possessory liens against the Debtors' property and may stop providing essential services to the Debtors.

119.     The Debtors have reviewed their books and records and estimate that as of the Petition Date approximately $350,000 is owed in prepetition charges to the Distribution Vendors. If the Distribution Vendors assert possessory liens and refuse to release the Debtors' products, or even just delay shipments of those products or materials, the disruption to the Debtors' supply chain, manufacturing and distribution operations could result in significant adverse consequences

46

to the Debtors' businesses. If raw materials and supplies are withheld by the Shippers, this will severely impact the Debtors' manufacturing operations and potentially cause the Debtors to cease manufacturing certain products. Likewise, if finished products that are stored with the Processors are lost in transit or shipments are delayed, the Debtors will not be able to timely fulfill customer orders or stock their stores. If the Debtors' business operations are to continue, and the Debtors are to efficiently administer their estates, the Debtors must be able to maintain their manufacturing and distribution network in which the payment of the Distribution Vendors comprises a vital link. The Debtors will seek to pay Distribution Vendors up to an aggregate amount of $350,000.

## L.    Cash Management

120.    In the ordinary course of business, the Debtors operate a cash management system (the "Cash Management System") involving 156 domestic bank accounts (collectively, the "Bank Accounts"). The Cash Management System provides a well-established mechanism for the collection, management, and disbursement of funds used in the Debtors' business.

121.    The Debtors' ability to continue their Cash Management System in the ordinary course of their business is essential to their operations. Absent the ability to maintain their Cash Management System, the Debtors would have to significantly alter their business operations to comply with United States Trustee established guidelines (the "UST Guidelines"). The Cash Management System provides benefits to the Debtors, such as enabling them to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce costs and administrative expenses by facilitating the movement of funds.

122.    In light of the substantial size and complexity of the Debtors' operations, any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates. Altering the Cash Management System could

47

disrupt payments to employees and key vendors. Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures.

123.    The Debtors will also seek authority to implement ordinary course changes to their Cash Management System that the Debtors determine are beneficial to their business, provided that such changes shall only be made to the extent permitted under the DIP Credit Facility or as otherwise ordered by the Court. In addition, the Debtors will seek authority to make certain changes to their Cash Management System as required by any order approving the Debtors' entry into the DIP Credit Facility.

124.    In addition, in the ordinary course of their business, the Debtors engage in intercompany transactions with each other and with certain Non-Debtor Affiliates. The majority of the Intercompany Transactions involve the purchase and sale of apparel and other merchandise manufactured by certain of the Debtors and then sold to other Debtors and the Non-Debtor Affiliates. Certain Debtors and Non-Debtor Affiliates also submit remittances to American Apparel (USA), LLC on account of certain expenses incurred by American Apparel (USA), LLC in employing the Debtors' management and administrative personnel and maintaining facilities for substantially all of the Debtors' and Non-Debtor Affiliates' administrative functions. Although Debtors manage their expenses and revenues through a consolidated Cash Management System, the Debtors maintain records sufficient to track Intercompany Transactions

125.    The continuation of these ordinary course transactions will permit the Debtors to conduct business as usual, to continue to implement their vertical integration strategy and avoid any disruption to the detriment of the Debtors and their non-Debtor affiliates. The Debtors

request that the Court accord administrative expense status to all intercompany claims against a Debtor by another Debtor or a Non-Debtor Affiliate arising after the Petition Date as a result of inter-Debtor and intercompany transactions.

**M.     Confirming the Protections of Section 362, 365, and 525 of the Bankruptcy Code**

126.     Given the global reach of the Debtors' businesses, the Debtors transact with vendors and suppliers of goods and services located outside the United States.  These foreign creditors and counterparties are not likely to be familiar with the Bankruptcy Code, particularly with respect to the various protections it affords to chapter 11 debtors, including the automatic stay.  As such, the Debtors believe that there is risk that certain foreign creditors and counterparties will not adhere to, or respect, the automatic stay or the orders of a court in the United States.  Any such act by a foreign creditor or counterparty in contravention of the Bankruptcy Code could disrupt the Debtors' ability to operate their businesses.

127.     Accordingly, to aid in the administration of the Debtors' bankruptcy cases and avoid disruptions to the Debtors' businesses, the Debtors will seek entry of an order confirming the application of the automatic stay provisions of section 362 of the Bankruptcy Code, the anti-termination and anti-modification provisions of section 365 of the Bankruptcy Code, and the anti-discrimination provisions of section 525 of the Bankruptcy Code.

128.     The Debtors believe that, absent an order enforcing the automatic stay protections of Bankruptcy Code section 362 and the bankruptcy termination provisions of Bankruptcy Code section 365, parties may take precipitous action against the Debtors or the property of the estates. The Debtors believe that the existence of such an order, which the Debtors will be able to transmit to affected parties, will maximize the protections afforded by sections 362, 365 and 525 of the Bankruptcy Code.

49

## CONCLUSION

129.     For all of the reasons set forth herein and in the First Day Pleadings, I respectfully

request that the Court grant the relief requested in each of the First Day Pleadings.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated:  October 5, 2015
At: Los Angeles, California                              Mark Weinsten
                                                         Chief Restructuring Officer