## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AMERICAN APPAREL, INC., *et al.*,[1] | : | Case No.15-12055 (   ) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

## MOTION FOR AN ORDER (I) APPROVING THE CONTINUED USE OF THE DEBTORS' CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS, (II) APPROVING, ON AN INTERIM BASIS, THE DEBTORS' DEPOSIT GUIDELINES AND EXTENDING TIME TO COMPLY WITH SECTION 345(B) OF THE BANKRUPTCY CODE, (III) APPROVING CONTINUATION OF ORDINARY COURSE INTERCOMPANY TRANSACTIONS, AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") move the Court pursuant to sections 345, 363 and 503(b)(1) of the Bankruptcy Code and Local Bankruptcy Rule 9013-1(m) for the entry of an order (in substantially the form attached as Exhibit D hereto) (i) approving the Debtors' continued use of (a) their current cash management system (the "Cash Management System"), and (b) the Debtors' existing bank accounts (the "Bank Accounts") and business forms, including authorizing the Debtors to open and close bank accounts; (ii) granting the Debtors a 45-day extension to comply with the requirements of section 345(b) of the Bankruptcy Code and interim approval of the Debtors' current deposit guidelines; (iii) approving the continuation of certain ordinary course Intercompany Transactions (as defined below); (iv) according administrative expense priority to all postpetition intercompany claims held by a Debtor or one of the Non-Debtor Affiliates (as

---

[1]  The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): American Apparel, Inc. (0601); American Apparel (USA), LLC (8940); American Apparel Retail, Inc. (7829); American Apparel Dyeing & Finishing, Inc. (0324); KCL Knitting, LLC (9518); and Fresh Air Freight, Inc. (3870). The address of each of the Debtors is 747 Warehouse Street, Los Angeles, California, 90021.

defined below) against one or more of the Debtors; and (v) authorizing all banks participating in

the cash management system to honor certain transfers and charge bank fees and certain other

amounts, all of which is subject to the DIP Order and the DIP Documents (each as defined

below).  In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. sections

157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. section 157(b).  Venue for this

matter is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409.

## BACKGROUND

### A.      General Background

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").  The Debtors are continuing in possession of their properties and are managing their

businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  No official committee of unsecured creditors has been appointed in these cases.

3.      The Debtors and their non-Debtor affiliates (the "Non-Debtor Affiliates") operate

a vertically integrated manufacturing, distribution, and retail business focused on branded

fashion-basic apparel, employing approximately 8,500 employees across six manufacturing

facilities and approximately 230 retail stores in the U.S. and 17 other countries worldwide.

Additional information regarding the Debtors and these cases, including the Debtors' businesses,

corporate structure, financial condition, and the reasons for and objectives of these cases, is set

forth in the *Declaration of Mark Weinsten in Support of First Day Pleadings* (the "First Day

Declaration"), filed contemporaneously herewith and incorporated herein by reference.

2

### B.    The Debtors' Cash Management System

4.    The Cash Management System is an integrated system involving approximately 156 domestic bank accounts (collectively, the "Bank Accounts")[2] that provide well-established mechanisms for the collection, concentration, management and disbursement of funds used in the Debtors' business.

5.    The principal components of the Cash Management System and the flow of funds through that system are described below:[3]

(a)    Cash Collection and Concentration.

The Debtors' cash management system is concentrated at Capital One Bank ("Capital One"). Virtually all the Debtors' cash receipts ultimately flow into a blocked account maintained with Capital One (Account No. 232[4]) (the "Wholesale Main Concentration Account"). The Wholesale Main Concentration Account is the depository account for wholesale receivables, but also functions as the account into which the Debtors' other collection accounts ultimately flow. The Wholesale Main Concentration Account is a zero-balance account that is swept daily into the Wholesale Operating Account (defined below) to fund the Debtors' operations. The Debtors' procedures for cash collections and concentration are described in further detail below:

(i)    Local Accounts. Collections from the Debtors' retail operations (other than credit card collections and cash amounts needed to operate the stores) are received and deposited into approximately 138[5] depository bank accounts (the "Local Accounts"), each with a bank branch located near a retail location, at one of Capital One (the "Capital One Local Accounts"), Citibank (the "Citibank Local Accounts") or Bank of Hawaii (the "Bank of Hawaii Local Account").

---

[2]        This figure does not include any accounts that may later be opened in connection with the DIP Credit Facility.

[3]        A chart summarizing the Cash Management System, as it exists on the Petition Date, and a schedule of prepetition Bank Accounts are attached hereto as Exhibits A and C, respectively, and are incorporated herein by reference.

[4]        In order to alleviate privacy concerns, references to account numbers herein and in Exhibit C include only the last three digits.

[5]        Several of the Debtors' retail stores, though listed separately on the schedule of prepetition Bank Accounts attached hereto as Exhibit C, utilize the same retail store concentration account with Citibank (Account No. 802).

3

(ii)    <u>Retail Concentration Account</u>.  Cash from Capital One Local Accounts are swept daily into a retail concentration account maintained with Capital One (Account No. 999) (the "<u>Treasury Key Account</u>"), which funds then flow into the Wholesale Main Concentration Account.

(iii)    <u>Retail Main Concentration Account</u>.  Cash from Citibank Local Accounts is transferred on a weekly basis into a concentration account maintained with Capital One (Account No. 275) (the "<u>Retail Main Concentration Account</u>").  Cash from the Bank of Hawaii Local Account is deposited by check on a monthly basis[6] into the Retail Main Concentration Account. Funds in the Retail Main Concentration Account are swept into the Wholesale Main Concentration Account.

(iv)    <u>Credit Card Accounts</u>.  Funds relating to credit card transactions for domestic, in store retail customers flow into the Capital One Local Accounts, which funds then flow into the Treasury Key Account followed by the Wholesale Main Concentration Account.  Funds relating to credit card transactions for wholesale customers, as well as credit card transactions in connection with domestic e-commerce, and certain foreign online stores, flow into accounts maintained with Capital One (Account No. 585, 132, 267, 593 and 140).  These accounts sweep into the Wholesale Main Concentration Account.

(b)    **Disbursement Accounts**.

Funds from the Wholesale Main Concentration Account are swept into the wholesale operating account maintained at Capital One (Account No. 240) (the "<u>Wholesale Operating Account</u>").  Funds drawn on the Debtors' prepetition asset-based revolving credit facility (the "<u>Prepetition ABL Facility</u>") also are deposited into the Wholesale Operating Account.  The Wholesale Operating Account is then used to wire funds or make transfers to vendors, as well as to fund the other accounts listed below, including the Retail Operating Account, the Bond Reserve Account, the Wholesale and Retail Payroll Accounts and the Wholesale and Retail Controlled Disbursement Accounts.  The Wholesale Operating Account also is used to fund Wholesale Foreign Operations, if needed:

(i)    <u>Payroll Accounts</u>.  The Debtors maintain two payroll accounts with Capital One, one for wholesale operations and one for retail operations (Account Nos. 259 and 291) (the "<u>Wholesale Payroll Account</u>" and the "<u>Retail Payroll Account</u>," respectively), for the payment of their employees.

---

[6]        The frequency with which funds from the Bank of Hawaii Local Account are deposited into the Retail Main Concentration Account will increase under the DIP Order and the DIP Documents.

(ii)    <u>Disbursement Accounts</u>.  The Debtors maintain two disbursements accounts with Capital One, one for wholesale operations and one for retail operations (Account Nos. 643 and 635) (the "<u>Wholesale Control Disbursement Account</u>" and the "<u>Retail Control Disbursement Account</u>," respectively), for vendor payments and reimbursements by check.[7]

(iii)    <u>Bond Reserve Account</u>.  The Debtors maintain a money market account at Capital One (Account No. 577) as a reserve for bond funding.  Though this account remains open, it is dormant and has a zero dollar balance.

(iv)    <u>Wholesale Foreign Operations</u>.  The Debtors rarely fund Wholesale Foreign Operations, except in the following limited circumstances. Certain non-debtor affiliates maintain local accounts with HSBC in Mexico and Europe (the "<u>HSBC Foreign Accounts</u>") and incur bank charges thereunder (the "<u>Foreign Bank Charges</u>").  The HSBC Foreign Accounts then charge the HSBC parent account held by Debtor American Apparel (USA), LLC (Account No. 577) (the "<u>HSBC Parent Account</u>") for the Foreign Bank Charges.  Finally, the Wholesale Operating Account transfers funds to the HSBC Parent Account to pay the Foreign Bank Charges.  For each of July and August 2015, monthly Foreign Bank Charges averaged approximately $3,000.

(v)    <u>Operating Accounts</u>.  In addition to the Wholesale Operating Account, the Debtors maintain a retail operating account with Capital One (Account No. 283) (the "<u>Retail Operating Account</u>," together with the Wholesale Operating Account, the "<u>Operating Accounts</u>").  The Retail Operating Account is used to wire or transfer funds to the Debtors' retail foreign operations, if needed.[8]  If the Operating Accounts exceed $5 million in the aggregate for two (2) consecutive days, the excess amount is applied against amounts owing under the the Prepetition ABL Facility.

---

[7]    The Debtors kept two "legacy" controlled disbursement accounts (Account Nos. 860 and 879) open before the Petition Date for the purpose of processing any outstanding checks.  The Debtors intend to close these two accounts as soon as practicable postpetition.

[8]    Though the Debtors have not utilized their Cash Management System for this purpose to date, the Debtors, in accordance with the terms of a final order approving the DIP Credit Facility, shall utilize the Cash Management System, as it may be modified by the DIP Credit Facility, to:  (a) fund approximately $250,000 during the chapter 11 cases toward the Company's ongoing winddown of its Brazilian operations by Non-Debtor Affiliate American Apparel Brasil Comerico de Roupas Ltda; and (b) loan approximately $1.2 million during the chapter 11 cases to Non-Debtor Affiliate American Apparel (Carnaby) Ltd. ("<u>Carnaby</u>") to enable Carnaby to satisfy certain lease guarantee obligations.  Carnaby's failure to satisfy such claims would jeopardize the Company's operations in the United Kingdom and possibly deprive the Debtors of the certain annual revenue and distributions they receive from Carnaby each year.  <u>See</u> also note 11, *infra*, regarding the ordinary course of conduct with respect to the Debtors' Korean operations.

C.    **Modifications to the Cash Management System Required by the DIP Credit Facility[9]**

6.     Contemporaneously herewith the Debtors have filed a motion (the "DIP Motion") seeking authority to enter into a postpetition financing facility (the "DIP Credit Facility"), the terms of which are more fully set forth in the documentation in respect of the DIP Credit Facility (the "DIP Documents") and the proposed interim order approving the Debtors' postpetition financing facility (the "Interim DIP Order," and, together with any other order approving the DIP Credit Facility, the "DIP Orders"). Certain modifications to the Debtors' Cash Management System are required pursuant to the terms of the DIP Documents and the Interim DIP Order. In particular, funds that typically would have flowed from (a) the Retail Main Concentration Account to the Wholesale Main Concentration Account and (b) the Wholesale Main Concentration Account to the Wholesale Operating Account shall instead be diverted into the DIP Funding Account (as defined in the DIP Documents), which will then be used to disburse funds, upon withdrawal requests from the Debtors, to the Wholesale Operating Account. Aside from these modifications, cash will largely continue to flow through the Cash Management System as it did prepetition. A diagram representing the Cash Management System as modified by the DIP Documents and the Interim DIP Order is attached hereto as Exhibit B.

7.     In addition, the Interim DIP Order and the DIP Documents authorize the Debtors and the DIP Agent (as defined in the Interim DIP Order) to enter into additional agreements providing for the establishment of lock boxes, blocked accounts or similar arrangements in favor of the DIP Agent for purposes of facilitating cash collections from the Debtors in

---

[9]     On the date hereof, the Debtors filed a motion seeking interim and final approval of the DIP Credit Facility.

accordance with the terms of the DIP Documents, and to give directions and instructions to the depository banks at which the Debtors' bank accounts are maintained (or amend control agreements with such depository banks), including, without limitation, Capital One, National Association and its affiliates, in order to direct the Debtors' cash collections to be transferred to the DIP Funding Account pursuant to (and as defined in) the DIP Credit Agreement.

8.      Further, the Interim DIP Order and the DIP Documents provide that the agent under the Prepetition ABL Facility (the "Prepetition ABL Agent") shall immediately share dominion and control with the DIP Agent with respect to each depository account of the Debtors or other third party that was subject to a deposit account control agreement with the Prepetition ABL Agent as of the Petition Date, and each of such deposit account control agreements shall thereafter be enforceable by the DIP Agent against, and binding upon, each depository institution party thereto until the DIP Obligations have been paid in full in cash and the DIP Credit Agreement (both as defined in the Interim DIP Order) shall have been terminated, after which such deposit account control agreements shall again be solely enforceable by the Prepetition ABL Agent.

**D.      Transactions Among the Debtors and Non-Debtor Affiliates**

9.      In the ordinary course of their business, prior to the Petition Date, the Debtors provided goods and services to, and engaged in intercompany financial transactions with, (a) each other (collectively, the "Inter-Debtor Transactions") and (b) the Non-Debtor Affiliates (collectively, the "Inter-Affiliate Transactions" and, together with the Inter-Debtor Transactions, the "Intercompany Transactions"). As set forth above, the Debtors manage their expenses and revenues through a consolidated Cash Management System. The Debtors, however, maintain records sufficient to track Intercompany Transactions such that these transactions should be permitted to continue after the commencement of these cases.

7

10.     The majority of the Intercompany Transactions involve the purchase and sale of apparel and other merchandise manufactured by certain of the Debtors and then sold to other Debtors and the Non-Debtor Affiliates.  For example, in the ordinary course of business, Debtor American Apparel (USA), LLC ("AME") ships merchandise manufactured by certain of the Debtors to retail stores owned and operated by (a) Debtor American Apparel Retail, Inc. ("AAR"), which owns and operates substantially all of the Debtors' retail stores located in the United States and (b) foreign Non-Debtor Affiliates that own and operate retail stores located outside of the United States.  AME then records an intercompany claim on its books and records against AAR and each of the Non-Debtor Affiliates to account for (a) the merchandise shipped to each and, separately, (b) for the associated freight and shipping costs.  Similarly, Non-Debtor Affiliates and AAR sometimes return merchandise back to AME, which creates an intercompany claim owed by AME to the Non-Debtor Affiliate or AAR for the merchandise returned, and also for the associated freight and shipping costs.

11.     The Debtors' other primary, recurring Intercompany Transaction involves remittances by Debtors and Non-Debtors Affiliates to AME on account of certain expenses incurred by AME for the benefit of all Debtors and Non-Debtor Affiliates (the "Corporate Allocation Charge").  In particular, the Corporate Allocation Charge accounts for the expenses incurred by AME in employing the Debtors' management and administrative personnel and maintaining facilities for substantially all of the Debtors and Non-Debtor Affiliates' administrative functions.  AME calculates the Corporate Allocation Charge on a quarterly basis based on each subsidiary's relative percentage of the total costs of sales.  AME's employment of the Debtors' management personnel also has led to an intercompany claim owing from AME to American Apparel, Inc. ("AAI") on account of equity awards issued by AAI to certain

employees under the Debtors' 2011 Stock Incentive Plan.  To account for stock distributions to those employees — and the fact that they are not employed by AAI — AME recorded intercompany claims owing to AAI in the amount of the market value of the stock distributions paid.[10]

12.    Accordingly, at any given time, there may be balances that are due and owing from one Debtor to another Debtor and between certain Debtors and the Non-Debtor Affiliates. With respect to the shipment and return of manufactured goods, the balances between Debtors, and between Debtors and Non-Debtor Affiliates, are assessed on a monthly basis and recorded on the Debtors' books and records.  These intercompany payables and receivables, as well as the Corporate Allocation Charge discussed above, are settled on an ongoing basis through periodic cash remittances from certain of the Debtors and Non-Debtor Affiliates to AME based on those entities' determination of cash on hand in excess of their respective weekly cash forecasts.[11]

## RELIEF REQUESTED

13.    Through this Motion, the Debtors hereby seek the entry of an Order substantially in the form attached hereto as Exhibit D, and in all cases subject to the DIP Order and DIP Documents:

---

[10]    As of the Petition Date, this intercompany claim has not been repaid or reduced by AME.

[11]    There is one exception to this course of conduct.  Korean law restricts the ability of Korean companies to distribute cash to non-Korean entities.  To account for that restriction, the Debtors' Korean subsidiary ("AA Korea") does not regularly distribute cash to AME on account of shipped inventory.  Instead, AA Korea has occasionally entered into formal agreements to loan funds to AAR, to be repaid over a specific duration either through setoff against intercompany claims generated by the receipt of product, or by cash payments.

9

(a)    approving the Debtors' continued use of (i) their current Cash Management System, as it shall be modified by the DIP Orders and DIP Documents, and (ii) their existing bank accounts (the "Bank Accounts") and business forms, including authorizing the Debtors to open and close bank accounts;

(b)    granting the Debtors a 45-day extension to comply with the requirements of section 345(b) of the Bankruptcy Code and interim approval of the Debtors' current deposit guidelines;

(c)    approving the continuation of Intercompany Transactions;

(d)    according super-priority administrative expense status to all postpetition Intercompany Transactions; and

(e)    authorizing all banks participating in the Cash Management System to honor certain transfers and charge bank fees and certain other amounts.

## BASIS FOR RELIEF

**A.    The Continued Use of the Cash Management System, Bank Accounts and Business Forms is Essential to the Debtors' Ongoing Business and Is in the Best Interests of the Debtors' Respective Estates and Creditors**

### 1.    Cash Management System

14.    The Debtors' ability to continue their Cash Management System in the ordinary course of their business, including as may be modified by the requirements of the DIP Credit Facility, is essential to their operations. Absent the ability to maintain their Cash Management System, the Debtors would have to significantly alter their business operations to comply with United States Trustee established guidelines (the "UST Guidelines").[12] The Cash Management System provides benefits to the Debtors, such as enabling them to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce costs and administrative expenses by facilitating the movement of funds. These benefits are especially important here given the

---

[12]    Among other requirements, the UST Guidelines with respect to a debtor's cash management system include: (i) closing all existing bank accounts and opening new debtor in possession accounts; and (ii) maintaining separate debtor in possession accounts for various items.

significant volume of cash transactions managed through the Cash Management System, which, over the last twelve months, included approximately $445 million in receipts and $464 million in disbursements.

15.    In light of the substantial size and complexity of the Debtors' operations, any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates.    Altering the Cash Management System could disrupt payments to employees and key vendors.    Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures.

16.    The Debtors further seek authority to implement ordinary course changes to their Cash Management System that the Debtors determine are beneficial to their business, provided that such changes shall only be made to the extent permitted under the DIP Credit Facility or as otherwise ordered by the Court.    As part of these potential ordinary course changes, the Debtors request authority to open and close bank accounts, including any bank account that may be opened in connection with the DIP Credit Facility.    The Debtors request that banks be authorized to honor the Debtors' requests to open or close any bank accounts, provided, however, that any new domestic account must be established at a bank insured with the Federal Deposit Insurance Corporation (the "FDIC") and organized under the laws of the United States or any State therein, or in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, on the list of authorized bank depositories for the District of Delaware.

17.    Bankruptcy courts, including courts in this district, routinely permit chapter 11 debtors to maintain their existing cash management systems, generally treating requests for such relief as a relatively "simple matter." *In re Baldwin-United Corp.,* 79 B.R. 321, 327 (Bankr.

S.D. Ohio 1987); *In re Columbia Gas Sys.*, 997 F.2d 1039, 1061 (3d Cir. 1993) (recognizing

that a requirement to maintain all accounts separately "would be a huge administrative burden

and economically inefficient"); *Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.)*,

778 F.2d 617, 621 (11th Cir. 1985) (holding that allowing the debtors to use their prepetition

"routine cash management system" was entirely consistent with applicable provisions of the

Bankruptcy Code).

18.    Further, the continued postpetition use of cash management systems and

continued use of the prepetition bank accounts has been approved, often as a routine matter, in

other bankruptcy cases in this district. *See, e.g., In re Molycorp, Inc.*, No. 15-11357 (CSS)

(Bankr. D. Del. July 22, 2015) ("*Molycorp Order*"); *In re RadioShack Corp.*, No. 15-10197

(BLS) (Bankr. D. Del. Mar. 9, 2015) ("*RadioShack Order*"); *In re Old FENM Inc.*, Case No.

13-12569 (KJC) (Bankr. D. Del. Oct. 1, 2013) ("*Old FENM Order*"); *In re MSD Performance,*

*Inc.*, Case No. 13-12286 (PJW) (Bankr. D. Del. Sept. 9, 2013) ("*MSD Order*"); *In re OnCure*

*Holdings, Inc.*, Case No. 13-11540 (KG) (Bankr. D. Del. Jun. 18, 2013) ("*OnCure Order*");

*In re AFA Investment Inc.*, Case No. 12-11127 (MFW) (Bankr. D. Del. Apr. 3, 2012) ("*AFA*

*Investment Order*"); *In re Harry & David Holdings, Inc.*, Case No. 11-10884 (MFW) (Bankr.

D. Del. Mar. 29, 2011) ("*Harry & David Order*").[13]

19.    The Debtors respectfully submit that under the circumstances the maintenance of

the Cash Management System, as it may be modified in order to comply with the DIP

Documents and the DIP Orders, is in the best interests of the Debtors' estates and creditors.

Preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that

---

[13]    Because of the voluminous nature of the orders cited herein, they are not attached to this motion. Copies of these orders, however, are available on request.

12

inevitably would be associated with any substantial changes to the Cash Management System will facilitate the Debtors' stabilization of their postpetition business operations and assist the Debtors with the objectives in these cases.

### 2.    Bank Accounts

20.    As set forth above, the Debtors' Cash Management System utilizes a number of Bank Accounts on a regular basis.  The Debtors maintain each of their respective Bank Accounts at financial institutions insured by the FDIC.  To avoid substantial disruption to the normal operation of their business and to preserve a "business as usual" atmosphere, the Debtors hereby request that they be permitted to continue to use their Bank Accounts with the same account numbers.  The Debtors further request that their banks and financial institutions (collectively, the "Banks") be authorized to continue to service and administer the Bank Accounts as accounts of the applicable Debtor as debtor in possession without interruption. Absent this relief, the UST Guidelines would require the Debtors to close all of their prepetition Bank Accounts and open new accounts.  Authorizing the Debtors to continue using their prepetition Bank Accounts will eliminate disruption and assist the Debtors in achieving a smooth transition of their operations.

21.    To protect against the possible inadvertent payment of prepetition claims, the Debtors will immediately advise their banks not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtors.  Importantly, the Debtors possess the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones.

13

22.     Authority to continue the use of bank accounts has been granted in numerous other chapter 11 cases. *See, e.g., Molycorp Order; Radioshack Order; Old FENM Order; MSD Order; OnCure Order; AFA Investment Order; Harry & David Orde*r.

### 3.     Business Forms

23.     In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms. By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue using their existing checks and other business forms without alteration or change. Pursuant to Rule 2015-2(a) of the Local Bankruptcy Rules, and to avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they not be required to include the legend "D.I.P." and the corresponding bankruptcy case number on any existing business forms or checks.

24.     Because parties that presently conduct business with the Debtors will be aware of the Debtors' status as debtors in possession, the alteration of the Debtors' checks and business forms would be unnecessary and unduly burdensome. Further, this Court has allowed the Debtors to use their prepetition business and check forms without the "D.I.P." label in numerous other large cases. *See, e.g., RadioShack Order; Old FENM Order; MSD Order; OnCure Order; AFA Investment Order; Harry & David Order.*

### B.     Request for Interim and Final Waiver of  Section 345(b) Deposit Guidelines

25.     The Debtors' funds are maintained in domestic bank accounts insured by the United States through the FDIC (the "Deposit Guidelines"). The Debtors' Banks — Capital One, Citibank and Bank of Hawaii — have each executed a Uniform Deposit Agreement

14

("UDA") with the United States Trustee for the District of Delaware (the "U.S. Trustee").
Accordingly, the Debtors believe that the Deposit Guidelines substantially comply with the
approved investment guidelines identified in section 345(b) of the Bankruptcy Code.
Nevertheless, out of an abundance of caution, and as the deposits in those accounts may exceed
the FDIC insurance limitations, the Debtors seek, pursuant to Local Rule 2015-2(b), a 45-day
waiver of the requirements of section 345(b) to permit them to continue to deposit funds in their
Bank Accounts, including any account created in connection with the DIP Credit Facility, and
confer with the U.S. Trustee to determine whether any modifications to the Deposit Guidelines
are required.  The Debtors' request that this interim waiver would then ripen into a permanent
waiver unless a party in interest objects in the first 45 days of these chapter 11 cases.

     26.    Pursuant to section 345(b) of the Bankruptcy Code, any deposit or other
investment made by a debtor, except those insured or guaranteed by the United States or by a
department, agency, or instrumentality of the United States or backed by the full faith and credit
of the United States, must be secured by either a bond in favor of the United States that is
secured by the undertaking of a corporate surety approved by the U.S. Trustee for the relevant
district or the deposit of securities of the kind specified in 31 U.S.C. § 9303.  As noted above,
the Debtors believe the Deposit Guidelines comport with these requirements, but, even if they
do not, section 345(b) also provides that a bankruptcy court may allow the use of alternatives to
these approved investment guidelines "for cause."  *See* 11 U.S.C. § 345(b*); In re Serv. Merch.
Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

     27.    In the *Service Merchandise* case, the court identified the following factors as a
guide for determining whether cause exists to waive the requirements of section 345(b) of the
Bankruptcy Code:

DOCS_DE:202224.1 03636/001

a.    the sophistication of the debtor's business;

b.    the size of the debtor's business operations;

c.    the amount of investments involved;

d.    the bank ratings of the financial institutions where the debtor's funds are held;

e.    the safeguards in place within the debtor's own business for insuring the safety of the funds;

f.    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

g.    the benefit to the debtor of current practices;

h.    the harm, if any, to the estate; and

i.    the reasonableness of the debtor's request for relief from the section 345(b) requirements in light of the overall circumstances of the case.

*Id.* Examining these factors, the *Service Merchandise* court concluded that cause existed in that case because the debtors were "large, sophisticated [companies] with a complex cash management system" that had the ability to shift money as needed to ensure the safety of their funds. *Id.* Moreover, the benefits to the debtor of waiving the section 345(b) requirements far outweighed any potential harm to the estate, and the failure to waive the requirements "would needlessly handcuff these debtors' reorganization efforts." *Id.* at 896-97.

28.    As in *Service Merchandise* and the other chapter 11 cases in which courts in this district have granted requests for approval of the continued use of investment and deposit guidelines that did not strictly comply with section 345 of the Bankruptcy Code, the Debtors are large, sophisticated companies with a complex Cash Management System that provides the Debtors the ability to efficiently transfer funds to ensure their safety. In light of these factors and the safety of the Debtors' Bank Accounts, the Debtors respectfully request that, to the extent the Deposit Guidelines do not comply with the requirements of section 345(b), the Court

16

extend the Debtors' time to comply with section 345(b) of the Bankruptcy Code for 45 days, without prejudice to the Debtors' ability to seek a final waiver of those requirements. During the extension period, the Debtors will engage in discussions with the U.S. Trustee and any statutory committee appointed in these chapter 11 cases to determine whether modifications to the Deposit Guidelines are appropriate under the circumstances.

29.    Local Rule 2015-2(b) provides that if a motion for a waiver under section 345 of the Bankruptcy Code is filed on the first day of the case, and there are more than 200 creditors, the court may grant an interim waiver. As this motion is being filed on the first day of the Debtors' chapter 11 cases and the Debtors have in excess of 200 creditors, by this motion the Debtors request that the Court enter an order approving, on an interim basis, a section 345-waiver of the Deposit Guidelines; provided, however, that if any official committee appointed in these chapter 11 cases, or any other party in interest (including the U.S. Trustee), files an objection to the Deposit Guidelines within 45 days after the entry of the order granting the relief requested herein and such objection is not resolved or withdrawn before expiration of the 45-day period following entry of the order, the Debtors shall schedule a prompt hearing before the Court to renew their request for waiver under section 345(b) of the Bankruptcy Code. Courts in this district have permitted similar and longer waivers in other comparable chapter 11 cases. *See, e.g., MSD Order* (granting 45-day extension); *OnCure Order* (granting 30-day extension); AFA Investment Order (granting 45-day extension); *Harry & David Order* (same); *In re Simmons Bedding Co.*, Case No. 09-14037 (MFW) (Bankr. D. Del. Nov. 17, 2009) (granting 60-day extension).

30.    Finally, upon there being no objection at the expiration of the 45-day waiver period, or such longer period in the event that the 45-day waiver is extended, the Debtors

17

respectfully request that such waiver become permanent without the need for a further hearing

by the Court. Courts in this district have permitted interim waivers to ripen into permanent

waivers under similar circumstances. *See, e.g., In re Altegrity*, No. 15-10226 (Bankr. D. Del.

Mar. 16, 2015) (authorizing an interim waiver of section 345(b) and providing that if no

objection is timely made, the waiver shall become final without a further hearing); *In re Stallion*

*Oilfield Servs. Ltd.*, No. 09-13562 (Bankr. D. Del. Oct. 20, 2009) (granting an interim waiver of

section 345(b) and providing that waiver shall become final if no timely objections are filed); *In*

*re Masonite Corp.*, No. 09-10844 (Bankr. D. Del. Mar. 17, 2009) (granting an interim waiver of

section 345(b) and providing that waiver shall become final if no timely objections are filed).

      C.      **The Court Should Authorize Banks Participating in the Cash Management System to Honor Certain Transfers and Charge Bank Fees and Certain Other Amounts**

      31.      Contemporaneously with the filing of this motion, the Debtors have filed various

motions for authorization to pay certain prepetition obligations. With respect to some of these

obligations, prior to the Petition Date, the Debtors issued checks that have yet to clear the

banking system. With respect to other obligations, the Debtors intend to issue checks

postpetition on account of such prepetition debt once the Court enters an order permitting the

Debtors to take such action. The Debtors intend to inform the Banks which prepetition checks

the Banks should honor pursuant to orders of the Court authorizing such payment.

      32.      As a result of the foregoing, the Debtors request that the Banks be authorized to

accept and honor all representations from the Debtors regarding which checks, drafts, wires or

ACH transfers (each a "Disbursement") should be honored or dishonored consistent with any

order of this Court, whether such Disbursements are dated prior to, on or subsequent to the

Petition Date; provided, however, that to the extent the Debtors direct the Banks to dishonor any

Disbursements or the banks inadvertently dishonor any Disbursements, the Debtors may issue a replacement Disbursement consistent with the orders of this Court. Pursuant to the relief requested in this motion, the Banks will not be liable to any party on account of (a) following the Debtors' instructions or representations as to any order of this Court, (b) honoring any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored or (c) an innocent mistake made despite implementation of reasonable item-handling procedures. Such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

33.     Finally, the Debtors request authority for the Banks to charge and the Debtors to pay both prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors (collectively, the "Bank Fees"). Bank Fees for the Debtors recently have averaged approximately $228,000 on an annual basis. The Debtors further request that the Banks be authorized to charge back returned items to the Bank Accounts in the normal course of business.

34.     The Debtors require this relief to minimize or eliminate any disruption to the Cash Management System and the Bank Accounts and assist the Debtors in accomplishing a smooth transition with respect to these cases. Authority for debtors to pay bank fees and banks to charge back returned items has been routinely granted in other chapter 11 cases. *See, e.g., Molycorp Order; Radioshack Order; Old FENM Order; MSD Order; OnCure Order; AFA Investment Order; Harry & David Order.*

**D.**    **Permitting Continued Intercompany Funding and Intercompany Transactions with Non-Debtor Affiliates and Granting Administrative Expense Status to Postpetition Inter-Debtor Obligations is Appropriate**

35.    As described above, under the Cash Management System, funds generated by the business operations of each participating Debtor ultimately flow into the Wholesale Main Concentration Account which are swept daily into the Wholesale Operating Account, into which funds drawn on the Debtors' credit line under the Prepetition ABL Facility also are deposited. As the Debtors participating in the Cash Management System require funds to meet current obligations, cash is transferred from the Wholesale Operating Account into the appropriate disbursement account. In addition, and as described above, a variety of ordinary course Intercompany Transactions are central to the Debtors' operations. It is, therefore, imperative that the Debtors be permitted to continue to engage in the Intercompany Transactions during these chapter 11 cases.

36.    If this Court authorizes the continuation of the Intercompany Transactions, at any given time there may be balances due and owing between Debtors or between Debtors and the Non-Debtor Affiliates. These balances represent extensions of intercompany credit. The Debtors will continue to maintain records of all Intercompany Transactions and current intercompany accounts receivable and payable. In addition, as set forth above, the Debtors possess the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments, including those related to the Intercompany Transactions. The Debtors will continue to maintain such records during these chapter 11 cases.

37.    The continuation of the ordinary course Intercompany Transactions and related transfers will permit the Debtors to conduct business as usual and avoid any disruption to the detriment of the Debtors and their Non-Debtor Affiliates. Accordingly, the Debtors submit that

20

the continuation of these transactions is in the best interests of the Debtors' estates and creditors

and respectfully request that the continuation of the ordinary course Intercompany Transactions

be permitted postpetition.

38.    In addition, the Debtors respectfully request that, pursuant to section 503(b)(1) of

the Bankruptcy Code, all claims arising from Intercompany Transactions occurring after the

Petition Date be accorded administrative expense status, subject only to claims with a higher

priority pursuant to any interim or final order approving the DIP Credit Facility.  According

such status to claims arising from Intercompany Transactions will ensure that each entity

utilizing funds that flow through the Cash Management System will continue to bear ultimate

payment responsibility for its respective liabilities, thereby protecting the interests of the

Debtors' creditors.

39.    The continuation of intercompany transactions, including intercompany

transactions with non-debtor affiliates to preserve and protect the value of a debtor's enterprise,

and granting administrative expense or super-priority administrative expense status for such

transactions, as requested here, has been granted in other chapter 11 cases in this district.

*See, e.g., Molycorp Order; Radioshack Order; Old FENM Order; MSD Order; OnCure Order;*

*AFA Investment Order; Harry & David Order.*

## REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY

40.    Pursuant to Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), the Debtors seek immediate entry of an order granting the

Debtors (a) the authority to continue to pay Bank Fees and (b) a waiver of any stay of the

effectiveness of such an order.  Bankruptcy Rule 6003(b) provides, in relevant part, that

"[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the

court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to pay all or part of a claim that arose before the filing of the petition." Accordingly, where the failure to grant any such requested relief would result in immediate and irreparable harm to the Debtors' estates, the Court may allow the Debtors to pay all or part of a claim that arose before the Petition Date prior to the twenty-first day following the Petition Date. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

41.    The continued use of the Bank Accounts, Cash Management System and business forms, and the payment of Bank Fees, are necessary to prevent immediate and irreparable damage to the Debtors' operations. Accordingly, the Debtors submit that ample cause exists to justify:  (a) the entry of the Order granting the relief sought herein pursuant to Bankruptcy Rule 6003(b); and (b) a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NOTICE

42.    Notice of this motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates; (c) counsel to Standard General L.P. and its affiliates; (d) counsel to U.S. Bank, N.A., in its capacity as the trustee under the indenture governing the Debtors' secured notes; (e) Milbank, Tweed, Hadley & McCloy LLP, as counsel to an ad hoc group of noteholders; (f) counsel to Wilmington Trust, National Association, as agent to the lenders under the Debtor-in-Possession Agreement and as administrative agent for the Debtors' ABL Facility; and (g) the Internal Revenue Service and the Securities and Exchange Commission.

As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

43.    No prior request for the relief sought herein has been made to this Court or any other court.

**[Remainder of page intentionally left blank]**

WHEREFORE, the Debtors respectfully request that the Court enter the attached Order and grant such other relief as the Court deems appropriate.

Respectfully submitted,

Dated: October 5, 2015

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302-652-4400
Email:    ljones@pszjlaw.com
          joneill@pszjlaw.com
          jmulvihill@pszjlaw.com

and

JONES DAY
Richard L. Wynne (CA Bar No. 149504)
Erin N. Brady (CA Bar No. 215038)
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone:   (213) 489-3939
Facsimile:   (213) 243-2539
Email:       rlwynne@jonesday.com
             enbrady@jonesday.com

and

Scott J. Greenberg (NY Bar No. SG-2881)
222 East 41st Street
New York, NY 10017
Telephone:   (212) 326-3939
Facsimile:   (212) 755-7306
Email:       sgreenberg@jonesday.com

Proposed Co-Counsel for the Debtors and Debtors in Possession

24