## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| AMERICAN APPAREL, INC., *et al.*,[1] | : | Case No. 15-12055 (___) |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |

### MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) AND 507 AND (B) UTILIZE CASH COLLATERAL, (II) AUTHORIZING THE REPAYMENT IN FULL OF AMOUNTS OWED UNDER THE PREPETITION ABL CREDIT FACILITY, (III) GRANTING PRIMING LIENS, PRIORITY LIENS AND SUPERPRIORITY CLAIMS TO THE DIP LENDERS, (IV) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES, (V) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c) AND (VI) GRANTING RELATED RELIEF

---

[1]    The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): American Apparel, Inc. (0601); American Apparel (USA), LLC (8940); American Apparel Retail, Inc. (7829); American Apparel Dyeing & Finishing, Inc. (0324); KCL Knitting, LLC (9518); and Fresh Air Freight, Inc. (3870). The address of each of the Debtors is 747 Warehouse Street, Los Angeles, California, 90021.

# TABLE OF CONTENTS

**Page**

Jurisdiction and Venue ................................................................................................ 1

Preliminary Statement ................................................................................................. 1

General Background .................................................................................................... 3

Relief Requested ......................................................................................................... 3

Factual Background ..................................................................................................... 5

    I.      The Debtors' Prepetition Funded Debt ............................................................ 5

          A.      Prepetition ABL Facility ..................................................................... 5

          B.      Prepetition Senior Notes due 2020 ..................................................... 7

          C.      Collateral and Intercreditor Agreement ............................................. 8

    II.     The Debtors' Immediate Need for Liquidity .................................................... 9

    III.    Debtors' Efforts to Obtain Postpetition Financing ......................................... 10

Material Terms of the DIP Credit Facility ................................................................ 13

Requirements under Local Rule 4001-2 ................................................................... 19

    I.      Local Rule 4001-2(a)(i)(A) ............................................................................ 20

    II.     Local Rule 4001-2(a)(i)(B) ............................................................................ 21

    III.    Local Rule 4001-2(a)(i)(C) ............................................................................ 21

    IV.    Local Rule 4001-2(a)(i)(D) ............................................................................ 22

    V.     Local Rule 4001-2(a)(i)(E) ............................................................................ 22

    VI.    Local Rule 4001-2(a)(i)(F) ............................................................................ 23

    VII.   Local Rule 4001-2(a)(i)(G) ............................................................................ 23

    VIII.  Local Rule 4001-(2)(a)(i)(H) ......................................................................... 24

Additional Provisions ............................................................................................... 25

Request for the Approval of the DIP Credit Agreement and Related Actions ........... 26

    I.      Approval Under Section 364(c) of the Bankruptcy Code ................................. 26

          A.      The Debtors Were Unable to Obtain Necessary Postpetition
                Financing on an Unsecured Basis ...................................................... 27

          B.      The DIP Credit Facility is Necessary to Preserve and Protect the
                Assets of the Debtors' Estates ........................................................... 29

          C.      The Terms of the DIP Credit Facility are Fair, Reasonable and
                Appropriate Under the Circumstances ............................................... 29

          D.      The DIP Credit Facility is in the Best Interests of the Debtors'
                Estates and Creditors ........................................................................ 30

i

## TABLE OF CONTENTS
### (continued)

Page

II.    Approval of Postpetition Financing Under Section 364(d) of the Bankruptcy Code is Warranted .......................................................................... 31

    A.    The Debtors Were Unable to Obtain Necessary Postpetition Financing Otherwise .......................................................... 31

    B.    The Prepetition Secured Creditors are Adequately Protected .................. 32

III.    Entry into the DIP Credit Facility Is an Exercise of the Debtors' Sound Business Judgment.......................................................................... 34

    A.    The Roll-Up of Obligations under the Prepetition ABL Facility Is Appropriate .......................................................... 35

    B.    The Scope of the Carve-Out is Appropriate ........................................... 38

    C.    The Budget is Appropriate.................................................... 39

    D.    The Payment of Fees under the DIP Agreement is Appropriate ............. 39

Request for Use OF Cash Collateral .................................................... 40

Request for Modification of the Automatic Stay ........................................ 40

Good Faith .......................................................................................... 41

Request for Hearing and Authority to make interim borrowings under the DIP Credit Facility .......................................................................... 41

Establishing Notice Procedures and Scheduling Final Hearing ................................ 42

Notice .......................................................................................... 42

No Prior Request.......................................................................... 43

## TABLE OF AUTHORITIES

**Page**

CASES

Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),
  789 F.2d 1085 (4th Cir. 1986) .......................................................................................27, 28

Burtch v. Ganz (In re Mushroom Transp. Co.),
  382 F.3d 325 (3d Cir. 2004)....................................................................................................29

In re 495 Cent. Park Ave. Corp.,
  136 B.R. 626 (Bankr. S.D.N.Y. 1992) .............................................................................28, 31

In re Aleris Int'l Inc.,
  No. 09-10478 (Bankr. D. Del. Mar. 18, 2009).........................................................................39

In re Ames Dep't Stores,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990)..........................................................27, 28, 38, 41, 42

In re Appleseed's Intermediate Holdings LLC,
  Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011).......................................................37

In re Aqua Assocs.,
  123 B.R. 192 (Bankr. E.D. Pa. 1991) .....................................................................................27

In re Associated Wholesalers, Inc.,
  Case No. 14-12092 (Bankr. D. Del. Oct. 6, 2014)..................................................................37

In re Cal Dive Int'l, Inc.,
  Case No. 15-10458 (CSS) (Bankr. D. Del. Apr. 20, 2015) .....................................................37

In re Capmark Fin. Grp. Inc.,
  438 B.R. 471 (Bankr. D. Del. 2010) ........................................................................................36

In re Capsule Int'l Holdings LLC,
  Case No. 13-13281 (CSS) (Bankr. D. Del. Jan. 16, 2014) ......................................................36

In re Colt Holding Co. LLC,
  Case No. 15-11296 (LSS) (Bankr. D. Del. Jul. 10, 2015) ......................................................37

In re Crouse Grp., Inc.,
    71 B.R. 544 (Bankr. E.D. Pa. 1987), modified on other grounds, 75 B.R. 553
    (Bankr. E.D. Pa. 1987)...........................................................................................27

In re Dayton Superior Corp.,
    Case No. 09-11351 (BLS) (Bankr. D. Del. Jun. 5, 2009)................................36, 37

In re Defender Drug Stores, Inc.,
    145 B.R. 312 (9th Cir. BAP 1992)........................................................................39

In re Dunes Casino Hotel,
    69 B.R. 784 (Bankr. D.N.J. 1986) ...................................................................31, 32

In re Dura Auto. Sys., Inc.,
    No. 06-11202 (Bankr. D. Del. Jan. 30, 2008).......................................................40

In re Energy Future Holding Corp.,
    527 B.R. 157 (D. Del. 2015)..................................................................................36

In re Every WareGlobal, Inc.,
    Case No. 15-10743 (LSS) (Bankr. D. Del. Apr. 28, 2015)....................................36

In re Farmland Indus., Inc.,
    294 B.R. 855 (Bankr. W.D. Mo. 2003).............................................................29, 30

In re Filene's Basement, LLC,
    2014 WL 1713416 (Bankr. D. Del. Apr. 29, 2014)................................................34

In re Furniture Brands Int'l, Inc.,
    Case No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013)...................................37

In re Great Atl. & Pac. Tea Co.,
    No. 10 24549 (Bankr. S.D.N.Y. Jan. 11, 2011) ....................................................40

In re Indianapolis Downs, LLC,
    Case No. 11-11046 (BLS) (Bankr. D. Del. Apr. 26, 2011) ...................................36

In re InSight Health Services Holdings Com.,
    No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011)...........................................40

In re LandSource Communities Dev. LLC,
    Case No. 08-11111 (KJC) (Bankr. D. Del. Jul. 21, 2008).....................................36

iv

In re Los Angeles Dodgers LLC,
        457 B.R. 308 (Bankr. D. Del. 2011) ........................................................27

In re Lyondell Chem. Co.,
        Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009)................................36

In re MACH Gen, LLC,
        Case No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014)....................................37

In re Mervyn's Holdings LLC,
        Case No. 08-11586 (KG) (Bankr. D. Del. Jul. 31, 2008) .......................................36

In re NEC Holdings Corp.,
        Case No. 10-11890 (PJW) (Bankr. D. Del. Jul. 16, 2010)......................................38

In re OnCure Holdings, Inc., et al.,
        Case No. 13-11540 (Bankr. D. Del. Jul. 24, 2013)..................................................36

In re Pacific Energy Res., Ltd.,
        Case No. 09-10785 (Bankr. D. Del. Jun. 4, 2009) (KJC) .......................................38

In re RadioShack Corp.,
        Case No. 15-10197 (BLS) (Mar. 6, 2015) ..............................................................37

In re Real Mex Restaurants, Inc.,
        Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011)......................................38

In re Revel AC, Inc.,
        Case No. 13-16253 (JHW) (Bankr. D.N.J. Apr. 22, 2013).....................................38

In re School Specialty, Inc.,
        No. 13-10125 (Bankr. D. Del. Feb. 26, 2013) ........................................................36

In re Simasko,
        47 B.R. 444 (Bankr. D. Colo. 1985) ................................................................41, 42

In re Sky Valley, Inc.,
        100 B.R. 107 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB
        v. Sky Valley, Inc., 99 B.R. 117 (N.D. Ga. 1989) ............................................28, 32

In re Source Interlink Cos. Inc.,
        No. 09-11424 (KG) (Bankr. D. Del. Apr. 29, 2009)...............................................37

In re Tri-Valley Corp.,
    Case No. 12-12291 (MFW) (Bankr. D. Del. Sept. 28, 2012) ..................................36

In re Tuscany Int'l Holdings (U.S.A.) Ltd., et al.,
    Case No. 14-10193 (Bankr D. Del. Mar. 21, 2014) .........................................36

In re YL West 87th Holdings I LLC,
    423 B.R. 421 (Bankr. S.D.N.Y. 2010) ..........................................................34

Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp.,
    Inc.),
    16 F.3d 552 (3d Cir. 1994) (en banc) ..........................................................32

Richmond Leasing Co. v. Capital Bank, N.A.,
    762 F.2d 1303 (5th Cir. 1985) ..................................................................34

Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.),
    300 B.R. 861 (Bankr. W.D. Pa. 2003) .........................................................31

Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines,
    Inc.),
    163 B.R. 964 (Bankr. D. Del. 1994) ...........................................................34

Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In
    re Ellingsen MacLean Oil Co.),
    65 B.R. 358 (W.D. Mich. 1986) ................................................................29

## STATUTES

11 U.S.C. § 362 .....................................................................................5, 15, 40

11 U.S.C. § 363(a) .........................................................................................4

11 U.S.C. § 363(c) ........................................................................................15

11 U.S.C. § 363(c)(2) ....................................................................................40

11 U.S.C § 364 ...............................................................................26, 34, 39, 41

11 U.S.C. § 364(a) ........................................................................................27

11 U.S.C. § 364(b) .....................................................................................26, 27

11 U.S.C. § 364(c) .............................................................................26, 27, 28, 35

11 U.S.C. § 364(c)(1) .................................................................................4

11 U.S.C. § 364(c)(2) .................................................................................4

11 U.S.C. § 364(d) .............................................................4, 15, 31, 32, 35

11 U.S.C. § 364(d)(1) ...............................................................................31

11 U.S.C. § 364(d)(1)(B) .....................................................................32, 33

11 U.S.C. § 364(e) ....................................................................................41

11 U.S.C. § 506(c) .................................................................16, 17, 18, 21

11 U.S.C. § 544 .........................................................................................20

11 U.S.C. § 545 .........................................................................................20

11 U.S.C. § 547 .........................................................................................20

11 U.S.C. § 548 .........................................................................................20

11 U.S.C. § 549 ....................................................................................20, 22

11 U.S.C. § 552(b) ...............................................................18, 24, 25

11 U.S.C. § 552(b)(1) ................................................................................24

11 U.S.C. § 726(b) ...............................................................................14, 39

11 U.S.C. § 1104 ......................................................................................16

11 U.S.C. § 1106(a)(3) .............................................................................16

11 U.S.C. § 1106(a)(4) .............................................................................16

11 U.S.C. § 1106(b) .................................................................................16

11 U.S.C. § 1107(a) ...................................................................................3

11 U.S.C § 1108 ........................................................................................3

11 U.S.C. § 1121 ......................................................................................17

28 U.S.C. § 157 ..........................................................................................1

DOCS_DE:202226.1 03636/001

28 U.S.C. § 157(b) ................................................................................................1

28 U.S.C. § 1334 ..................................................................................................1

28 U.S.C. § 1408 ..................................................................................................1

28 U.S.C. § 1409 ..................................................................................................1

28 U.S.C. § 1930(a) ............................................................................................14

31 U.S.C. 3717 ...................................................................................................14

**OTHER AUTHORITIES**

Bankruptcy Rule 4001(b) ....................................................................................41

Bankruptcy Rule 4001(c) ...............................................................................41, 42

of the Interim Order (a) ........................................................................................4

Local Rule 4001-2 ..............................................................................................19

Local Rule 4001-2(a)(i) ......................................................................................19

Local Rule 4001-2(a)(i)(A) .................................................................................20

Local Rule 4001-2(a)(i)(B) .................................................................................21

Local Rule 4001-2(a)(i)(C) .................................................................................21

Local Rule 4001-2(a)(i)(D) .................................................................................22

Local Rule 4001-2(a)(i)(E) .............................................................................22, 23

Local Rule 4001-2(a)(i)(F) .................................................................................23

Local Rule 4001-2(a)(i)(G) .................................................................................23

Local Rule 4001-(2)(a)(i)(H) ..............................................................................24

Local Rule 9013-1(m) .....................................................................................42, 43

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move the Court for the entry of an order, in substantially the form attached hereto as Exhibit 1 (the "Interim Order"), and a final order (the "Final Order"), under sections 105, 107, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of Bankruptcy Code, Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 and 9018-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (a) authorizing the Debtors to (i) obtain postpetition financing pursuant to a superpriority debtor-in-possession financing facility on the terms described herein and (ii) utilize cash collateral; (b) granting liens and superpriority administrative claims; (c) scheduling a final hearing with respect to the relief requested herein; and (d) granting related relief (the "Motion"). In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## PRELIMINARY STATEMENT

2.      As more fully described in this Motion and in the *Declaration of Mark Weinsten in Support of First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference, several factors have severely impacted the Debtors' financial condition and near-term liquidity, precipitating the commencement of these chapter 11 cases and requiring the Debtors to seek immediate access to the Debtors' proposed $90 million debtor-in-possession super-priority financing facility (the below-defined "DIP Credit

1

Facility").[2] This proposed postpetition financing will, among other things, provide the capital necessary to allow the Debtors to continue operating without material disruption to their businesses during the chapter 11 cases, all in an effort to maximize the value of their estates for the benefit of creditors by reorganizing as a going concern.  Most urgently, the proposed postpetition financing will allow the Debtors to meet their payroll obligations this week to over 4,900 employees and keep their approximately 230 stores operating.

3.        As set forth in the Flachs Declaration (as defined below), the DIP Credit Facility was preceded by a competitive marketing process designed to secure postpetition financing on the best available terms.  Numerous third party financing sources were contacted, as well as prepetition secured creditors.  The proposal submitted by the Supporting Parties (as defined below), which includes a group of lenders under the Prepetition ABL Facility and holders of the Prepetition Senior Notes (each term as defined below) (such group, the "Committee of Lead Lenders"), was determined by the Debtors and their advisors to be the most advantageous, with the most favorable economics coupled with the significant benefit of binding commitments to support a confirmable plan in the near term and providing sufficient liquidity at exit to ensure such plan is well within the bounds of feasibility, all as more fully set forth in the Restructuring Support Agreement dated October 4, 2015 (the "RSA").  The DIP Credit Facility was the product of an extensive, and at times contentious, arm's-length negotiation with the Supporting Parties, and no competing proposal provided the Debtors with a similarly beneficial set of comprehensive terms.

4.        As a result, by this Motion the Debtors seek authorization to obtain postpetition financing pursuant to the terms set forth in this Motion, that certain Debtor-In-Possession Credit

---

[2]        Capitalized terms not otherwise defined herein shall have the meanings given to them in the Interim Order and the DIP Credit Agreement, as applicable.

Agreement (the "DIP Credit Agreement"; attached as Exhibit A to the Interim Order), the Interim

Order and the Final Order.  The Debtors intend to use $70 million of the proceeds of the DIP

Credit Facility immediately upon the entry of, and on the terms set forth in, the Interim Order.

## GENERAL BACKGROUND

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors are

continuing in possession of their properties and are managing their businesses, as debtors in

possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official

committee of unsecured creditors has been appointed in these cases.

6.      The Debtors and their non-Debtor affiliates operate a vertically integrated

manufacturing, distribution, and retail business focused on branded fashion-basic apparel,

employing approximately 8,500 employees across six manufacturing facilities and approximately

230 retail stores in the United States and 17 other countries worldwide.  Additional information

regarding the Debtors and these cases, including the Debtors' businesses, corporate structure,

financial condition, and the reasons for and objectives of these cases, is set forth in the First Day

Declaration.

## RELIEF REQUESTED

7.      By this Motion, the Debtors seek entry of the Interim and Final Orders:

(a)      authorizing the Debtors to obtain postpetition financing, as set forth below
and in the DIP Credit Agreement, with Wilmington Trust, N.A. (the "DIP
Agent"), as administrative agent, and the other lenders party to the DIP
Credit Agreement (collectively, the "DIP Lenders"), with funds thereunder
available for use in accordance with the budget (as amended, modified or
updated in accordance with the DIP Credit Agreement, the "Budget")[3] and
the other terms set forth in the DIP Credit Agreement;

---

[3]      The Budget is attached as Exhibit 2 hereto; the DIP Lenders' consent to such Budget extends to the
first four weeks thereof in accordance with the DIP Credit Agreement.

DOCS_DE:202226.1 03636/001

(b)     authorizing the Debtors to make non-refundable payments of the principal, interest, fees, expenses and other amounts payable in accordance with the terms of the DIP Credit Facility and any interim or final order approving the DIP Credit Facility;

(c)     authorizing the Debtors to grant (i) security interests in and liens on the DIP Collateral (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) and (ii) superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code);

(d)     authorizing the Debtors' use of cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code) constituting Collateral under the Prepetition ABL Facility (as defined in the DIP Credit Agreement) and under the Prepetition Notes Indenture, including, without limitation, all of the Debtors' cash on hand as of the Commencement Date (the "Cash Collateral");

(e)     authorizing the Debtors to provide adequate protection of the liens and security interests of (i) Prepetition ABL Lenders and Prepetition ABL Agent under the Prepetition ABL Facility (collectively, the "Prepetition ABL Liens"), and (ii) holders of the Prepetition Senior Notes and the Prepetition Senior Notes Trustee (the "Prepetition Senior Notes Liens", and together with the Prepetition ABL Liens, the "Prepetition Liens");

(f)     authorizing the Borrower to use Cash Collateral and the proceeds from the DIP Credit Facility upon entry of the Interim Order (a) to provide working capital, and for other general corporate purposes of the Credit Parties (as defined in the DIP Credit Agreement), (b) to pay in full, as a condition to closing the DIP Credit Facility, the outstanding balance of all Prepetition ABL Obligations, including the unpaid fees, costs and expenses and indemnification rights of each of the Prepetition ABL Agent (including, without limitation, in its capacity  as "Collateral Agent" under the Prepetition ABL Facility) and the Committee of Lead Lenders, whether incurred prior or subsequent to the Commencement Date; (c) to pay related postpetition transaction costs, fees and expenses with respect to the DIP Facility; (d) to fund the Carve-Out (as defined below), and (e) to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court;

(g)     authorizing the Borrower to use a portion of the proceeds from the DIP Credit Facility (i) to provide working capital, and for other general corporate purposes of the Credit Parties (as defined in the DIP Credit Agreement); (ii) to pay in full, as a condition to closing the DIP Credit Facility, the outstanding balance of all Prepetition ABL Obligations; (iii) to pay related postpetition transaction costs, fees and expenses with

DOCS_DE:202226.1 03636/001

respect to the DIP Credit Facility; (iv) to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court; and (v) to fund the Carve-Out;

(h)     modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement the terms of the DIP Credit Agreement, Interim Order, Final Order, and as otherwise provided herein;

(i)     scheduling an emergency interim hearing (the "Interim Hearing") on this Motion for this Court to consider entry of the Interim Order, which authorizes the Debtors to borrow up to an aggregate principal or face amount not to exceed $70 million on an interim basis in accordance with the terms of the DIP Credit Facility and Interim Order;

(j)     scheduling of a final hearing (the "Final Hearing") on the Motion to consider entry of a Final Order authorizing the borrowings and letter of credit issuances under the DIP Credit Documents on a final basis and approval of notice procedures with respect thereto; and

(k)     granting certain related relief.

## FACTUAL BACKGROUND

### I.     The Debtors' Prepetition Funded Debt

8.     The Debtors' primary liabilities consist of: (a) a $90 million asset-based revolving credit facility secured by a lien on substantially all of the Debtors' assets, subject to the terms of an intercreditor agreement; (b) $206 million in notes secured by a lien on substantially all of the Debtors' assets, subject to the terms of an Intercreditor Agreement (as discussed and defined below); (c) two unsecured credit facilities totaling approximately $25 million and (d) unsecured trade debt arising from the Debtors' operations.

### A.     Prepetition ABL Facility

9.     On April 4, 2013, American Apparel (USA), LLC entered into a secured $35 million asset-based revolving credit facility (as amended, the "Capital One Credit Facility") pursuant to that certain Credit Agreement (as amended from time to time, the "Capital One Credit Agreement"), among American Apparel (USA), LLC, American Apparel Retail, Inc.,

5

American Apparel Dyeing & Finishing, Inc. and KLC Knitting, LLC, as borrowers (the "ABL Borrowers"), American Apparel, Inc. ("AAI") and Fresh Air Freight, Inc. as guarantors (the "ABL Guarantors" and, together with the ABL Borrowers, the "ABL Obligors"), Capital One Business Credit Corp. ("Capital One") as administrative agent (the "Capital One Agent"), and the lenders party thereto (the "Capital One Lenders"). Subject to the terms of the Intercreditor Agreement, the Capital One Credit Facility was secured by a lien on substantially all of the Debtors' assets. On July 5, 2014, the Capital One Credit Agreement was amended to increase the Capital One Lenders' initial commitment to $50 million.

10.    On August 17, 2015, the Capital One Lenders assigned their rights and obligations as lenders to a syndicate of lenders that included certain of the Company's existing creditors, including funds associated with Standard General L.P., Monarch Alternative Capital L.P., Coliseum Capital LLC and Goldman Sachs Asset Management, L.P. (collectively, the "Prepetition ABL Lenders"), and Capital One was replaced by Wilmington Trust, National Association ("Wilmington Trust") as administrative agent (such transactions, the "ABL Assignment").

11.    Immediately following this assignment, the Capital One Credit Facility was amended and restated pursuant to an amended and restated credit agreement among the Company, the Prepetition ABL Lenders and Wilmington Trust (the "Prepetition ABL Facility"), pursuant to which, among other things, (x) the commitment thereunder was increased from $50 million to $90 million, (y) the borrowing base was increased by $15 million (provided that such increase would not apply to the extent the borrowing base exceeds $60 million) and (z) amounts

6

borrowed and repaid under the Prepetition ABL Facility could no longer be re-borrowed.[4]

Additionally, certain covenant violations existing as of June 30, 2015, under the Capital One

Credit Facility were waived under the Prepetition ABL Facility.  In connection with this

amendment, the Prepetition ABL Lenders received certain amendment and closing fees and

reimbursement of closing expenses.

12.     The Prepetition ABL Facility, like the Capital One Credit Facility before it,

continues to be secured by a lien on substantially all of the Debtors' assets, subject to the terms of

the Intercreditor Agreement.  The borrowings that were outstanding under the Capital One Credit

Facility at the time of the ABL Assignment remain outstanding under the Prepetition ABL

Facility.  As of the Petition Date, an aggregate principal balance of approximately $60 million

remains outstanding under the Prepetition ABL Facility.

**B.     Prepetition Senior Notes due 2020**

13.     Pursuant to an Indenture dated April 4, 2013, among U.S. Bank National

Association ("U.S. Bank"), as trustee and collateral agent, AAI as issuer, the remaining Debtors

as guarantors (the "Guarantors," and together with AAI, the "Notes Obligors"), AAI issued

Senior Notes totaling $206 million, due April 15, 2020 (the "Prepetition Senior Notes").  The

Prepetition Senior Notes issued with an initial interest rate of 13% per annum, subject to

adjustment.  That adjustment has triggered, such that interest now accrues at the rate of 15% per

annum, with the interest in excess of 13% per annum treated as paid-in-kind for interest

payments due before April 15, 2018.  Subject to the terms of the Intercreditor Agreement, the

Prepetition Senior Notes are secured by a lien on substantially all of the Debtors' assets.  As of

---

[4]     Certain of the Debtors' other financing agreements, including the Prepetition Senior Notes and an unsecured credit facility with Standard General Master Fund, L.P. (as assignee of Lion/Hollywood L.L.C.) were also amended to permit the incurrence of additional indebtedness evidenced by the Prepetition ABL Facility.

7

the Petition Date, an aggregate principal balance of approximately $209.9 million remains

outstanding under the Prepetition Senior Notes.

### C.    Collateral and Intercreditor Agreement

14.    The Prepetition ABL Facility and the Prepetition Senior Notes are secured by

substantially all of the Debtors' assets.  U.S. Bank, as Collateral Agent for the Secured Notes,

and Wilmington Trust, as administrative agent under the Prepetition ABL Facility (as successor

administrative agent under the Prepetition ABL Facility to Capital One Business Credit Corp.),

are parties to that certain Intercreditor Agreement dated as of April 4, 2013 (as amended,

the "Intercreditor Agreement"), which sets forth the relative lien priorities between the

Prepetition ABL Lenders and the noteholders.  The Intercreditor Agreement provides that the

Prepetition ABL Facility is secured by (i) a lien on the Credit Facility Priority Collateral[5] that is

contractually senior to the lien on the Credit Facility Priority Collateral that secures the

Prepetition Senior Notes and (ii) a lien on the Notes Priority Collateral[6] that is contractually

subordinated to the lien on the Note Priority Collateral that secures the Prepetition Senior Notes,

in each case subject to certain permitted liens.  The Intercreditor Agreement also provides that

the Prepetition Senior Notes are secured by (i) a lien on the Notes Priority Collateral that is

---

[5]    As defined in the Intercreditor Agreement, "Credit Facility Priority Collateral" consists of all of
the Company's and each Guarantor's existing and future assets, consisting of: (i) accounts, (ii) inventory, (iii) cash,
(iv) deposit accounts and all cash, checks and other instruments on deposit therein or credited thereto, (v) securities
accounts and all investment property, (vi) tax refunds, (vii) intercompany notes and obligations, (viii) proceeds of
business interruption insurance, (ix) royalties and contract and license rights, (x) instruments, documents, chattel
paper (whether tangible or electronic), drafts and acceptances, payment intangibles and all supporting obligations
and general intangibles to the extent they arise out of or relate to the foregoing in clauses (i) through (ix), and (xi)
books, records and the proceeds of the foregoing (including insurance proceeds of the foregoing). The following
specifically does not constitute Credit Facility Priority Collateral: (w) trademarks, licenses, trade names, patents,
trade secrets, domain names, and copyrights of the Company or any Guarantor, and general intangibles necessary for
the operation of the equipment, machinery and motor vehicles, including warranties and operational manuals and
similar items, (x) any Capital Stock of any direct or indirect Subsidiary of the Company, (y) any general intangibles
relating to any of the foregoing, and (z) the identifiable proceeds of each of the foregoing.

[6]    As defined in the Intercreditor Agreement, "Notes Priority Collateral" means all existing and
future property and assets owned by the Company and the Guarantors, whether real, personal or mixed (other than
any Excluded Assets or Credit Facility Priority Collateral).

contractually senior to a lien on the Notes Priority Collateral that secures the Credit Agreement and (ii) a lien on the Credit Facility Priority Collateral that is contractually subordinated to the lien on the Credit Facility Priority Collateral that secures the Credit Agreement, again in each case subject to certain permitted liens.  The below chart illustrates the priorities granted with respect to the Prepetition Collateral:

|  | Credit Facility Priority Collateral | Notes Priority Collateral |
|---|---|---|
| **First Priority** | Prepetition ABL Lenders | Holders of Prepetition Senior Notes |
| **Second Priority** | Holders of Prepetition Senior Notes | Prepetition ABL Lenders |

## II.   The Debtors' Immediate Need for Liquidity

15.    Over the course of the prior year, the Debtors undertook a multi-faceted and robust effort to revitalize their operations and improve their capital structure and liquidity, which entailed recruiting new management, improving operations and logistics, reducing costs and funded debt balances, identifying and closing underperforming stores, improving liquidity and recapitalizing their balance sheet.  These efforts have garnered measurable improvements in certain areas, but the Debtors' liquidity continued to deteriorate.  The continuing loss of liquidity was largely the result of (a) an inability to fully implement new management's turnaround plan, which, in part, resulted in an inability to turnaround retail and e-commerce sales in the short term; (b) insufficient interest from potential investors in a strategic transaction; (c) shareholders' rejection of a proposal to increase authorized shares, which would have given the Debtors greater flexibility to generate capital through future equity financing and potential strategic transactions; (d) an erosion in vendor confidence, which has led to less favorable payment terms; and (e) the costs and distractions resulting from numerous litigation matters.

16.    Most recently, in July 2015, the Debtors deployed a plan to drastically reduce costs in an effort to give themselves a runway to execute their turnaround plan.  The Debtors

aimed to reduce short-term costs by $30 million through, among other things,

(a) an organization-wide headcount reduction, (b) negotiations with landlords of significant

stores and warehouse facilities to reduce rent obligations, and (c) sourcing fabric and other

production inputs from less expensive suppliers.  Despite these efforts, the Debtors' management

projects that, absent a sudden and unexpected turnaround in sales, the Debtors will be unable to

fund approximately $2.5 million in payroll obligations to approximately 4,900 employees due on

October 7, 2015.  As of the Petition Date, the Debtors have approximately $2.6 million cash on

hand, an amount that is insufficient to both pay their employees and continue operating their

business.

      17.     Although, as set forth above, the ABL Amendment provided the company with

access to much-needed liquidity and capital, the ABL Amendment was only a short-term

solution and was insufficient, on its own, to finance the Debtors' ongoing obligations on a

long-term basis.  Particularly, the additional financing under the ABL Amendment provided the

Debtors required critical short-term financing to bridge a liquidity shortfall prior to the Petition

Date.  Although this liquidity lasted a short time, it gave the Company enough time to carefully

assess its options and select the most value-maximizing path for its stakeholders.  However, as of

the Petition Date, the Debtors do not have sufficient cash on hand with which to fund the basic

operation of their businesses, let alone to fund these chapter 11 cases, and, absent obtaining

authorization to enter into the DIP Credit Facility on an interim basis, will need to close its stores

and commence the process of liquidation, including the immediate conversion of these cases.

### III.   Debtors' Efforts to Obtain Postpetition Financing

      18.     Concurrently with the negotiations over the ABL Amendment in August 2015,

and after having received tepid interest from potential investors in a distressed transaction or

restructuring transaction that would have avoided the need to seek bankruptcy relief, the Debtors

10

and their advisors entered into extensive arms'-length negotiations with Standard General and the
Committee of Lead Lenders regarding (a) the terms of potential debtor in possession financing
necessary to provide the Debtors with sufficient liquidity to sustain operations without material
disruption to their businesses, while in a bankruptcy proceeding, and (b) the terms of a potential
chapter 11 plan of reorganization.

19.    The Debtors' investment banker, Moelis & Co. ("Moelis"), simultaneously
commenced a process to market a proposed debtor-in-possession financing to third party
financing sources, as further described in the Declaration of Robert Flachs in support of this
Motion (the "Flachs Declaration").  In particular, the Debtors and Moelis sought proposals from
14 potential financing sources, which included both 13 third party lenders (the "Third Party
Lenders") and certain of the Debtors' existing constituents (the "Existing Constituents" and,
together with the Third Party Lenders, the "Potential Financing Parties").  Of the 14 Potential
Financing Parties that were contacted, four executed non-disclosure agreements and two received
access to an electronic data room containing due diligence information related to the Debtors and
their financing needs.  Ultimately, the Debtors received three term sheets for possible debtor in
possession financing, including two proposals from Third Party Lenders (together, the "Third
Party DIP Proposals") and one proposal from the Supporting Parties.

20.    The negotiations on both fronts were active and intensive, given the Debtors'
urgent need for capital in the near term.  Ultimately, on October 4, 2015, the Debtors entered into
an agreement in principle with Standard General and the Committee of Lead Lenders
(collectively, the "Supporting Parties") regarding the key terms of a financial restructuring
through a plan of reorganization, coupled with an aggregate commitment of $70 million in
postpetition and exit financing.  The parties' agreement was memorialized in the RSA, which

11

contemplates a total post-effective date commitment of $40 million of new capital in the form of

equity and debt.  In connection with the RSA, these creditors (collectively, in such capacity,

the "DIP Lenders") also agreed to act as lenders under the DIP Credit Facility.  Concurrently

with the negotiations of the RSA, the Debtors and the Supporting Parties negotiated and agreed

on the terms of the DIP Credit Agreement.

21.    The Debtors, with the advice of their advisors, carefully scrutinized the Third

Party Proposals and the Supporting Parties' proposal.  As the chart below summarizes, and as is

discussed in further detail in the Flachs Declaration, the Debtors determined that the DIP Credit

Facility was superior to the Third Party Proposals in five important respects.  Consequently, on

October 4, 2015, the Debtors reached agreement on the terms of the DIP Credit Agreement with

the Supporting Parties.

| Key Terms | DIP Credit Facility | Comments |
|---|---|---|
| **Parties** | • Prepetition ABL Lenders and Prepetition Senior Noteholders | • Avoids a priming fight with the holders of Prepetition Senior Notes |
| **Credit Facility Structure** | • Term loan | • Provides assured credit availability and frees Debtors from the burdens and uncertainty associated with tying the Debtors' access to liquidity to an ever-fluctuating borrowing base |
| **Exit Capital** | • $40 million in equity and debt | • Enables the payment of administrative expense claims incurred during the chapter 11 cases as well as provides substantial and necessary liquidity for the reorganized Debtors to operate upon exit from bankruptcy |
| **Conversion** | • DIP facility converts to exit facility | • Obviates need to raise additional cash to satisfy DIP facility |
| **Plan Support** | • Offered in conjunction with a Restructuring Support Agreement | • Provides ample and necessary support for a confirmable plan of reorganization |

## MATERIAL TERMS OF THE DIP CREDIT FACILITY

22.    The principal terms of the DIP Credit Facility are as follows:[7]

| Required Disclosures | Summary of Material Terms |
| --- | --- |
| **Borrowers**<br><br>*Credit Agreement, Introductory Paragraph & Definitions* | American Apparel (USA), LLC; American Apparel Retail, Inc.; American Dyeing & Finishing, Inc.; KCL Knitting, LLC. |
| **Guarantors**<br><br>*Credit Agreement, Definitions* | American Apparel, Inc., Fresh Air Freight, Inc. and the Borrowers. |
| **DIP Agent**<br><br>*Credit Agreement, Article IX* | Wilmington Trust, National Association, as administrative agent in connection with the DIP Credit Facility. |
| **DIP Lenders**<br><br>*Credit Agreement, Definitions, Schedule 2.01* | See Schedule 2.01 (as it may be amended, supplemented or otherwise modified from time to time) to the DIP Credit Agreement. |
| **DIP Credit Facility**<br><br>*Credit Agreement, § 2.01, Schedule 2.01* | Senior secured postpetition financing in an aggregate principal amount of approximately $90 million in the form of a delayed draw term loan comprised of (i) up to $30 million in a new money (the "New Money Loan") and (ii) a roll-up of the Prepetition ABL Facility in an amount of approximately $60 million (the "Prepetition ABL Refinancing") (together, the "DIP Loans").<br><br>Upon entry of the Interim Order, the Debtors are authorized to implement the Prepetition ABL Refinancing in accordance with the terms of the DIP Credit Documents and Interim Order. |
| **Use of Cash Collateral**<br><br>*Credit Agreement, § 6.11* | Upon authorization from the Court, the Debtors may use the Cash Collateral and proceeds of the DIP Loans solely (i) to provide working capital, and for other general corporate purposes of the Credit Parties, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court in accordance with the Budget; (ii) to repay on the Closing Date an amount equal to, and used to refinance, all amounts due and owing under the Prepetition ABL Facility as of the date of repayment of the Prepetition ABL Facility, (iii) to pay related transaction costs, fees and expenses with respect to the DIP Facility, (iv) to make the Permitted Adequate Protection Payments in accordance with the Approved Budget, and (v) to fund the Carve-Out. |

---

[7]    This summary is qualified, in its entirety by the provisions of the DIP Credit Agreement and the Interim Order. Unless otherwise set forth in this summary, capitalized terms used within this summary shall have the meanings ascribed to them in the Interim Order and the DIP Credit Agreement, as applicable.

13

| | |
|---|---|
| **Carve-Out**<br><br>*Interim Order ¶ 14* | The DIP Credit Agreement provides a carve-out (the "Carve-Out") for (i) all fees required to be paid to the clerk of the Court and the U.S. Trustee under section 1930(a) of title 28 of the United States Code and 31 U.S.C. § 3717, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $100,000, and (iii) professional fees and expenses allowed by the Court, provided that professional fees and expenses incurred after the Carve Out Trigger Date shall not exceed $2,000,000 in the aggregate.<br><br>Upon the Borrower's receipt of a Carve-Out Notice, a portion of proceeds from the New Money Loan in the amount of $2,000,000 plus an amount equal to the aggregate unpaid professional fees, costs and expenses incurred at any time before the Carve Out Trigger Date will be deposited into a Carve-Out Account solely for purposes of funding the Carve-Out. |
| **Interest Rate and Fees**<br><br>*Credit Agreement, Definitions;*<br>*§ 2.08(a) & (b)* | Interest shall accrue at Libor plus 7.00% *per annum.*<br><br>The Default Rate shall be the interest rate or rate otherwise applicable thereto plus 2% per annum. |
| **Priority and Security**<br><br>*Credit Agreement § 10.05;*<br>*Interim Order ¶¶ 9-10 & 12* | The DIP Lenders under the DIP Credit Facility shall be afforded certain liens and claims, including priming liens (as discussed in paragraphs 34 and 35 of this Motion) and superpriority claims on property of the estate; provided, however, that the DIP Lenders shall not receive priming liens on any and all other valid, perfected, enforceable and non-avoidable liens (if any) in existence as of the Commencement Date that are (i) senior in priority (as to the Prepetition ABL Collateral or the Prepetition Senior Notes Collateral) to the Prepetition Liens; or (ii) that are junior in priority to or equal in priority (as to the Prepetition ABL Collateral or the Prepetition Senior Notes Collateral) to the Prepetition Liens; provided further, however, that, to the extent that the holder of any Non-Primed Lien is provided adequate protection that is approved by the Court and that is acceptable to the DIP Agent and the DIP Lenders, the DIP Liens shall be senior to such Non-Primed Liens. |
| **Approved Budget**<br><br>*Credit Agreement, Exhibit F; §§ 4.02(i);*<br>*5.24, 6.11, 7.13* | Cash Collateral and proceeds of the DIP financing may be used to operate the business of the Debtors to the extent permitted by the Budget that was prepared in good faith by the management of the Borrowers.<br><br>*See* Section 6.11 in the DIP Credit Agreement and Events of Default below.  *See also* Section 7.13 (Financial Covenants) in the DIP Credit Agreement. |
| **Conditions Precedent**<br><br>*Credit Agreement, Art. IV* | Conditions precedent include without limitation (i)  execution and delivery of the DIP Credit Agreement and  related loan documents; (ii) entry of the material first day  orders and the Interim Order in form and substance reasonably satisfactory to the DIP Agent and DIP Lenders, including the Cash Management Order; (iii) DIP Agent's receipt and approval of the Budget; and (v) payment of certain fees and expenses owing as of the Closing Date. |
| **Representations and Warranties** | Substantially similar representations and warranties as  those contained in the Prepetition ABL Facility (modified to include representations |

14

| | |
|---|---|
| *Credit Agreement, Art. V* | and warranties as are customary in debtor-in-possessions loan agreements of this type), including the representation that the Budget was prepared in good faith by the management of the Borrowers, based on assumptions believed by the management of the Borrowers to be reasonable at the time made and upon information believed by the management of the Borrowers to have been accurate based upon the information available to the management of Borrower at the time such Budget was furnished and on and after the date of delivery of any Variance Report in accordance with this Agreement, such Variance Report shall be complete and correct and fairly represent in all material respects the results of operations of the Holdings and its Subsidiaries for the period covered thereby and in the detail to be covered thereby. |
| **Events of Default**<br><br>*Credit Agreement § 8.01* | The DIP Credit Agreement provides for standard events of default for a facility of this type, including, without limitation, the following bankruptcy-related defaults:<br><br>• Subject to Section 7.15 and, other than with respect to all professional fees which have been allowed by the Bankruptcy Court in the Chapter 11 Cases and interest and fees accrued with respect to the DIP Facility, (i) the proceeds of any Loan shall have been expended in a manner, or a withdrawal from the DIP Funding Account shall be for a purpose, which is not in accordance with the Approved Budget, or (ii) any disbursement is made by any Credit Party that is not set forth in a line item on the Approved Budget;<br><br>• The Interim Order and the Final Order, as applicable, shall cease to create a valid and perfected lien with such priority required by this Agreement and such DP Order, subject to Permitted Prior Liens and the Carve-Out, on a material portion of the Collateral purported to be covered thereby;<br><br>• The Final Order Entry Date shall not have occurred within 45 days after the Interim Order Entry Date;<br><br>• An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case;<br><br>• Any Credit Party shall file a motion in the Chapter 11 Cases to obtain additional or replacement financing from a party other than the Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code, except (i) with the express written consent of Required Lenders or (ii) to the extent any such financing shall provide for the payment in full of the Obligations;<br><br>• Any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim (or the Credit Parties shall otherwise make a payment on any prepetition claim) other than (x) as provided for in the "first-day orders" and included in the Approved Budget or (y) otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any |

15

security interest to permit foreclosure on any assets having a book value in excess of $1,000,000 in the aggregate or to permit other actions that would have a material adverse effect on the Credit Parties or their estates, or (iii) except with respect to the Prepetition Obligations as provided in the Interim Order and the Final Order, as applicable, approving any settlement or other stipulation not approved by the Required Lenders and not included in the Approved Budget with any secured creditor of any Credit Party providing for payments as adequate protection or otherwise to such secured creditor;

- An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Credit Party, or any Subsidiary Credit Party, or any Affiliate of a Credit Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

- An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitment, and payment in full of all obligations of the Credit Parties under the Loan Documents;

- An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the DIP Agent), (i) to revoke, reverse, stay, modify, supplement or amend any of the Interim Order and the Final Order, as applicable, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Credit Parties equal or superior to the priority of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the DIP Agent and the Lenders in respect of the Obligations (other than the Carve Out) or (iii) to grant or permit the grant of a lien on the Collateral (other than Permitted Liens);

- An application for any of the orders described in clauses 8.01(aa) through 8.01(cc) of the DIP Credit Agreement shall be made by a person other than the Credit Parties and such application is not contested by the Credit Parties in good faith or the relief requested is not withdrawn, dismissed or denied within 45 days after filing or any person obtains a final order under Section 506(c) of the Bankruptcy Code against the Administrative Agent or obtains a final order adverse in any material respect to the Administrative Agent or the Lenders or any of their respective rights and remedies under the Loan Documents or in the Collateral;

- The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Credit Party to file a

16

Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

- (i) Any Credit Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the DIP Agent and/or the Lenders, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by Loan Documents or the Chapter 11 Orders with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by the Credit Parties which contests the validity, perfection or enforceability of any of the liens and security interests of the DIP Agent and/or the Lenders created by any of the Interim Order, the Final Order, or the Loan Documents;

- Any Credit Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Credit Party) any other person's motion to, disallow in whole or in part the Lenders' claim in respect of the obligations or contest any material provision of any Loan Document or any material provision of any Loan Document shall cease to be effective;

- The Interim Order or the Final Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent);

- The Approved Plan of Reorganization or the Confirmation Order is amended, supplemented or otherwise modified without the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent);

- The withdrawal or termination of the Approved Plan of Reorganization;

- Any Credit Party or any of their Affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any Person that would be materially inconsistent with the treatment of any such Person under the Approved Plan of Reorganization, without the prior written consent of the Required Lenders;

- The entry of the Confirmation Order, in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), shall not have occurred by the date that is 120 days after the Petition Date;

- The effective date of the Approved Plan of Reorganization shall

|  | not have occurred by the date that is 180 days after the Petition Date, or such later date to which the Required Lenders have consented in writing; |
|  | • The failure of the Credit Parties to comply in any material respect with the Restructuring Support Agreement or a "Supporting Party Termination Event" (as defined therein) under the Restructuring Support Agreement as a result of a breach by a Credit Party has occurred; or |
|  | • The failure of the Credit Parties to obtain an order of the Bankruptcy Court approving the disclosure statement with respect to the Approved Plan of Reorganization, within 60 days of the Petition Date. |
| **Maturity/Termination Date** *Credit Agreement, Definitions* | The earlier of (i) April 5, 2016; (ii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Credit Parties to a Chapter 7 liquidation or the dismissal of any of the Chapter 11 Cases; (iii) the acceleration of the Loans and the termination of all Commitments under the DIP Credit Facility pursuant to Section 8.02 of the DIP Credit Agreement; (iv) the sale of all or substantially all of the Credit Parties' assets; and (v) the consummation of the Approved Plan of Reorganization for the Credit Parties. |
| **Adequate Protection** *Interim DIP Order ¶ 12(A)-(D)* | Granting the Prepetition Secured Parties Adequate Protection Liens and the Adequate Protection Priority Claims, effective and perfected upon the date of entry of the Interim Order, which shall secure the payment of an amount equal to the diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral from and after the Petition Date.  The priority of the Adequate Protection Liens shall give effect to the Prepetition Secured Parties' intent to recognize the priorities established in the Intercreditor Agreement.<br><br>As additional adequate protection, and subject to the Budget, the Debtors shall pay Adequate Protection Payments to the Prepetition ABL Agent and the Prepetition Senior Notes Trustee (i) immediately upon entry of the Interim Order, in the form of cash payments equal to all accrued and unpaid reasonable and documented fees and expenses owing to such parties and incurred before the Petition Date; and (ii) from time to time after the Petition Date, in the form of cash payments equal to all reasonable and documented fees and expenses. |
| **Section 506(c) Waiver** *Interim Order ¶ 18* | Upon the entry of a Final Order, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting, any surcharge claim under section 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Agent, the DIP Lenders, the Prepetition Secured Parties upon, the DIP Collateral and the Prepetition Collateral. |
| **Applicability of "equities of the case" exception to Section 552(b); No Marshaling** *Interim Order ¶ 18* | Upon the entry of a Final Order, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting, the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Credit Facility.<br><br>In no event shall the DIP Agent or the DIP Lenders be subject to the |

| | equitable doctrine of marshaling or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral unless consented to by the DIP Agent. |
|---|---|
| **Expenses**<br><br>*Credit Agreement §§ 2.09, 11.04* | Fees and expenses required to be paid under the DIP Credit Agreement include without limitation (i) the Commitment Fee; (ii) the Agency Fee; (iii) the Exit Fee; (iv) all reasonable out-of-pocket costs and expenses of the DIP Agent and the Committee of Lead Lenders; and (v) the Carve-Out.<br><br>In addition, the Debtors shall indemnify the DIP Agent and the DIP Lenders against any liability arising in connection with the DIP Credit Documents to the extent set forth in the DIP Credit Documents. |
| **Miscellaneous**<br><br>*Credit Agreement § 8.01* | As noted above, it shall be an Event of Default if the Debtors fail to meet certain milestones (the "Milestones") set forth in the DIP Credit Agreement, which include without limitation:<br><br>• The Final Order Entry Date shall not have occurred within 45 days after the Interim Order Entry Date;<br><br>• The entry of the Confirmation Order, in form and substance reasonably satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the DIP Agent), shall not have occurred by the date that is 120 days after the Petition Date;<br><br>• The effective date of the Approved Plan of Reorganization shall not have occurred by the date that is 180 days after the Petition Date, or such later date to which the Required Lenders have consented in writing; or<br><br>• The failure of the Credit Parties to obtain an order of the Bankruptcy Court approving the disclosure statement with respect to the Approved Plan of Reorganization, within 60 days of the Petition Date. |

## REQUIREMENTS UNDER LOCAL RULE 4001-2

23.    Rule 4001-2 of the Local Rules requires that certain provisions contained in the

DIP Credit Agreement be highlighted and that the Debtors provide justification for the inclusion

of such highlighted provision(s).

24.    Local Rule 4001-2(a)(i) provides:

> Provisions to be Highlighted.  All Financing Motions must (a) recite
> whether the proposed form of order and/or underlying cash collateral
> stipulation or loan agreement contains any provision of the type indicated
> below, (b) identify the location of any such provision in the proposed form
> of order, cash collateral stipulation and/or loan agreement and (c) justify
> the inclusion of such provision:

19

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. §506(c);

(D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E) Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve out;

(G) Provisions that prime any secured lien without the consent of that lienor; and

(H) Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).

25.     The Debtors identify and discuss the following provisions of the DIP Credit Agreement and Interim Order in accordance with Local Rule 4001-2 in the context and circumstances of these cases.

## I.     Local Rule 4001-2(a)(i)(A)

26.     _Cross Collateralization._  Local Rule 4001-2(a)(i)(A) requires disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other

20

adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law). The DIP Credit Agreement does not grant cross-collateralization protection.

## II.    Local Rule 4001-2(a)(i)(B)

27.    *Stipulation and Challenge Provisions.*  Local Rule 4001-2(a)(i)(B) requires disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters.  Paragraph 27 of the Interim Order binds the estates and all other parties in interest with respect to the validity, perfection or amount of the Prepetition ABL Facility, but is subject to the rights of any party in interest with requisite standing for a period of the earlier of (a) sixty (60) days after the appointment of any official committee of creditors (the "Committee") or (b) seventy-five (75) days after entry of the Final Order if no Committee is appointed to file an Objection (as defined in the Interim Order).  Thus, the Debtors submit that parties in interest will have an adequate opportunity to investigate the Prepetition ABL Facility and associated liens.

## III.    Local Rule 4001-2(a)(i)(C)

28.    *Section 506(c) Waiver.*  Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estates' rights under Bankruptcy Code section 506(c).  Paragraph 18 of the Interim Order provides in part that upon the entry of the Final Order, no person will be permitted to surcharge the Collateral (as defined in the Interim Order) under section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever

21

be imposed against the Collateral, except for the Carve-Out. Because this waiver only will be effective upon entry of the Final Order and to the extent such order so provides, the Debtors respectfully submit that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice."

**IV.     Local Rule 4001-2(a)(i)(D)**

29.     _Liens on Avoidance Actions._  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions under which the Debtors immediately grant the prepetition secured lenders liens on the Debtors' claims or causes of action under 11 U.S.C. §§ 544, 545, 547, 548 and 549 (the "Avoidance Actions"). Paragraph 9 of the Interim Order provides the DIP Lenders with (a) liens on causes of action pursuant to section 549 of the Code subject to the entry of the Interim Order and (b) liens on proceeds of Avoidance Actions, subject to the entry of the Final Order.

30.     This provision does not seek a security interest and lien on avoidance actions under chapter 5 of the Bankruptcy Code (with the exception of avoidance actions pursuant to section 549 of the Code) but rather, on the proceeds thereof. The grant of a security interest and lien on actions under section 549 is reasonable because such actions would by definition accrue postpetition and likely involve the transfer of estate property on which the DIP Agent has a perfected lien and be otherwise prohibited under the DIP Credit Agreement. Further, this provision is subject to the approval of the Court at a Final Hearing. As such, the Debtors respectfully submit that prepetition secured lenders are not being granted liens on the Avoidance Actions, and parties in interest will have an opportunity to be heard on the requested relief.

**V.     Local Rule 4001-2(a)(i)(E)**

31.     _Roll-Up._  Pursuant to Local Rule 4001-2(a)(i)(E), a movant must describe provisions of the proposed debtor-in-possession facility that deem prepetition secured debt to

22

constitute postpetition debt. <u>See</u> Del. Bankr. L.R. 4001-2(a)(i)(E).  Paragraph 7 of the Interim

Order provides that the Debtors are authorized to pay in full in cash all Roll-Up Obligations (as

defined in the DIP Credit Agreement) in accordance with the terms of the DIP Credit Documents

and Interim Order upon entry of the Final Order.  Financing on a postpetition basis was not

available on terms more favorable than those provided under the DIP Credit Agreement and the

Interim Order.  In addition, the DIP Lenders were only willing to extend postpetition financing to

the Debtors on the condition that proceeds of the DIP Credit Facility would be used to roll-up the

obligations outstanding under the Prepetition ABL Facility, which the Debtors believe to be fully

secured.  Moreover, over 95% of the junior secured creditors affected by the proposed "roll-up"

of the Prepetition ABL Facility also are DIP Lenders and thus have consented to this feature of

the DIP Facility.

## VI.    Local Rule 4001-2(a)(i)(F)

32.    <u>*Carve-Out.*</u>  Pursuant to Local Rule 4001-2(a)(i)(F), a movant must describe

provisions of the proposed debtor-in-possession facility that provide disparate treatment for

professionals retained by a creditors' committee with respect to a professional fee carve-out.

Paragraph 14 of the Interim Order provides a professional fee carve-out for the Debtors'

professionals and professionals hired by any official committee of unsecured creditors.  The

Debtors submit that the treatment of the Debtors' professionals and any Committee's

professionals under the Carve-Out is substantially similar and therefore there is no disparate

treatment of any Committee's professionals.

## VII.    Local Rule 4001-2(a)(i)(G)

33.    <u>*Priming Liens.*</u>  Pursuant to Local Rule 4001-2(a)(i)(G), a movant must describe

provisions of the proposed debtor-in-possession facility that contemplates a priming of any

secured lien without the consent of that lienor.  <u>See</u> Del. Bankr. L.R. 4001-2(a)(i)(G).

23

34.     The DIP Credit Facility is a "priming" facility inasmuch as the DIP Credit Facility will be secured by first priority, senior, priming, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under the Prepetition ABL Collateral and the Prepetition Senior Notes Collateral (both as defined in the Interim Order) that is subject to or encumbered by a validly perfected, unavoidable security interest or lien on the Petition Date or subsequently perfected thereafter.  However, as discussed below, the DIP Credit Facility shall not prime the liens of non-consenting lienholders or those that do not accept the adequate assurance protection provided under the DIP Credit Facility.  The Prepetition Secured Parties (as defined in the Interim Order) have consented to the terms of the DIP Credit Agreement and the Interim and Final Orders, including the priming of the liens granted pursuant to the Prepetition ABL Facility and the Prepetition Senior Notes,[8] as the priority of such liens is governed by the Intercreditor Agreement.  Finally, by virtue of paragraph 12 of the Interim Order and the other provisions of the Intercreditor Agreement, the Prepetition Secured Parties are deemed to have consented to, among other things, the security interests and priming liens under the DIP Credit Agreement.

## VIII.    Local Rule 4001-(2)(a)(i)(H)

35.     _Waiver of Section 552(b) "Equities of the Case" Exception._  Pursuant to Local Rule 4001-2(a)(i)(H), a movant must describe provisions of the proposed debtor-in-possession facility that seek to affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code.  Paragraph 18 of the Interim Order provides that upon the entry of a Final Order, the Debtors (on behalf of themselves and their estates) shall irrevocably

---

[8]         The requisite threshold of holders of Prepetition Senior Notes under the Prepetition Senior Notes indenture required to permit such liens has consented as over 95% of the holders of Prepetition Senior Notes are DIP Lenders.

waive, and shall be prohibited from asserting, the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Credit Facility. Paragraph 18 further provides that in no event shall the DIP Agent or the DIP Lenders be subject to the equitable doctrine of marshaling or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral unless consented to by the DIP Agent. Because this provision will only be effective upon entry of the Final Order and to the extent such order so provides, the Debtors respectfully submit that parties in interest will have an opportunity to be heard with respect to this provision.

## ADDITIONAL PROVISIONS

36.     In addition to the disclosures made pursuant to the Local Rules, the DIP Facility Documents and the Interim Order contain certain other provisions that the Debtors believe the Court likely would want the Debtors to highlight, even though these provisions are noted in the Material Terms of the DIP Credit Facility chart set forth in this Motion. In particular, the DIP Credit Agreement contains various "milestones" that the Debtors must meet throughout the chapter 11 cases, and failure to meet such milestones constitutes an Event of Default under the DIP Credit Agreement. These milestones require (a) entry of the Final Order within 45 days of the entry of the Interim Order; (b) approval of the disclosure statement with respect to the Approved Plan of Reorganization (as defined in the DIP Credit Agreement) within 60 days of the Petition Date; (c) entry of the Confirmation Order within 120 days of the Petition Date; and (d) that the effective date of the Approved Plan of Reorganization shall have occurred within 180 days of the Petition Date. Given the Debtors' desire to minimize the costs of administering these chapter 11 cases and the substantial progress toward a reorganization that already has been achieved to date — as evidenced by the RSA and the New Equity Commitment, both as

25

discussed above, and the filing of a chapter 11 plan contemporaneously herewith — the Debtors

are confident that they can satisfy such milestones and reorganize as efficiently as practicable.

## REQUEST FOR THE APPROVAL OF THE
## DIP CREDIT AGREEMENT AND RELATED ACTIONS

I.    **Approval Under Section 364(c) of the Bankruptcy Code**

37.    As described above, it is essential that the Debtors obtain access to sufficient

postpetition financing and use of Cash Collateral to avoid immediate and irreparable harm to

their businesses.  The preservation of estate assets, the Debtors' continuing viability and their

ability to maximize value for stakeholders depends heavily upon the expeditious approval of the

relief requested herein.

38.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured

credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary

course of business and (c) obtaining credit with specialized priority or with security.  See 11

U.S.C. § 364.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis,

pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain

credit or to incur debt, the repayment of which is entitled to superpriority administrative expense

status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered

property, or a combination of the foregoing.  See 11 U.S.C. § 364(c).[9]

---

[9] Section 364(c) of the Bankruptcy Code provides as follows:

(c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

DOCS_DE:202226.1 03636/001

39.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c); see In re Ames Dep't Stores, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

40.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(a)     the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying these factors); In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (same); In re Ames Dep't Stores, 115 B.R. at 39.

**A.     The Debtors Were Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis**

41.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan

27

Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id.; see also In re Ames Dep't Stores, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

42.    As set forth above and in the Flachs Declaration, the Debtors engaged in a robust prepetition process to secure debtor in possession financing. The Debtors' management, with the assistance of their advisors, sought restructuring alternatives and explored various alternative sources of capital and financing as a part of this process but determined that financing was unavailable on an unsecured basis. The Debtors' extensive efforts to seek the necessary postpetition financing within the Debtors' existing capital structure, from additional third-parties, as well as vigorous negotiations with Standard General and the Committee of Lead Lenders were reasonable and sufficient and satisfy the statutory requirements of section 364(c) of the Bankruptcy Code. See, e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (a debtor seeking financing under section 364(c) of the Bankruptcy Code made an acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request); In re Ames Dep't Stores, 115 B.R. at 40 (same).

28

### B.    The DIP Credit Facility is Necessary to Preserve and Protect the Assets of the Debtors' Estates

43.    It is essential that the Debtors immediately obtain the financing necessary to preserve and protect the value of their estates.  As noted above, the Debtors require such liquidity in order to meet imminent payroll obligations to over 4,900 employees that are due and payable on October 7, 2015.  The Debtors' inability to pay their employees would threaten the stability of the Debtors' workforce and would result in significant disruptions to the operation, if not the permanent cessation, of the Debtors' business.  In addition, the Debtors do not have sufficient working capital, financing or cash collateral to continue the operation of their business without immediate, additional financing.  Accordingly, the DIP Credit Facility is necessary to ensure that the Debtors are able to maintain their business, and thus maximize the value of their estates, pending confirmation of an Approved Plan of Reorganization.  See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004) (debtors-in-possession have a duty to maximize their estates' assets).

### C.    The Terms of the DIP Credit Facility are Fair, Reasonable and Appropriate Under the Circumstances

44.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and potential lender.  See In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

45.    The terms of the DIP Credit Agreement and the proposed DIP Orders were negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, resulting

in agreements designed to permit the Debtors to obtain the needed liquidity to maximize the

value of their assets through confirmation of a chapter 11 plan as contemplated under the RSA.

> **D.    The DIP Credit Facility is in the Best Interests of the Debtors' Estates and Creditors**

46.    The Debtors believe that the approval of the DIP Credit Facility is in the best

interests of the Debtors' estates and their creditors.  Given that the Debtors do not currently have

any other executable options for financing in these cases that would permit the Debtors to remain

a viable, going-concern entity, the Debtors, in the exercise of their sound business judgment,

believe that they have negotiated for the best possible terms for the DIP Credit Facility.

47.    The Debtors submit that the milestones under the DIP Credit Facility are

appropriate in these circumstances and provide the Debtors and their advisors with sufficient

runway to obtain confirmation of an Approved Plan of Reorganization.  See In re Farmland

Indus., Inc., 294 B.R. 855, 884 (Bankr. W.D. Mo. 2003) (stating that it "was not unreasonable for

the DIP [l]enders to insist on having a definite timetable," and that debtor in possession financing

amendment "despite the tough new guidelines … is in the best interests of the estate … to avoid

a termination of the [d]ebtors' DIP financing [which] would have been disastrous for the

[d]ebtors … and, more than likely, have caused the [d]ebtors to cease their business operations,

to the extreme detriment of their creditors.").

48.    Moreover, not only does the DIP Credit Facility provide the Debtors ample

postpetition liquidity to permit the Debtors to operate while in chapter 11 plan, the DIP Lenders,

in their capacity as Supporting Parties under the RSA have agreed to provide the Debtors with a

viable path toward a near-term conclusion of these case with ample committed liquidity to do so

on a feasible basis.  No other proposal provides the Debtors with such assurance of a viable exit

from bankruptcy in the near term, and, accordingly is in the best interests of the Debtors' estates.

## II. Approval of Postpetition Financing Under Section 364(d) of the Bankruptcy Code is Warranted

49.     Section 364(d)(1) provides that a Debtor may incur debt "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the Court finds, after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." See Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.), 300 B.R. 861, 863, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by "contact[ing] numerous lenders" and was unable to obtain credit without a priming lien, it had met its burden under section 364(d)); In re 495 Cent. Park, 136 B.R. at 630-31 (holding that debtor must make an effort to obtain credit without the requirement of a priming lien but is not required to seek credit from every possible lender); In re Dunes Casino Hotel, 69 B.R. 784, 796 (Bankr. D.N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien).

### A. The Debtors Were Unable to Obtain Necessary Postpetition Financing Otherwise

50.     As fully described above and in the Flachs Declaration, the Debtors conducted a robust solicitation process and no other postpetition credit was available to the Debtors on terms better than the DIP Credit Facility.  The DIP Credit Facility surpasses certain other proposals received by the Debtors for the principal reasons that it (a) provides the Debtors with sufficient liquidity and, if needed, incremental liquidity to operate their business until confirmation of an Approved Plan or Reorganization, (b) includes the ability to convert the DIP Credit Facility into an exit term facility in accordance with the terms of the DIP Credit Agreement and the Exit

31

Credit Agreement and therefore avoid the need to pay off the DIP Loans in full in cash on the

Effective Date and (c) is being supplied in connection with a global restructuring deal that

includes a commitment for the infusion of $40 million of exit capital.

**B.    The Prepetition Secured Creditors are Adequately Protected**

51.    The secured creditors whose liens are being "primed" by a new postpetition lender

under section 364(d) of the Bankruptcy Code must be provided with adequate protection of their

interests in collateral.  See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland

Dev. Grp., Inc.), 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (noting that adequate protection is

required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives

the value for which it bargained pre-bankruptcy); Dunes Casino, 69 B.R. at 793 (holding that

"[a]dequate protection is designed to preserve the secured creditor's position at the time of the

bankruptcy").

52.    As noted above, the Prepetition Secured Parties have consented to the terms of the

DIP Credit Agreement and the Interim and Final Orders, including the priming of the liens

granted pursuant to the Prepetition ABL Facility and the Prepetition Senior Notes, as the priority

of such liens is governed by the Intercreditor Agreement.  See Sky Valley, Inc., 99 B.R. at 123

(holding that secured creditors' consent to imposition of priming lien "relieved the debtor of

having to demonstrate that [the lienholders] were adequately protected").  Further, the DIP Credit

Facility does not grant priming liens on lienholders that have not consented to the priming of

their liens or accepted the adequate protection offered under the DIP Credit Agreement.

Therefore, the only liens primed by the DIP Credit Facility are those of prepetition secured creditors who have consented to such priming or accepted adequate assurance.[10]

53.    Whether or not a Prepetition Secured Party consents to the priming of its liens, such party shall receive and retain all rights and entitlements that a secured creditor that did not consent to the use of its cash collateral or other property would receive or retain. In addition, the Prepetition Secured Parties shall be granted the Adequate Protection Liens and the Adequate Protection Priority Claims, effective and perfected upon the date of entry of the Interim Order, which shall secure the payment of an amount equal to the diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (as such terms are defined in the Interim Order) from and after the Petition Date. As additional adequate protection, and subject to the Budget, the Debtors shall pay Adequate Protection Payments to the Prepetition ABL Agent and the Prepetition Senior Notes Trustee (i) immediately upon entry of the Interim Order, in the form of cash payments equal to all accrued and unpaid reasonable and documented fees and expenses owing to such parties and incurred before the Petition Date; and (ii) from time to time after the Petition Date, in the form of cash payments equal to all reasonable and documented fees and expenses (as such terms are defined in the Interim Order).

54.    Thus, the requirements of section 364(d)(1)(B) of the Bankruptcy Code have been fulfilled, and the proposed DIP Credit Facility, including its priming provisions, should be approved.

---

[10]    The requisite threshold of holders of Prepetition Senior Notes under the Prepetition Senior Notes indenture required to permit such liens has consented as over 95% of the holders of Prepetition Senior Notes are DIP Lenders.

### III.   Entry into the DIP Credit Facility Is an Exercise of the Debtors' Sound Business Judgment

55.    As described above, after appropriate investigation and analysis, the Debtors'

management has concluded that the DIP Credit Facility is the best option available under the

circumstances of these cases.  Bankruptcy courts routinely defer to a debtor's business judgment

on most business decisions, including the decision to borrow money, unless such decision is

arbitrary and capricious.  See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441

(Bankr. S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business

judgment in granting section 364 financing"); Trans World Airlines, Inc. v. Travellers Int'l AG

(In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the

interim loan, receivables facility and asset-based facility were approved because they "reflect[ed]

sound and prudent business judgment on the part of TWA . . . [were] reasonable under the

circumstances and in the best interest of TWA and its creditors"); cf. In re Filene's

Basement, LLC, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (stating

"[t]ransactions under § 363 must be based upon the sound business judgment of the debtor or

trustee.").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate

and increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

56.    The Debtors, with the assistance of their advisors, have exercised their sound

business judgment in determining that a postpetition credit facility is appropriate and have

satisfied the legal prerequisites to incur debt under the DIP Facility.  In light of this, and that the

Debtors could not obtain postpetition financing from another lending source on terms superior to

the DIP Credit Facility, the Debtors' decision to enter into the DIP Credit Facility is a sound

34

exercise of the Debtors' business judgment, including, as discussed below, the following aspects of the DIP Credit Facility:  (a) the roll-up of obligations under the Prepetition ABL Facility; (b) the Carve-Out; (c) the Budget; and (d) the payment of certain fees under the DIP Credit Agreement.  Accordingly, the Court should grant the Debtors authority to enter into the DIP Credit Facility and obtain funds from the DIP Lenders on the secured, administrative superpriority basis described above, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

### A.    The Roll-Up of Obligations under the Prepetition ABL Facility Is Appropriate

57.    As discussed above, the DIP Loans provided by the proposed DIP Credit Facility will be used, in part, upon entry of the Interim Order, to refinance the Debtors' outstanding obligations under the Prepetition ABL Facility.  The DIP Lenders provided the additional financing under the ABL Amendment because the Debtors required critical short-term financing to bridge a liquidity shortfall prior to the Petition Date.  Although this liquidity lasted a short time, it gave the Company enough time to carefully assess its options and select the most value-maximizing path for its stakeholders.  The DIP Lenders were only willing to extend postpetition financing to the Debtors on the condition that proceeds of the DIP Credit Facility would be used to roll up the obligations outstanding under the Prepetition ABL Facility.  As discussed in the Flachs Declaration and herein, the DIP Credit Facility was the only viable postpetition financing option that would enable the Debtors to continue to operate as a going concern as they worked toward confirmation of a plan of reorganization and eventual emergence from chapter 11 on a much stronger footing to compete in the retail and wholesale apparel marketplace.  Moreover, as holders of over 95% of the Prepetition Senior Notes, the DIP Lenders are also the primary junior creditors affected by the roll-up feature.  Therefore, the roll-up does not unduly prejudice the

35

junior creditors that would otherwise be most directly affected by it and is, accordingly, reasonable under the circumstances.

58.      Courts in this jurisdiction and others have approved financing facilities that, like the DIP Credit Facility proposed herein, provide for the roll-up of prepetition financing facilities. See In re Energy Future Holding Corp., 527 B.R. 157, 167 (D. Del. 2015) (approving settlement that "was simply a roll-up of the first lien noteholders with the new DIP financing."); In re Capmark Fin. Grp. Inc., 438 B.R. 471, 511 (Bankr. D. Del. 2010) ("[P]repetition secured claims can be paid off through a 'roll-up.'"); In re Every WareGlobal, Inc., Case No. 15-10743 (LSS) (Bankr. D. Del. Apr. 28, 2015) (approving roll-up of prepetition revolving debt in post-petition revolving facility); In re Tuscany Int'l Holdings (U.S.A.) Ltd., et al., Case No. 14-10193 (Bankr D. Del. Mar. 21, 2014) (approving roll-up of prepetition debt); In re Capsule Int'l Holdings LLC, Case No. 13-13281 (CSS) (Bankr. D. Del. Jan. 16, 2014) (same); In re OnCure Holdings, Inc., et al., Case No. 13-11540 (Bankr. D. Del. Jul. 24, 2013) (same); In re School Specialty, Inc., No. 13-10125 (Bankr. D. Del. Feb. 26, 2013) (same); In re Tri-Valley Corp., Case No. 12-12291 (MFW) (Bankr. D. Del. Sept. 28, 2012) (same); In re Indianapolis Downs, LLC, Case No. 11-11046 (BLS) (Bankr. D. Del. Apr. 26, 2011) (same); In re Dayton Superior Corp., Case No. 09-11351 (BLS) (Bankr. D. Del. Jun. 5, 2009) (same); In re Mervyn's Holdings LLC, Case No. 08-11586 (KG) (Bankr. D. Del. Jul. 31, 2008) (same); In re LandSource Communities Dev. LLC, Case No. 08-11111 (KJC) (Bankr. D. Del. Jul. 21, 2008) (same); Transcript of Hearing at 753:1-3, In re Lyondell Chem. Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) (roll up "was an element of the consideration offered to those willing to lend new money . . .").

59.      Further, courts authorizing first day, interim relief under postpetition financing facilities have permitted such interim borrowings to be applied towards the roll-up of prepetition

36

obligations. See, e.g., In re Cal Dive Int'l, Inc., Case No. 15-10458 (CSS) (Bankr. D. Del.

Apr. 20, 2015) (authorizing pursuant to interim order repayment of approximately $100 million

in prepetition debt (on an overall $120 million financing)); In re MACH Gen, LLC, Case No. 14-

10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing pursuant to interim order repayment of

approximately $144 million in prepetition debt (on an overall $200 million financing)); In re

Furniture Brands Int'l, Inc., Case No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013)

(authorizing pursuant to an interim order repayment of approximately $91 million in prepetition

debt (on an overall $140 million postpetition financing)); In re Appleseed's Intermediate

Holdings LLC, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing pursuant to

an interim order repayment of approximately $48 million in prepetition debt (on an overall $140

million postpetition financing)); In re Source Interlink Cos. Inc., No. 09-11424 (KG) (Bankr. D.

Del. Apr. 29, 2009) (authorizing pursuant to an interim order repayment of approximately $110

million in prepetition debt (on an overall $139 million postpetition financing); In re Dayton

Superior Corp., Case No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing pursuant

to an interim order repayment of approximately $110 million in prepetition debt (on an overall

$165 million postpetition financing)).

     60.    Moreover, the magnitude of the roll-up (2:1 ratio of rolled-up versus new money)

is well within the range of "market" norms. See, e.g., In re Colt Holding Co. LLC, Case No. 15-

11296 (LSS) (Bankr. D. Del. Jul. 10, 2015) (approving $75 million financing with $55 million

roll-up or 2.6:1 ratio); In re Cal Dive Int'l, Inc., Case No. 15-10458 (CSS) (Bankr. D. Del. Apr.

20, 2015) (approving $120 million financing with $99.8 million roll-up or 4.9:1 ratio); In re

RadioShack Corp., Case No. 15-10197 (BLS) (Mar. 6, 2015) (approving $285 million financing

with $250 million roll-up or a 7.1:1 ratio); In re Associated Wholesalers, Inc., Case No. 14-

37

12092 (Bankr. D. Del. Oct. 6, 2014) (approving $175 million financing with $125 million roll-up

or 2.5:1 ratio); In re NEC Holdings Corp., Case No. 10-11890 (PJW) (Bankr. D. Del. Jul. 16,

2010) (approving $139 million financing with $110 million roll-up or 3.79:1 ratio); In re Real

Mex Restaurants, Inc., Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011) (approving $49

million financing with $37.5 million roll-up or 3.26:1 ratio); In re Pacific Energy Res., Ltd., Case

No. 09-10785 (Bankr. D. Del. Jun. 4, 2009) (KJC) (approving $183 million financing with $143

million roll-up or 3.58:1 ratio); In re Revel AC, Inc., Case No. 13-16253 (JHW) (Bankr. D.N.J.

Apr. 22, 2013) ($125 million financing with $101 million roll-up or 4.3:1 ratio).

**B.     The Scope of the Carve-Out is Appropriate**

61.     The proposed DIP Credit Facility subjects the security interests and administrative

expense claims of the DIP Lenders, as well as the Adequate Protection Liens, to the Carve-Out.

Similar carve-outs for professional fees have been found to be reasonable and necessary to

ensure that a debtor's estate and any statutory committee can retain assistance from counsel. See

Ames, 115 B.R. at 40. The DIP Facility does not directly or indirectly deprive the Debtors'

estates or other parties in interest of possible rights and powers by restricting the services for

which professionals may be paid in these cases. See Ames, 115 B.R. at 38 (observing that courts

insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such

protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

Additionally, the Carve-Out protects against administrative insolvency during the course of these

chapter 11 cases by ensuring that assets remain for the payment of professional fees of the

Debtors and any official committees, notwithstanding the grant of superpriority and

administrative liens and claims under the DIP Facility.

62.     Importantly, the Carve-Out set forth in the Interim Order (a) does not cause

disparate treatment with respect to the professionals retained by the official committee of

38

unsecured creditors and the professionals retained by the Debtors, (b) includes the fees to be paid

to the Court and the U.S. Trustee, and the reasonable expenses any trustee appointed under

section 726(b) of the Bankruptcy Code, and (c) does not impair the ability of any party to object

to such fees, expenses, reimbursement or compensation. Accordingly, the Debtors submit that

the proposed Carve-Out comports with the standard set forth in this Court's Local Rules.

### C.      The Budget is Appropriate

63.      As described above, the Debtors' access to Cash Collateral and DIP Loans under

the DIP Credit Facility will be subject to the Budget. After diligent consideration of all known

circumstances, and upon consultation with their advisors, the Debtors believe, in their reasonable

business judgment, that the proposed Budget (including the variances permitted thereunder

pursuant to the DIP Credit Agreement) is achievable and will allow the Debtors to operate in

chapter 11 without the accrual of unpaid liabilities. Furthermore, the Debtors believe that the

Budget will be adequate, considering all available assets, to pay all administrative expenses due

or accruing during the period covered by the DIP Credit Facility and the Budget. Accordingly,

the Debtors submit that the proposed Budget is appropriate.

### D.      The Payment of Fees under the DIP Agreement is Appropriate

64.      The fees and charges to be paid to the DIP Lenders and DIP Agent, as expressly

provided in the DIP Credit Agreement, are reasonable and appropriate under the circumstances.

Courts routinely authorize debtor-in-possession lenders to impose fees beyond the explicit liens

and rights specified in section 364 of the Bankruptcy Code. See In re Defender Drug Stores, Inc.,

145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to section 364 of

the Bankruptcy Code that included a lender "enhancement fee"). Moreover, such fees are often

permitted where the associated financing is, in the debtor's business judgment, beneficial to the

debtors' estates. See In re Aleris Int'l Inc., No. 09-10478 (Bankr. D. Del. Mar. 18, 2009)

39

(approving a 3.5% front-end net adjustment against each lender's initial commitment); In re Dura Auto. Sys., Inc., No. 06-11202 (Bankr. D. Del. Jan. 30, 2008) (approving a 2.5% fee related to refinancing and extending a postpetition financing facility); see also In re Great Atl. & Pac. Tea Co., No. 10 24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3% letter of credit fee); In re InSight Health Services Holdings Com., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5% DIP closing fee).

## REQUEST FOR USE OF CASH COLLATERAL

65.     In connection with their need for debtor-in-possession financing, the Debtors also require the use of Cash Collateral.  Bankruptcy Code section 363(c)(2) provides that the Debtors may not use, sell, or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Prepetition Secured Parties are deemed to have consented to the Debtors' use of Cash Collateral under the DIP Credit Agreement by virtue of paragraph 12 of the Interim Order and the other provisions of the DIP Credit Agreement and Intercreditor Agreement.  Based on the foregoing, the Debtors respectfully request that the Court authorize the Debtors to use the Cash Collateral in accordance with the terms set forth in the Interim and Final Orders.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

66.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition.  The proposed Interim Order contemplates the modification of the automatic stay (to the extent applicable), to the extent necessary to permit the (a) Debtors and (b) DIP Agent to implement the terms of the Interim Order.  Stay modification provisions of this type are standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Debtors

40

respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and DIP Credit Agreement.

## GOOD FAITH

67.     The terms and conditions of the DIP Credit Facility and the use of Cash Collateral are fair and reasonable and were negotiated by the parties in good faith and at arms' length. Therefore, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Credit Facility, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR HEARING AND AUTHORITY TO
## MAKE INTERIM BORROWINGS UNDER THE DIP CREDIT FACILITY

68.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an interim hearing and authorize the Debtors use of Cash Collateral in order to (a) maintain and finance the ongoing operations of the Debtors, and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest.

69.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Fed. R. Bankr. P. 4001(c). Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Simasko, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); see also In re Ames Dep't Stores, 115 B.R. at 38. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent disruption

41

of the debtor's business, and the debtor is entitled to borrow those amounts that it believes

prudent in the operation of its business.  See, e.g., In re Simasko, 47 B.R. at 449; In re Ames

Dep't Stores, 115 B.R. at 36.

70.    Pursuant to Bankruptcy Rule 4001(c), the Debtors respectfully request that the

Court conduct a preliminary hearing on the Motion and authorize the Debtors from the entry of

the Interim Order until the Final Hearing to obtain access to the $70 million available upon entry

of the Interim Order under the terms contained in the DIP Credit Agreement and the Interim

Order and to utilize Cash Collateral.

## ESTABLISHING NOTICE PROCEDURES AND SCHEDULING FINAL HEARING

71.    The Debtors respectfully request that the Court schedule the Final Hearing and

authorize them to serve the Motion and the signed Interim Order, which fixes the time, date and

manner for the filing of objections, on (a) the United States Trustee for Region 3; (b) the Internal

Revenue Service; (c) all relevant state and local taxing authorities; (d) the United States Attorney

General; (e) the Securities Exchange Commission; (f) the parties listed in the consolidated list of

thirty (30) largest unsecured creditors filed by the Debtors in the chapter 11 cases (collectively,

the "Top 30 Creditors"); (g) counsel to the DIP Agent and the Prepetition ABL Agent;

(h) counsel to Standard General, L.P.; (i) counsel to the Committee of Lead Lenders; (j) all

entities known or reasonably believed to have asserted a security interest or lien against the

Debtors; (k) all parties having filed requests for notice in the Cases; and (l) all parties entitled to

notice pursuant to Local Rule 9013-1(m).

## NOTICE

72.    Notice of this motion will be provided to:  (a) the United States Trustee for

Region 3, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn:  Jane

Leamy, Esq.; (b) the Internal Revenue Service, Centralized Insolvency Operations, 11601

Roosevelt Boulevard, Mail Drop N781, Philadelphia, Pennsylvania 19255; (c) all relevant state and local taxing authorities; (d) the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530; (e) the Securities Exchange Commission, Attn: General Counsel, 100 F Street NE, Washington, DC 20549; (f) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in the Cases (collectively, the "Top 30 Creditors"); (g) counsel to the DIP Agent and the Prepetition ABL Agent, Covington & Burling LLP, 620 Eighth Avenue, New York, New York 10018, Attn: Ronald Hewitt, Esq.; (h) counsel to Standard General, L.P., Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, Attn: M. Natasha Labovitz, Esq.; (i) counsel to the Committee of Lead Lenders, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005, Attn: Gerard Uzzi and Bradley Scott Friedman, and Fox Rothschild LLP, Wilmington, 919 North Market Street, Suite 300, P.O. Box 2323, Wilmington, Delaware 19899-2323, Attn: Jeffrey M. Schlerf, Esq.; (j) all entities known or reasonably believed to have asserted a security interest or lien against the Debtors; (k) all parties having filed requests for notice in the Cases; and (*l*) all parties entitled to notice pursuant to Local Rule 9013-1(m) (the parties set forth in the preceding clauses (a) through (*l*), collectively, the "Notice Parties"). In light of the nature of the relief requested, the Debtors submit that not further notice is necessary.

## NO PRIOR REQUEST

73.    No prior request for the relief sought herein has been made to this Court or any other court.

DOCS_DE:202226.1 03636/001

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order substantially in the form attached hereto as Exhibit 1, granting: (a) the relief requested herein on an interim basis; (b) scheduling the Final Hearing; and (c) such other and further relief to the Debtors as the Court may deem proper.

Respectfully submitted,
Dated:  October 5, 2015

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
Email:       ljones@pszjlaw.com
                 joneill@pszjlaw.com
                 jmulvihill@pszjlaw.com

and

JONES DAY
Richard L. Wynne (CA Bar No. 149504)
Erin N. Brady (CA Bar No. 215038)
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539
Email:         rlwynne@jonesday.com
                  enbrady@jonesday.com

and

Scott J. Greenberg (NY Bar No. SG-2881)
Michael J. Cohen (NY Bar No. MC-7808)
222 East 41st Street
New York, NY 10017
Telephone:    (212) 326-3939
Facsimile:    (212) 755-7306
Email:         sgreenberg@jonesday.com

*Co-Counsel for the Debtors and Debtors in Possession*

44