IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

————————————————————————— )
                                )
In re:                          ) Chapter 11
                                )
AMERICAN APPAREL, INC., *et al.,* ) Case No. 15-12055 (CSS)
                                )
              Debtors.          ) (Jointly Administered)
                                )
                                ) Re:  Docket Nos. 6, 77
                                )
                                ) Obj. Deadline: 10/26/15, 4:00 p.m.
                                ) Hearing Date: 11/2/15, 10:00 a.m.
————————————————————————— )

## OBJECTION OF CERTAIN UTILITY COMPANIES TO THE MOTION FOR INTERIM AND FINAL ORDERS ESTABLISHING ADEQUATE ASSURANCE PROCEDURES WITH RESPECT TO DEBTORS' UTILITY PROVIDERS

Consolidated Edison Company of New York, Inc. ("Con Ed"), Georgia Power Company ("Georgia Power"), Public Service Electric and Gas Company ("PSE&G"), San Diego Gas & Electric Company ("SDG&E") and Southern California Edison Company ("SCE") (collectively, the "Utilities"), by counsel, hereby object to the *Motion For Interim and Final Orders Establishing Adequate Assurance Procedures With Respect To Debtors' Utility Providers* (the "Utility Motion"), and set forth the following:

### Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amount

1

of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the Debtors to shift their statutory burden.

With respect to Section 366(c) of the Bankruptcy Code, it specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account. Despite the foregoing, the Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing $500,000 that supposedly reflects two-weeks of the Debtors' estimated monthly utility charges, net of any prepetition deposits, letters of credits or surety bonds (the "Bank Account").

Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment, the Court should reject it as an insufficient form of adequate assurance of payment for the following reasons:

(i) Unlike all of the identified and permissible forms of adequate assurance of payment listed in Section 366(c)(1)(A), the Bank Account is not something held by the Utilities, so the Utilities have no control over: (A) when the Bank Account will be terminated; or (B) If the Bank Account will remain in place if there is an event of a default by the Debtors on their use of DIP financing (this is in complete contrast to the Carve-Out received by the Debtors' professionals in the DIP Financing pleadings, which remains in place even if there is an event of default);

(ii) In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and

2

possibly litigate the demand if the Debtors refuse to honor a disbursement request;

(iii) It is underfunded from the outset because the Utilities issue monthly bills; and

(iv) The Debtors are not required to replenish the Bank Account following pay-outs.

The post-petition deposits sought by the Utilities in these jointly-administered cases are the following two-month deposits that the Utilities are authorized to obtain from all of the customers in their service territories pursuant to applicable state law:  (A) Con Ed - $49,760; (B) Georgia Power - $5,100; (C) PSE&G - $11,798; (D) SDG&E - $16,288; and (E) SCE - $409,969.  Based on all the foregoing, this Court should deny the Utility Motion because the amounts of the post-petition deposit requests of the Utilities are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.    On October 5, 2015 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.    The Debtors' chapter 11 bankruptcy cases are being jointly administered.

3

### The Utility Motion

3.    On the Petition Date, the Debtors filed the Utility Motion.

4.    Proper notice of the Utility Motion was not provided to the Utilities prior to the Court entering the *Interim Order Establishing Adequate Assurance Procedures With Respect To the Debtors' Utility Providers* (the "Interim Utility Order") on October 6, 2015.

5.    Because the Utilities were not properly or timely served with the Utility Motion and the Debtors never attempted to contact the Utilities regarding their adequate assurance requests prior to the filing of the Utility Motion, the Utilities had no opportunity to respond to the Utility Motion or otherwise be heard at the *ex parte* hearing on the Utility Motion that took place on October 6, 2015, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by the Debtors) requires that there be "notice and a hearing" to the Utilities.

6.    In the Utility Motion, the Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate assurance of payment, which is the Bank Account containing $500,000 that supposedly represents two-weeks of the Debtors' estimated monthly utility charges.  Utility Motion at ¶ 7.  The foregoing proposal

4

is unacceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

7. The Interim Utility Order provides that $600,000 shall be placed into the Bank Account which is one-half of the Debtors' estimated average monthly utility charges.  Interim Utility Order at ¶ 4; Utility Motion at ¶ 4.

8. The Interim Utility Order and proposed Final Utility Order provide that any payment to be made therein would be subject to the requirements imposed on the Debtors under any approved order regarding post-petition financing.  Interim Utility Order at ¶ 2; proposed Final Utility Order at ¶ 2.  It is not clear if the Debtors and their secured lenders are trying to subordinate all of the post-petition payments made to the Utilities to the secured lenders' liens or just the proposed amount contained in the Bank Account. At a minimum, all post-petition payments made by the Debtors to the Utilities, including any post-petition security, should not be subordinated to the lenders' liens or subject to subsequent disgorgement by the secured lenders.  If the Debtors want the Utilities to provide

5

post-petition utility goods/services, any and all post-petition payments made to the Utilities should be free and clear of any and all liens, otherwise all of the relief sought in the Utility Motion is nothing more than a subterfuge.

9.    The Utility Motion does not address why the Bank Account would be undercapitalized at only a supposed two-week deposit amount when the Debtors know that the Utilities are required by applicable state laws, regulations or tariffs to bill the Debtors monthly. Moreover, the Utilities presume that the Debtors want the Utilities to continue to bill them monthly in arrears pursuant to the billing cycles established by applicable state law.

10.    Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that the Bank Account "together with the Debtors' ability to pay for future utility services in the ordinary course of business . . . constitutes sufficient adequate assurance of future payment to the Utility Companies to satisfy the requirements of section 366 of the Bankruptcy Code." Utility Motion at ¶ 7.

## Facts Regarding the Debtors

11.    The Debtors and their non-debtor foreign affiliates

6

("American Apparel" or the "Company") are the largest apparel manufacturer in North America. *Declaration of Mark Weinsten In Support of First Day Pleadings* ("First Day Declaration") at ¶ 7.

12.  American Apparel has struggled in recent years. Between 2009 and 2014, the Company lost more than $300 million. First Day Declaration at ¶ 8.

### The Debtors' Prepetition Indebtedness

13.  As of the Petition Date, the Debtors had outstanding long term debt in the aggregate principal amount of approximately $295 million, consisting of:  (a) $60 million of debt under an asset-based revolving credit facility; (b) $209.9 million of secured notes due April 15, 2020; and (c) a $9.9 million unsecured note due April 15, 2021.  First Day Declaration at ¶ 27.

14.  For the three-month period ending June 30, 2015, the Company's net sales totaled approximately $124 million (representing a 17% decrease compared with the same period in 2014), resulting in a net loss totaling approximately $19 million and adjusted EBITDA of approximately $4.1 million (compared with $15.9 million of adjusted EBITDA for the same period in 2014). First Day Declaration at ¶ 74.

### The Disclosure Statement And Plan

15.  On the Petition Date, the Debtors filed the Plan.

16.  On October 15, 2015, the Debtors filed a Disclosure

Statement.

17.   On October 15, 2015, the Debtors also filed the
*Debtors' Motion For An Order (I) Approving Disclosure Statement,*
*(II) Approving The Form And Manner Of Service Of Disclosure*
*Statement Notice, (III) Establishing Procedures For Solicitation*
*And Tabulation Of Votes To Accept Or Reject Plan Of*
*Reorganization and (IV) Scheduling Hearing On Confirmation Of*
*Plan Of Reorganization* [Docket No. 132] seeking to establish the
following hearing dates and deadlines:

> A.   November 12, 2015 – Disclosure Statement
> objection deadline;

> B.   November 19, 2015 – Disclosure Statement
> hearing;

> C.   January 7, 2015 – Voting and objection
> deadline for the Plan; and

> D.   January 20, 2015 – Confirmation Hearing.

18.   The Plan contemplates:  (a) the conversion of over $200
million of Senior Notes into equity interests of the reorganized
American Apparel; (b) the infusion into the reorganized American
Apparel of up to $40 million in committed exit capital from the
Supporting Parties in the form of a minimum of $10 million of
equity capital and up to an additional $30 million under an exit
credit facility; and (c) distributions to general unsecured

8

creditors in the form of units in a litigation trust and, if the Plan is accepted by such class of creditors, a $1 million cash payment. First Day Declaration at ¶ 82.

## The Restructuring Support Agreement

19.   On October 4, 2015, the Debtors entered into the Restructuring Support Agreement with the Prepetition Secured Lenders and holders of over 95% of the Senior Notes (collectively, the "Committee of Lead Lenders") to be implemented through the Plan.  Through the Restructuring Support Agreement, the DIP Lenders committed to provide the Debtors with a $90 million DIP Credit Facility, and convert the DIP Credit Facility into an Exit Term Loan and provide an additional $40 million of liquidity to fund exit costs and capitalize the business.  First Day Declaration at ¶ 80.

20.   The Restructuring Support Agreement provides that the DIP Credit Facility will terminate on the earlier of (a) April 5, 2016, (b) the date on which the Court orders the Chapter 11 cases converted to Chapter 7, (c) the acceleration of loans and termination of commitments under the DIP Credit Agreement, (d) the sale of substantially all of the Debtors' assets, and consummation of a confirmed plan.  Restructuring Support Agreement at ¶ 81.

## The Debtors' Post-Petition Financing

21.   On the Petition Date, the Debtors filed the *Motion For*

9

*Entry of Interim and Final Orders (I) Authorizing the Debtors To*
*(A) Obtain Postpetition Senior Secured Superpriority Financing*
*Pursuant To 11 U.S.C. §§ 361, 362, 363(c), 363€, 364(c),*
*364(d)(1), 364(e) and 507 and (B) Utilize Cash Collateral, (II)*
*Authorizing the Repayment In Full of Amounts Owed Unser the*
*Prepetition ABL Credit Facility, (III) Granting Priming Liens,*
*Priority Liens and Superpriority Claims To the DIP Lenders, (IV)*
*Granting Adequate Protection To Certain Prepetition Secured*
*Parties, (V) Scheduling a Final Hearing Pursuant To Bankruptcy*
*Rules 4001(b) and (c) and (VI) Granting Related Relief* (the
"Financing Motion").

22.   Through the Financing Motion, the Debtors are seeking
approval for senior secured post-petition financing in an
aggregate principal amount of approximately $90 million in the
form of a delayed draw term loan comprised of (i) up to $30
million in a new money loan, and (ii) a roll-up of the
Prepetition ABL Facility of approximately $60 million (together,
the "DIP Loans").   Financing Motion at page 13.

23.   The Debtors also sought a carve-out for the payment of
fees and expenses of the Debtor's professionals incurred after a
Carve-Out Trigger Date of up to $2 million, plus an amount equal
to the aggregate unpaid professional fees, costs and expenses
incurred at any time before the Carve-Out Trigger Date (the
"Carve-Out").   Financing Motion at page 14.

10

24.  The Financing Motion further provides that cash collateral and proceeds of the DIP financing may be used to operate the Debtors' business to the extent permitted by the Budget through November 13, 2015, attached as Exhibit 2 to the Financing Motion (the "Budget").  It is unclear from the Budget whether the Debtor has budgeted sufficient sums for the payment of their post-petition utility expenses.

25.  On October 6, 2015, the Court entered the *Interim Order Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing Pursuant To 11 U.S.C. §§ 361, 362, 363(c), 363€, 364(c), 364(d)(1), 364(e) and 507 and (B) Utilize Cash Collateral, (II) Authorizing the Repayment In Full of Amounts Owed Unser the Prepetition ABL Credit Facility, (III) Granting Priming Liens, Priority Liens and Superpriority Claims To the DIP Lenders, (IV) Granting Adequate Protection To Certain Prepetition Secured Parties, (V) Scheduling a Final Hearing Pursuant To Bankruptcy Rules 4001(b) and (c) and (VI) Granting Related Relief* (the "Interim Financing Order"). The Interim Financing Order authorized the Debtors to borrower up to $10 million on an interim basis, plus any amounts necessary to effect the Prepetition ABL Refinancing.  Interim Financing Order at page 15.  The Interim Financing Order also approved the Carve-Out. Interim Financing Order at pages 26-27.

SL1 1388543v1 000000.00000

### The Debtors' Critical Vendor Motion

26.   On the Petition Date, the Debtors filed the *Motion For Interim and Final Orders Authorizing the Debtors To Pay Prepetition Claims of Certain Unsecured Critical Vendors* (the "Critical Vendor Motion").  Through the Critical Vendor Motion, the Debtors sought authority to pay the prepetition claims supposed critical vendors not to exceed $4 million on an interim basis, and $5 million on a final basis.  Critical Vendor Motion at ¶ 9.  Despite the fact that the Debtors claim that uninterrupted service from their utility companies is essential to the Debtors' ongoing operations and to preserving the value for all interested stakeholders (Utility Motion at ¶ 5), the Debtors do not consider the Utilities and other utility companies to be "critical vendors."

27.   On October 6, 2015, the Court entered the *Interim Order Granting Motion for Order Authorizing the Debtors To Pay Prepetition Claims of Certain Critical Vendors* (the "Interim Critical Vendor Order").  The Interim Critical Vendor Order authorized the Debtors' to pay supposed critical vendor claims in an aggregate amount of up to $4 million.  Interim Critical Vendor Order at page 2.

### Facts Concerning the Utilities

28.   Each of the Utilities provided the Debtors with prepetition utility goods and/or services and has continued to

12

provide the Debtors with utility goods and/or services since the Petition Date.

29.   Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges.  Once a bill is issued, the Debtors have approximately 20 to 30 days to pay the applicable bill. If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account. If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or its service will be disconnected.  Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

30.   In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' web site links to the tariffs and/or state laws, regulations and/or ordinances are as follows:

13

Con Ed:
    Electric - http://www.coned.com/rates/elec-sched1.asp
    Gas - http://www.coned.com/rates/gas_main.asp

Georgia Power:
http://www.georgiapower.com/pricing/gpc_rates.asp

PSE&G:
    Electric -
http://www.pseg.com/family/pseandg/tariffs/gas/pdf/gas_tariff.pdf
    Gas -
http://www.pseg.com/family/pseandg/tariffs/electric/pdf/electric_tariff.pdf

SDG&E:
http://www.sdge.com/rates-regulations/current-and-effective-tariffs/current-and-effective-tariffs

SCE:
http://www.sce.com/AboutSCE/Regulatory/tariffbooks/rules.htm

31.    Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' post-petition deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
| --- | --- | --- | --- |
| Con Ed | 24 | $13,999.92 | $49,760 (2-month) |
| Georgia Power | 5 | $3,742.35 | $5,100 (2-month) |
| PSE&G | 4 | $5,502.89 | $11,798 (2-month) |
| SDG&E | 3 | n/a | $16,288 (2-month) |
| SCE | 19 | $276,550 | $409,969 (2-month) |

32.    Con Ed held prepetition deposits totaling $47,535 that

14

it recouped against prepetition debt pursuant to Section
366(c)(4) of the Bankruptcy Code.  Con Ed has a deposit credit of
$32,403 that can be applied to Con Ed's post-petition deposit
request.

33.  Georgia Power held prepetition deposits totaling
$3,259.78 that it recouped against prepetition debt pursuant to
Section 366(c)(4) of the Bankruptcy Code.

34.  PSE&G held prepetition deposits totaling $4,466 that it
will recoup against prepetition debt pursuant to Section
366(c)(4) of the Bankruptcy Code.

35.  SCE holds a prepetition deposit of $428,205 that it
will recoup against prepetition debt pursuant to Section
366(c)(4) of the Bankruptcy Code.  Any remaining prepetition
deposit after recoupment can be applied to SCE's post-petition
deposit request.

## Discussion

### A.   THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a
> case filed under chapter 11, a utility referred to in
> subsection (a) may alter, refuse, or discontinue utility
> service, if during the 30-day period beginning on the
> date of the filing of the petition, the utility does not
> receive from the debtor or the trustee adequate assurance
> of payment for utility service that is satisfactory to
> the utility;

15

(3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of

16

payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors.  Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities.

> **1.    The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

(i)   Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

(ii)  In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a Disbursement Request.

(iii) It is underfunded from the outset because the Utilities issue monthly bills and by the time a default notice is

17

issued the Debtors will have used at least 45 to 60 days of commodity or service.

(iv) The Debtors are not required to replenish the Bank Account following pay-outs.

(v) The Bank Account, unlike the Professionals Carve-Out, may be subject to the Lender's liens.

Accordingly, the Court should not approve the Bank Account as adequate assurance to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

**2. The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amount of the Utilities' requests for adequate assurance of payment. Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified. *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof). However, the Debtors do not provide the Court with any evidence or factually supported documentation to explain why the amount of the Utilities' adequate assurance requests should be modified. Accordingly, the Court should

18

deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

**B. THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases. Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*,

19

62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

Although the billing cycles for each of the Utilities are slightly different, they all bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month. Each Utility then provides the Debtors with a certain period of time to pay the bill, the timing of which is set forth in applicable state laws, tariffs, and/or regulations.

Based on the foregoing state-mandated billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months. Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of 45 to 60 days based on their billing cycles. Furthermore, the amounts of the Utilities' deposit requests are the amounts that the applicable public service commission, which is a neutral third-party entity, or applicable contract, permits the Utilities to request from their customers. The Utilities are not taking the position that the deposits that they are entitled to obtain under applicable state law are binding on this Court, but, instead are introducing those

20

amounts as evidence of amounts that their regulatory entities permit them to request from their customers.

Finally, in contrast to the improper treatment proposed to the Debtors' Utilities, the Debtors have made certain supposed "critical vendors" and post-petition professionals are favored creditors over the Utilities by ensuring (i) the payment Critical Vendor Claims up to an aggregate of $5 million on a final basis, and that (ii) the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition DIP Financing default, by seeking and obtaining the Carve-Out for the payment of their fees/expenses incurred after a Carve-Out Trigger Date of up to $2 million, plus an amount equal to the aggregate unpaid professional fees, costs and expenses incurred at any time before the Carve-Out Trigger Date.  Therefore, despite the fact that the Utilities continue to provide the Debtors with crucial post-petition utility goods/services on the same generous terms that were provided prepetition, with the possibility of non-payment, the Debtors are seeking to deprive the Utilities of adequate security for which they are entitled to for continuing to provide the Debtors with post-petition utility goods/services. Furthermore, based upon the current status of this matter, the Utilities may have to provide post-petition utility goods/services to the Debtors for approximately six months. Against this factual background, it is reasonable for the

SL1 1388543v1 000000.00000

Utilities to seek and be awarded the full security they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.   Denying the Utility Motion as to the Utilities;

2.   Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to the Utilities, which are the form and amounts requested herein; and

3.   Providing such other and further relief as the Court deems just and appropriate.

Dated:  October 23, 2015          STEVENS & LEE, P.C.


                                  /s/ John D. Demmy
                                  John D. Demmy (Bar No. 2802)
                                  919 North Market Street, Suite 1300
                                  Wilmington, Delaware 19801
                                  Telephone:  (302) 425-3308
                                  E-mail:   jdd@stevenslee.com

                                  and

                                  Russell R. Johnson III
                                  John M. Craig
                                  Law Firm of Russell R. Johnson III, PLC
                                  2258 Wheatlands Drive
                                  Manakin-Sabot, Virginia  23103
                                  Telephone: (804) 749-8861
                                  Facsimile: (804) 749-8862
                                  E-mail:  russj4478@aol.com

                                  *Counsel for Consolidated Edison Company of New York, Inc., Georgia Power Company, Public Service Electric and Gas Company, San Diego Gas & Electric Company and Southern California Edison Company*

                                  22